## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THE UNITED STATES OF AMERICA *ex rel.* )
KATY KENNEDY and FRANK A. MATOS, )
THE STATE OF ILLINOIS *ex rel.* )
KATY KENNEDY and FRANK A. MATOS, and )
KATY KENNEDY, individually )
  )
  ) 03C- 2750
     Plaintiffs, )
  ) COMPLAINT FILED IN CAMERA
v. ) AND UNDER SEAL
  ) JURY TRIAL DEMANDED
AVENTIS PHARMACEUTICALS, INC., )
and PHARMANETICS, INC. )
  )
     Defendants. )

*FILED*

*MAY 14 2004*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

### NOTICE OF FILING

**To:** **See service list attached.**

PLEASE TAKE NOTICE THAT on May 14, 2004, I caused to be filed with the Clerk of the US District Court, Northern District of Illinois, Eastern Division, **PLAINTIFFS' AMENDED COMPLAINT**, a copy of which is attached hereto and served upon you.

_____
Attorney for Plaintiff

Michael C. Rosenblat
MICHAEL C. ROSENBLAT, P.C.
2400 Ravine Way, Suite 200
Glenview, Illinois 60025
847-657-0006

### CERTIFICATE OF SERVICE

    I, Michael C. Rosenblat, an attorney, certify that I caused copies of the foregoing **Plaintiffs' Amended Complaint**, to be served on each party to whom it is directed by hand delivery on the 14th day of May 2004.

_____
Michael C. Rosenblat

## SERVICE LIST

*United States, ex rel Kennedy v. Aventis,* 03C-2750

Lara S. Kaufmann
Assistant United States Attorney
219 S. Dearborn Street, Fifth Floor
Chicago, IL 60604

Patrick Keenan
Deputy Chief, Medicaid Fraud Unit
Illinois Attorney General's Office
100 West Randolph Street, 12th Floor
Chicago, IL 60601

Lisa M. Noller
Assistant United States Attorney
219 S. Dearborn Street, Fifth Floor
Chicago, IL 60604

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* ) | |
| KATY KENNEDY and FRANK A. MATOS, ) | |
| THE STATE OF ILLINOIS *ex rel.* ) | |
| KATY KENNEDY and FRANK A. MATOS, and ) | |
| KATY KENNEDY, individually ) | |
| ) | 03C- 2750 |
| Plaintiffs, ) | |
| ) | COMPLAINT FILED IN CAMERA |
| v. ) | AND UNDER SEAL |
| ) | JURY TRIAL DEMANDED |
| AVENTIS PHARMACEUTICALS, INC., ) | |
| and PHARMANETICS, INC. ) | |
| ) | |
| ) | |
| Defendants. ) | |

*FILED*
*MAY 1 4 2004*
*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

## AMENDED COMPLAINT

Plaintiffs complain and state as follows:

## I. NATURE OF THE ACTION

1.      This is an action to recover damages and civil penalties on behalf of the United

States of America under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended ("the

FCA"), and a related state false claims act, the Illinois Whistleblower Reward and Protection

Act, 740 ILCS §§ 175/1 *et seq.*  (Hereinafter the FCA and the Illinois Whistleblower Reward and

Protection Act will be referred to as the "FCAs."  The United States and the State of Illinois are

hereinafter referred to as the "Governments.")  This is also an action to recover damages on

behalf of Katy Kennedy, under the whistleblower protection provisions of the FCAs, and the

Illinois Whistleblower Act, 740 ILCS §§ 171/1 *et seq.*,  against Defendant Aventis

Pharmaceuticals, Inc.

1

2.     The FCAs causes of action arise from false statements, records, and claims by Defendants Aventis Pharmaceuticals, Inc. and PharmaNetics, Inc. ("Defendants") and/or their agents, employees and co-conspirators in violation of the FCAs. These violations involve false or fraudulent claims for payment or approval presented, or caused to be presented, and/or false records Defendants have made, used, or caused to be made or used, in order to get false or fraudulent claims paid or approved by the Governments, and/or conspired to defraud the Governments by getting false or fraudulent claims allowed or paid.

3.     These claims are based on Defendants' knowing dissemination of off-label information relating to the prescription drug Lovenox® ("Lovenox") which is the brand name of the generic drug enoxaparin. Lovenox is an anticoagulant and is prescribed by physicians almost exclusively for inpatient hospital use. "Off-label" promotion is any communication of information relating to a product not contained in the Federal Drug Administration's ("FDA") approved labeling. The FDA's approved labeling is the products package insert.

4.     In August 2000, Defendants entered into an agreement under which Defendant PharmaNetics would develop a test to detect the anticoagulant effects of Aventis Pharmaceutical's Lovenox on patients with unstable angina. The purpose of this test was to overcome objections from interventional cardiologists, who have patients who will transition to the catherization laboratory, and who were unwilling to perform interventional procedures on patients with unstable angina who were receiving Lovenox. Lovenox does not have an FDA approved application for use in the catherization laboratory where patients with unstable angina would be treated with interventional procedures. Defendants conspired to create a new marketing tool designed specifically to market Lovenox for an unapproved use.

5.     Simply put, Defendants' off-label promotion of Lovenox caused physicians to prescribe Lovenox for off-label uses. Defendants' knowing off-label promotion of Lovenox

2

caused physicians to prescribe Lovenox under the erroneous belief that Lovenox was indicated for those off-label uses. This in turn caused physicians and hospitals to submit false claims to the Governments. The off-label use of a particular drug is not covered under federal or state health plans unless its use is supported by certain criteria. In addition, based on information and belief, Defendants' off-label promotion of Lovenox has created a threat to public health and safety, and has resulted in injuries and patient deaths. In fact, Dr. Ben Gladden, Aventis Scientific Manager, has acknowledged bleeds, patient deaths, and inappropriate dosing.

 6. Aventis Pharmaceuticals also offered things of value to physicians and others to induce health care program business for Lovenox. These items of value included tickets to sporting events, programs without educational value, grants and other items of value, for physicians and others who were in positions to prescribe or influence prescriptions for Lovenox.

## II. PARTIES

 7. Relator, KATY KENNEDY ("Kennedy" or "Relator") is a resident of Des Plaines, Illinois and was an employee and sales representative of Defendant Aventis Pharmaceuticals, Inc. ("Aventis") from January 2002 to February 2004. Ms. Kennedy was employed by Aventis as a senior sales associate for the prescription drug Lovenox for two years. Ms. Kennedy has had employment in the pharmaceutical industry as a pharmaceutical sales representative for six years. Ms. Kennedy brings this action for violations of the FCAs as set forth herein, upon personal knowledge as to herself and her own acts and upon information and belief as to all other matters, on behalf of herself and the Governments under their respective *qui tam* provisions. Ms. Kennedy also brings this action for herself under the whistleblower protection provisions of the FCAs, and the Illinois Whistleblower Act.

 8. Relator, FRANK A. MATOS ("Matos" or "Relator") is a resident of Hoffman Estates, Illinois and an employee and senior specialty sales associate of Aventis. Mr. Matos has

been employed as a pharmaceutical sales representative for twenty-one years and has been employed by Aventis since March 1998. Mr. Matos was first assigned as a Lovenox sales representative in 2001, along with his other responsibilities, and became a full-time Lovenox sales representative in January 2002. Mr. Matos brings this action for violations of the FCAs as set forth herein, upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters, on behalf of himself and the Governments under their respective *qui tam* provisions.

9.     Defendant AVENTIS PHARMACEUTICALS, INC. is a Delaware corporation. Aventis' principal place of business is located at 300 Somerset Corp Blvd., Bridgewater, New Jersey. Aventis is the manufacturer of Lovenox. Aventis' U.S. sales of Lovenox were $958 million in 2002 and $1.2 billion in 2003. Lovenox is Defendant's second largest selling drug after Allegra®.

10.     Defendant PHARMANETICS, INC. ("PharmaNetics") is a North Carolina corporation. PharmaNetics' principal place of business is in Morrisville, North Carolina. PharmaNetics is a leading medical diagnostic company, which develops, among other tests, diagnostics to assess blood clot formation and dissolution.

## III.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

12.     This Court has supplemental jurisdiction over the *qui tam* Relators' state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case and controversy under Article III of the United States Constitution.

4

This Court also has jurisdiction over the state's claims pursuant to 31 U.S.C. § 3732(b), as the state's claims arise from the same transactions and occurrences as the federal action.

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Defendants transact business in the United States. Defendants can be found in, reside in, and/or transact or have transacted business related to the allegations in this complaint within the Northern District of Illinois.

14.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), as Defendants can be found in, reside in, and/or transact business in the Northern District of Illinois.

15.     This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

16.     To the extent that there has been a public disclosure unknown to Relators, Relators are an original source under 31 U.S.C. §3730 (e)(4), 740 ILCS 175/4(e)(4), and other state whistleblower statutes. Relators have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the Governments before filing an action under these sections.

17.     Relators Kennedy and Matos have served on the Attorney General of the United States, the United States Attorney for the Northern District of Illinois, and the Illinois Attorney General, substantially all  material evidence and information they possess in accordance with the provisions of 31 U.S.C. §3730(b)(2), and 740 ILCS 175/4(b)(2).

## IV.    THE FEDERAL FALSE CLAIMS ACT

18.     The False Claims Act provides, in pertinent part that:

5

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $ 10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person,

\* \* \*

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting. (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.
(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal.

31 U.S.C. § 3730.

19. The False Claims Act's whistleblower protection provision provides in pertinent part that:

6

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h)

## V.    THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

20.    The Illinois Whistleblower Reward and Protection Act provides, in pertinent part:

(a) Liability for certain acts. Any person who:
(1) knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid;
                                        * * *
is liable to the State for a civil penalty of not less than $ 5,000 and not more than $ 10,000, plus 3 times the amount of damages which the State sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.
(b) Knowing and knowingly defined. As used in this Section, the terms "knowing" and "knowingly" mean that a person, with respect to information:
(1) has actual knowledge of the information;
(2) acts in deliberate ignorance of the truth or falsity of the information; or
(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

§ 740 ILCS 175/3

(b) Actions by private persons. (1) A person may bring a civil action for a violation of Section 3 [740 ILCS 175/3] for the person and for the State. The action shall be brought in the name of the State. . . .

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the State. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. . . .

(3) The State may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. . . .

§ 740 ILCS 175/4

21. The Illinois Whistleblower Reward and Protection Act's whistleblower protection

provision provides, in pertinent part:

g) Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this Section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate circuit court for the relief provided in this subsection (g).

740 ILCS 175/4(g)

## VI. THE DEFENDANTS' SCHEME TO DEFRAUD

22. Lovenox is approved by the FDA for seven indications. Those indications are:

(1) Prophylaxis of deep vein thrombosis, which may lead to pulmonary embolism, in patients

undergoing abdominal surgery who are at risk for thromboemobolic complications; (2)

Prophylaxis of deep vein thrombosis, which may lead to pulmonary embolism, in patients

8

undergoing hip replacement surgery, during or following hospitalization; (3) Prophylaxis of deep
vein thrombosis, which may lead to pulmonary embolism, in patients undergoing knee
replacement surgery; (4) Prophylaxis of deep vein thrombosis, which may lead to pulmonary
embolism, in medical patients who are at risk for thromboemobolic complications due to
severely restricted mobility during acute illness; (5) Prophylaxis of ischemic complications of
unstable angina and non-Q-wave myocardial infraction, when concurrently administered with
aspirin; (6) Inpatient treatment of acute deep vein thrombosis with or without pulmonary
embolism, when administered in conjunction with warfarin sodium; and (7) the outpatient
treatment of acute deep vein thrombosis without pulmonary embolism when administered in
conjunction with warfarin sodium.

23.     Any marketing by Defendants for the use of Lovenox for indications other than
the seven FDA approved uses is prohibited. Defendants train and encourage, both overtly and
covertly, its Lovenox and ENOX sales representatives to market Lovenox for off-label uses.
Off-label promotion is strictly prohibited by the FDA. Off-label promotion includes a
pharmaceutical sales representative telling a physician or other customer about an unapproved
use, referring to a research paper, and emphasizing a particular point by highlighting an approved
document. Joe Levato, Aventis District Manager stated, in April 2003 that 60% of Lovenox
sales were off-label.

## VII.     THE OFF-LABEL PROMOTION AND MARKETING OF LOVENOX

24.     Defendants engaged in a nationwide scheme to market Lovenox for off-label
uses. Defendants sent their sales associates out into the medical community with instructions to
market Lovenox for unapproved uses and to mislead physicians as to the approved uses of
Lovenox. Defendants made false statements which they knew were false, and would result in

9

false claims for off-label uses being submitted to Medicaid or other federal and state payors. Instances of such off-label marketing are stated below.

25.     On August 10, 2001, Relator Matos received a copy of an email concerning renal dosing for exonaparin, which was given to Alexian Brothers Medical Center, Elk Grove Village, Illinois. The FDA has not approved enoxaparin dosing guidelines for this patient population.

26.     In May 2002 Sheetal Bahel, District Manager for Chicago South Region, Aventis, instructed a subordinate to make a binder containing off-label information, information which sales representatives are prohibited from disseminating to physicians or hospitals. This binder was provided by Sheetal Bahel to the Lovenox sales associates in her district for the purpose of marketing Lovenox for off-label uses. The binder is divided into eight sections, (1) Trauma, (2) General Surgery, (3) Stroke, (4) Neurosurgery, (5) Spinal Cord Injuries, (6) Obstetrician/Gynecology/Pediatrics, (7) Heparin Induced Thrombocytopenia (HIT), and (8) Other. None of these eight conditions are indicated uses for Lovenox.

27.     On or about beginning May 2002 Relator Matos informed senior Aventis personnel, including Steve Kanovsky, Legal Department, Mailet Manassian, Human Resources, Michael Johnson, VP Human Resources, and Tony Rizzello, Director Human Resources concerning unapproved/off-label clinicals being distributed by Aventis. Unapproved cardiology studies were distributed at a meeting, held on May 29, 2002, in Oakbrook, Illinois. These unapproved/off-label clinicals included NICE 1, 2, 3, and 4, Interact, Entire-Timi 23, FRIC, and FRISC.

28.     In May 2002, a Lovenox dosing guideline booklet, paid for with Aventis funds, was made by Julie Fitzpatrick, Aventis, and given to Relator Kennedy. On February 4, 2003, Relator Kennedy visited Resurrection Hospital, Park Ridge, Illinois, where an assistant to the Pharmacy Director, showed Relator Kennedy approximately one hundred and fifty (150) of these

10

guides. The FDA has not approved Lovenox/Enoxaparin dosing guidelines for special patient populations as indicated in the booklet.

29.     Clinical workshop materials were distributed to the Lovenox sales force at the 2003 Lovenox National Sales Meeting held between January 13 and 16, 2003 in Hollywood, Florida. This National Sales Meeting was attended by approximately 700 Lovenox sales associates, 100 management associates, and several high-ranking Aventis personnel including Aventis company executives from France. The Clinical workshop materials that were distributed were divided by tabs. Under Tab A, "Cardiology Update," there is a discussion of the off-label use of Lovenox in the catherization laboratory using unapproved IV dosing; Under Tab B, there is a discussion of unapproved IV dosing of Lovenox; Under Tab C, "DVT Prophylaxis Update," there is a discussion of unapproved IV dosing for Lovenox.

30.     At the January 2003 National Sales Meeting the entire Lovenox national sales force was informed via a slide presentation that Lovenox is "Therapeutic within 30 minutes."

31.     On or about between March 3 and 7, 2003 Advanced Training was conducted at Northwestern Memorial Hospital, Chicago, during which a significant amount of time was spent in the cardiac catherization laboratory even though Lovenox is not indicated for such use.

32.     The Lovenox Clinical Reference Guide, was received by Relator Matos, on March 3, 2003, and was accompanied by a memorandum, from the Lovenox Brand Team, dated February 2003, which states "The Guide should provided you with a solid scientific platform upon which you can base your discussions with physicians." However, the information in the Guide is not for promotional use, is off-label, and may not be discussed by the sales associates with physicians.

33.     During ID Advanced Boot Camp, held on or about between March 21 and 22, 2002 Relator Matos was trained on the dissemination of unapproved information and participated

11

in role-playing, which encouraged the discussion of unapproved information to overcome physician's objections.

34.     A Lovenox Sales Booklet, *Cardiology Workshop Marketing Overview, January 2003*, states, "Lovenox® reaches therapeutic levels within...1/2 Hour." This booklet was given to the entire U.S. Lovenox sales force in mid to late May 2003. During a sales practice role-play, held on May 27, 2003 Neil Wolf, Director Lovenox Marketing, told Relators Kennedy and Matos, and two other sales associates, who were also participating in the role-play, that therapeutic levels are reached in 60-90 minutes, not within the 1/2 hour as stated in the Sales Booklet.

35.     The Lovenox sales team was also provided reprints of articles containing off-label indication for Lovenox. These include articles from *Orthopedics; Thomboprophylaxis and Neuraxial Anesthesia; Percutaneous Coronary Intervention After Subcutaneous Enoxaparin Pretreatment in Patients With Unstable Angina Pectoris; Clinical Cardiology Consensus Report, October 15, 2003; Cardiology Workshop Marketing Overview, January 2003; An Update on Heparins at the Beginning of the New Millennium; Formulary, LMWHs: Review of their Role for unstable angina/non Q-wave myocardial infraction, December 2002; Low-Molecular-Weight Heparins: Formulary Drug Class Review, Reprinted from September 2001, Pharmacy and Therapeutics; Enoxaparin, A Pharmacoeconomic Review of its Use in the Prevention and Treatment of Venous Thromboembolism and in Acute Coronary Syndromes; Hospital Medicine Consensus Reports; The Lancet, reprint August 25, 2001; Applying Scientific Criteria to Therapeutic Interchange: A balanced Analysis of Low-Molecular-Weight Heparins, Reprinted from the Journal of Thrombosis and Thrombolysis, May 2001; European Heart journal, reprinted from February 2002; American Heart Journal, October 2002; Circulation, Journal of*

12

*the American Heart Association, February 6, 2001.* All of these were given to Aventis' Lovenox sales associates to assist them in the selling of Lovenox for off-label indications.

## VIII. GRANTS

36. Aventis also encouraged, overtly or covertly, it Lovenox sales representatives to provide items of value to physicians and others in order to induce health care program business for Lovenox. These items of value included grants and other items of value for physicians, pharmacists and others who were in a position to influence the purchase of Lovenox. These acts violated the Anti-Kickback Act, 42 U.S.C. § 1320a-7b.

37. Aventis also paid excessive fees to speakers to encourage their continued use and or promotion of Lovenox for unapproved indications.

38. Ben Muoghalu, a pharmacist was paid $20,000 by Aventis over a five-day period in 2001 to give ten, one-hour talks. Mr. Muoghalu was paid to speak on the prophylaxis of ischemic complications of unstable angina. On information and belief, Mr. Muoghalu was paid in order to induce him to keep Lovenox on hospital formularies that are under his control. On October 22, 2001, Mr. Muoghalu was paid to speak at 8 am in Elgin, Illinois, at 12 p.m. in Aurora, Illinois, and 3 p.m. in Joliet, Illinois. On October 23, 2001, Mr. Muoghalu was paid to speak at 8 a.m. in Waukegan, Illinois, and at 12 p.m. in Kankakee, Illinois. On October 25, 2001, Mr. Muoghalu was paid to speak at 11 a.m. in Urbana, Illinois and at 3 p.m. in Danville, Illinois. On October 26, 2001, Mr. Muoghalu was paid to speak at 8 a.m. in Joliet, Illinois.

39. Ben Muoghalu was paid $14,000 in 2002, by Aventis for speaking engagements. Mr. Muoghalu was paid $2,000 by Aventis for each of the following speaking engagements on Lovenox Managed Care Issues given on June 30, 2002, July 10, 2002, and August 10, 2002. Mr. Muoghalu was paid $2,000 by Aventis for each of the following speaking engagements on

13

Prophylaxis of DVT given on September 2, 2002 (Labor Day), October 16, 2002, November 7, 2002, and December 2, 2002.

40.     Aventis would also give unrestricted grants to organizations to induce their continued use and or promotion of Lovenox for unapproved indications. An unrestricted grant of $16,000 was given to Rockford Memorial Hospital, agreement date June 17, 2002. An unrestricted Grant of $30,000 was given to Midwest Heart Foundation, agreement date June 7, 2002. An unrestricted Grant of $10,000 was given to Midwest Heart Foundation. An unrestricted Grant of $10,000 was given to Midwest Heart Foundation. An unrestricted Grant of $10,000 was given to Midwest Heart Foundation. An unrestricted Grant of $25,000 was given to Illinois Bone and Joint Institute, agreement date, January 24, 2003.

41.     Additional grants were given by Aventis to Arlington Convention Center, $10,000; Midwest Heart Foundation, $10,000; Midwest Heart Foundation, $10,000; Illinois Bone and Joint Institute, $25,000; Illinois Bone and Joint Institute $15,000; Marc Cohen, $23,500; Eastern Vascular Society, $6,000; New York Chapter American College of Emergency Physicians, $5,000; American Heart Association, $6,000; Atlantic Health Systems, $6,000; St. Barnabus, $20,000; Henry Ford Health System, $10,500; The Care Group, $15,700; the Cleveland Clinic Foundation, $20,000; Cardiology Associates, $7,000; the Linder Center for Research and Education, $50,000; the Cleveland Clinic Foundation $25,000; Owen-Cardinal Health Company, $10,000; Coastal Bend Health, $10,000; Trauma and Critical Care Foundation, $15,000; Ochsner Clinic Foundation, $5,000; American Heart Association, $5,000; Southern Colorado Heart Institute, $5,000; Cardiovascular Institute of the South, $25,000; UTMB Continuing Education, $14,970; University of Texas, Medical School, $10,000; Arlington Convention Center; Ben Taub General Hospital, $15,000; the Texas Society of Hospital Pharmacists, $10,000; Dallas Academy of Internal Medicine, $15,000; Orthopedic

14

45. On October 17, 2002, PharmaNetics issued a press release approved by Aventis, which stated, "The ENOX® Test Card is intended to provide interventional cardiologists with the means of detecting the anticoagulant effects of enoxaparin in patients prior to percutaneous coronary interventions." Lovenox is not approved for PCI.

46. The ENOX test was developed by PharmaNetics to detect the anticoagulation effects of enoxaparin (Lovenox) in patients who will have an interventional procedure performed known as a PCI in the catherization laboratory ("cath lab"). Aventis enter into an agreement with PharmaNetics to develop and promote the ENOX test in order to increase the use of Lovenox in the cath lab. In a memorandum from the Lovenox Brand Team to Aventis Advanced Therapeutics Associates, dated February 2, 2003, the Aventis Lovenox sales associates were informed of the ENOX test and told that the accompanying brochure "should help you to discuss management of patients on LOVENOX® who may transition to the cath lab. The Enox test card is now available and can be used to help give skeptical physicians the evidence they need to feel confident using LOVENOX® in this scenario." Aventis representative were instructed to work closely with PharmaNetics personnel to identify accounts that could benefit from the ENOX test. The ENOX test is designed specifically for use with Lovenox[1] and does not produce reliable results for unfractionated heparin of other LMWH except enoxaparin, which is the generic equivalent of Lovenox. Lovenox is not indicated for PCI use and the test is used as a means of overcoming physician objections to PCI usage. Aventis paid PharmaNetics $5 million develop this test. The contract between Defendants to produce a testing method to be used in off-label applications and the memorandum, dated February 2, 2003, demonstrates Defendants' knowing promotion of Lovenox for off-label uses and the corresponding submissions of false claims.

---

[1] Lovenox is a low molecular weight heparin ("LMWH").

16

47.     On July 30, 2003, Frank Matos met with Mike Calvert, Clinical Sales Specialist, PharmaNetics. Mr. Calvert contacted Mr. Matos seeking Mr. Matos' assistance in identifying accounts to promote the ENOX test. During this meeting Mr. Calvert gave Mr. Matos several clinicals and assorted documents containing discussions of off-label uses and a list of frequently asked questions including reimbursement and test pricing. These clinicals included: *Clinical Case Update, April 2003*, which discussed the off-label use of Lovenox and states that LMWH is superior to unfractionated heparin; *Clinical Case Update, May 2003*, which discusses off-label uses of LMWH; *Clinical Case Update, July 2003*, which contains a list of unapproved studies discussing the off-label use of Lovenox; *Supplement to Interventional Cardiology Consensus Reports*, which discusses LMWH dosing guidelines for PCI.

48.     Despite the fact that Defendants' knew that Lovenox is not approved for PCI Defendants conspired to market Lovenox for such use.

49.     As Defendant PharmaNetics stated, "although LOVENOX® is not approved for PCI Aventis nonetheless has engaged in off-label promotion of its drug for PCI." (Paragraph 18, Complaint, *PharmaNetics v Aventis*, US District Court, Eastern District of North Carolina, 03-CV-817.) PharmaNetics' ENOX test was designed to overcome objections to the use of Lovenox for PCI. (October 17, 2002 PharmaNetics' press release.)

50.     Defendants were aware of these off-label promotions and illegal marketing plans including its mid-level and senior level officers and directors.

51.     Defendants sent their marketing representatives out into the medical community to market Lovenox for off-label uses, and to mislead doctors as to the approved and safe uses of Lovenox. These false statements to doctors, which Defendants knew were false, resulted in fraudulent claims for off-label uses being submitted to the Governments. Aventis tracks its sales of Lovenox and knew that its false statements were resulting in increased prescription usage and

17

thus reimbursement from government health care programs. These claims were either statutorily prohibited or were fraudulently induced. The illegal marketing of Lovenox is the direct cause of Lovenox's astonishing volume of off-label sales. These increased sales put patients at risk for the sole purpose of increasing Lovenox's market share.

52.     Defendants fraudulently induced physicians to write prescriptions for off-label uses by false and fraudulent misrepresentations regarding Lovenox. Defendants caused false claims to be submitted even if a particular payor does not have a specific prohibition on unapproved uses because the physician's judgment to prescribe Lovenox was tainted by the fraudulent statements made by Defendants' representatives. The fraud surrounding the efforts of Defendants to cause doctors to write prescriptions for Lovenox for unapproved uses was for the purpose of obtaining government payments. The initial fraudulent marketing of Lovenox for off-label uses was a step in Defendants' ultimate goal of obtaining payments from the Governments.

## X.     WHISTLEBLOWER PROTECTION

53.     Ms. Kennedy began her employment as a senior sales associate for Lovenox on January 24, 2002. During that time, Ms. Kennedy's supervisors were Joe Levato, District Manager and Steve Ross, Regional Business Director.

54.     On or about May 2002, Ms. Kennedy received a message from Mr. Levato, via Aventis' voicemail. Mr. Levato directed Ms. Kennedy and select sales representatives to spend all funds remaining in their expense accounts by July 1, 2002. At the time, May 2002, Ms. Kennedy had approximately $17,000.00 in her expense account.

55.     Mr. Levato advised Ms. Kennedy that the expense account funds should be spent on events that will occur post July 1, 2002, including speaker programs, entertainment and honoraria. Mr. Levato further advised Ms. Kennedy to create false entertainment invoices and to submit those for reimbursement.

18

56.     Ms. Kennedy questioned Mr. Levato to as to the whether this practice violated fraud and abuse and various company internal controls. Subsequent to this conversation Ms. Kennedy was threatened, harassed, and in other ways discriminated against in terms and conditions of her employment by Mr. Levato and Aventis. For example, Ms. Kennedy was told by Mr. Levato to that, he had no respect for her, that she did not fit in, that he could fire her at any time.

57.     On or about August 2002, Ms. Kennedy reported to Aventis Human Resources Department and Healthcare Compliance Department her concerns about inappropriate use of company funds. Ms. Kennedy spoke with Melissa Milkewitz, Human Resources, Aventis. Ms. Milkewitz violated Ms. Kennedy's confidentiality and informed Mr. Levato as to Ms. Kennedy's allegations regarding the inappropriate use of Aventis funds.

58.     On or about August 2002 Ms. Kennedy reported the inappropriate use of company funds to Michael Johnson, VP Human Resources, United States, Commercial Division, Aventis.

59.     In September 2002, Ms. Kennedy informed Tony Rizzello, Director Human Resources of the off-label promotion and marketing of Lovenox and inappropriate use of company funds. After this act by Ms. Kennedy, done in furtherance of an action under the FCAs and because of her refusal to participate in activities that would result in violations of state and or federal laws, rules, or regulations, Ms. Kennedy was threatened, harassed, retaliated and discriminated against by her employer Aventis.

60.     On or about October 2002 Ms. Kennedy called Jerry Belle, President Aventis North American Human Resources, relating her concerns about inappropriate company activities, which were continuing even after Ms. Kennedy reported such violations to the Healthcare Compliance and Human Resources Department. Ms. Kennedy received a return call

19

from Susan Ketterman, Senior VP Human Resources, stating that Michael Johnson would follow-up regarding Ms. Kennedy's report.

61.     As a direct result of Ms. Kennedy's acts done in furtherance of an action under the FCAs Ms. Kennedy was threatened, harassed, and in other ways discriminated against in terms and conditions of her employment by Aventis. Ms. Kennedy was repeatedly told that she could be fired at any time; she was ostracized by fellow sales associates and placed on "special assignment" which further created a hostile work environment for her. As a result of threats, harassment and discrimination, Ms. Kennedy was forced to resign her position with Aventis in February 2004.

62.     Aventis' senior personal were aware of the illegal off-label promotion of Lovenox and the threats, harassment, retaliation, and discrimination that Ms. Kennedy was subject to because of her whistleblowing activities which were done in furtherance of an action under the FCAs.

63.     As a result of Ms. Kennedy's refusal to participate in activities that would result in violations of State or Federal laws, rules, or regulations, Ms. Kennedy was retaliated against by her employer Aventis.

## COUNT I
### (Federal False Claims Act – Presentation of False Claims)
### (31 U.S.C. § 3729 (a)(1))

64.     Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

65.     Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

66. By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT II
(Federal False Claims Act – Making or Using a False Record or Statement)
(31 U.S.C. § 3729 (a)(2))

67. Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

68. Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

69. By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT III
(False Claims Act – Conspires to Defraud)
(31 U.S.C. § 3729 (a)(3))

70. Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

71. Defendants knowingly conspired to defraud the United States by getting a false or fraudulent claims allowed or paid by the United States.

72. By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT IV
(Illinois Whistleblower Reward and Protection Act – Presentation of False Claims)
(740 ILCS 175/3(a)(1))

21

73.    Relators repeat and reallege each and every allegation contained above as if fully set ... *h herein.

74.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the State of Illinois.

75.    By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and therefore is entitled to multiple damages under the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## COUNT V
(Illinois Whistleblower Reward and Protection Act – Making or Using a False Record or Statement)
(740 ILCS 175/3(a)(2))

76.    Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

77.    Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Illinois.

78.    By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and therefore is entitled to multiple damages under the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## COUNT VI
(Illinois Whistleblower Reward and Protection Act – Conspires to Defraud)
(740 ILCS 175/3(a)(3))

79.    Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

80.    Defendants knowingly conspired to defraud the State of Illinois by getting false or fraudulent claims allowed or paid by the State of Illinois.

22

81.     By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and is entitled to multiple damages under the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## COUNT VII
(Federal False Claims Act – Whistleblower Protection)
(31 U.S.C. § 3730(h))
(Aventis)

82.     Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

83.     Defendant Aventis threatened, harassed, and discriminated against Ms. Kennedy in the terms and conditions of her employment, because of the lawful acts done by Ms. Kennedy in furtherance of an action under this section.

84.     By virtue of the unlawful acts committed by Aventis, Ms. Kennedy is entitled to reinstatement with the seniority status she would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## COUNT VIII
(Illinois Whistleblower Reward and Protection Act – Whistleblower Protection)
(740 ILCS 175/4(g))
(Aventis)

85.     Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     Defendant Aventis threatened, harassed, and discriminated against Ms. Kennedy in the terms and conditions of her employment, because of the lawful acts done by Ms. Kennedy in furtherance of an action under this section.

23

87.     By virtue of the unlawful acts committed by Aventis, Ms. Kennedy is entitled to reinstatement with the seniority status she would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

**COUNT IX**
(Illinois Whistleblower Act – Whistleblower Protection)
(740 ILCS 174/20)
(Aventis)

88.     Relator Kennedy repeats and realleges each and every allegation contained above as if fully set forth herein.

89.     Defendant Aventis retaliated against Ms. Kennedy for refusing to participate in activities that would result in a violation of State of Federal laws, rules, or regulations.

90.     By virtue of the unlawful acts committed by Aventis, Ms. Kennedy is entitled to all relief necessary to make her whole, including but not limited to reinstatement with the same seniority status she would have had but for the violation, two times the amount of back pay, interest on the back pay, and compensation for damages sustained as a result of the violation, including litigation costs, expert witness fees, and reasonable attorney's fees.

WHEREFORE, Relators pray that the Court enter judgment against Defendants and in favor of the Governments and Relators as follows:

A. Order Defendants to cease and desist from violating the False Claims Acts as stated herein;

B. Award the Governments the maximum amount of damages they sustained as a result of Defendants' actions, as well as the maximum amount of civil penalties, as permitted, for each violation of the Governments' False Claims Acts.

24

C.  Award Relators, Matos and Kennedy, the maximum reward allowed pursuant to the
*qui tam* provisions of the Governments' False Claims Act.

D.  Award Relators, Matos and Kennedy, all costs and expenses of this action, including
Attorney's fees;

E.  Order Defendant Aventis to reinstate Katy Kennedy to the seniority status she would
have had but for the discrimination;

F.  Award Katy Kennedy two times the amount of back pay, plus interest, against
Defendant Aventis;

G.  Award Katy Kennedy all costs and expenses including litigation costs, expert witness
fees, and attorney's Fees, against Defendant Aventis; and

H.  Awarding the Governments and Relators, Matos and Kennedy, all such relief as the
Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relators hereby demands
trial by jury.

By:

Attorney for Relator Plaintiffs

Dated: May 14, 2004

Michael C. Rosenblat
Michael C. Rosenblat, P.C.
2400 Ravine Way, Suite 200
Glenview, Illinois 60025
847-657-0006

25