# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

Western Division

5:03-CV- 817-FL(2)

FILED

NOV 0 3 2003

US DISTRICT COURT, EDNC
BY _____ DEP. CLK
CLERK

PHARMANETICS, INC., )
)
    Plaintiff )
)
v. )
)    CIVIL ACTION NO. _____
)
AVENTIS PHARMACEUTICALS, INC., )
ALSO KNOWN AS AVENTIS )
PHARMACEUTICALS PRODUCTS, )
INC., )
)
    Defendant. )

## COMPLAINT

Plaintiff PHARMANETICS, INC. ("PharmaNetics"), by counsel, for its Complaint

against Defendant AVENTIS PHARMACEUTICALS, INC., also known as AVENTIS

PHARMACEUTICALS PRODUCTS, INC. ("Aventis"), alleges and states as follows:

## NATURE OF THE CASE

1.    This is an action for false advertising under the Lanham Act, 15 U.S.C. § 1125(a),

in connection with the Defendant's marketing and sale of the anticoagulant drug, LOVENOX®.

Additionally, PharmaNetics brings claims for unfair competition under common law, breach of

contract, tortious interference with contract/prospective economic advantage, fraud, and Unfair

and Deceptive Trade Practices in connection with Defendant's course of conduct relating to

LOVENOX®. Specifically, the Defendant currently markets LOVENOX® by commercially

advertising this drug with the phrases: "no routine monitoring required" and "therapeutic from

dose one." Such marketing is false and fraudulent and puts at risk the health of thousands of

consumers of this drug. In fact, knowing that monitoring is essential to the safe and effective use of LOVENOX®, Defendant entered into a contractual agreement by which PharmaNetics would develop an appropriate test (the ENOX® Test Cards) for immediately monitoring a patient's response to LOVENOX®. Rather than comply with this contractual agreement, Defendant has entered into a deliberate and concerted campaign to undermine PharmaNetics' ability to sell and distribute these test cards. By doing so, Defendant has substantially injured PharmaNetics and has jeopardized the health of patients throughout the country. Accordingly, PharmaNetics seeks injunctive relief to preclude Defendant's false marketing campaign and other wrongful conduct.

## PARTIES

2.      PharmaNetics, Inc. is a North Carolina corporation with its principal place of business in Morrisville, North Carolina. PharmaNetics is a leading medical diagnostics company that develops, manufactures and markets rapid turnaround diagnostics to assess blood clot formation and dissolution. The Company develops tests based on its proprietary dry chemistry Thrombolytic Assessment System. Its principal focus is the management of powerful new anticoagulant compounds, some of which may have narrow therapeutic ranges, as well as monitoring routine anticoagulants. PharmaNetics's "theranostic" tests represent a revolution in drug therapy in this field in that they allow doctors to see the individual response of a patient to a drug within moments of the administration of the drug. As a result, physicians can make timely and informed decisions that improve healthcare and patient outcomes.

3.      Aventis Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Aventis Pharmaceuticals, Inc. is the United States subsidiary of the global pharmaceutical company Aventis headquartered in Strasbourg, France.

2

Aventis advertises, distributes and sells its pharmaceutical products, including LOVENOX®, throughout the United States, including substantial sales in North Carolina.

## JURISDICTION AND VENUE

4.     This Court has federal question jurisdiction pursuant to the Trademark (Lanham) Act, 15 U.S.C. § 1125(a) et seq.; 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a) & (b), and, diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy is between citizens of different states and exceeds the value of $75,000, exclusive of interests and costs. This Court also has, pursuant to 28 U.S.C. § 1367(a), supplemental jurisdiction over those portions of the Complaint that arise under state law.

5.     Venue is proper in the United States District Court for the Eastern District of North Carolina, Western Division, pursuant to 28 U.S.C. § 1391(b) & (c) in that, among other things, Aventis is subject to personal jurisdiction in this district.

## FACTS COMMON TO ALL COUNTS

6.     Defendant Aventis markets the anticoagulant drug LOVENOX® (enoxaparin sodium injection). Anticoagulant drugs such as LOVENOX®, commonly referred to as "blood-thinners," are designed to prevent clots from forming in the blood. If a patient is inadequately anticoagulated, they may be at risk for developing a potentially fatal blood clot. However, if the blood becomes too anticoagulated (or thin), patients are at risk of hemorrhaging. For this reason, anticoagulant drugs, including LOVENOX®, are accompanied with prominent warnings to physicians and patients that these drugs should be used with extreme caution because of their association with hemorrhaging that can result in death.

3

7.     Because of the potentially fatal risks associated with inadequately anticoagulated blood, it is the generally accepted standard of care that patients receiving anticoagulant therapy be monitored and tested for purposes of measuring their blood's level of anticoagulation. The availability and use of a test allows physicians to determine whether a patient has taken or received anticoagulant medication, which is critical information for a physician, particularly prior to performing surgery or a coronary intervention such as angioplasty. Additionally, a test allows physicians to determine whether any adjustments to anticoagulant therapy are necessary based on whether the patient's blood is adequately anticoagulated.

8.     Despite the serious risks associated with inadequately anticoagulated blood, Aventis promotes its low-molecular-weight heparin drug, LOVENOX®, as a product that requires "no routine monitoring" and is "therapeutic from dose one."

9.     In addition to the fact that monitoring is the generally accepted standard of care, the approved label for LOVENOX® requires monitoring in many of the uses for which it is approved and prescribed.

10.     When LOVENOX® was first approved, there was no test routinely available to measure its anticoagulant effects. Although one test method (the anti-Xa assay) is capable, in theory, of monitoring the effects of low-molecular-weight heparins (such as LOVENOX®), the use of this test is not practicable for most patients. Because of the complexity and technical expertise required to perform the assay, as well as the lengthy turnaround time for the test results, anti-Xa tests are not routinely available in clinical laboratories and are offered in fewer than ten percent of hospitals. Hospitals are therefore unable to provide test results to physicians in a timely manner, limiting the clinical utility of the anti-Xa test in emergent indications.

4

11.     In contrast to LOVENOX® (which did not have a routinely available test when it was first approved), the most commonly prescribed anticoagulant drugs (standard heparin and warfarin) can be tested to detect their anticoagulant effects.  In fact, such tests have been readily available, routinely performed, and standard practice.  In particular, standard heparin is closely monitored throughout the course of therapy because of its highly variable response in patients. Frequent testing is required to make dosing adjustments to maintain the drug's anticoagulant activity within targeted therapeutic ranges and is especially necessary during surgical procedures.

12.     Despite strong clinical evidence that LOVENOX® is superior to standard heparin, it is a modified heparin nonetheless, and, cardiologists have been reluctant to perform interventional procedures on unstable angina patients receiving LOVENOX® without the ability to verify anticoagulation status.  Because of these concerns, in August of 2000, Aventis signed a contract with PharmaNetics, under the terms of which, PharmaNetics was to develop, in collaboration with Aventis, a test for rapidly detecting the anticoagulant effects of LOVENOX®.

### Background: Anticoagulant Therapy

13.     The physiological systems that control blood fluidity are extremely complex.  In the normal situation, a delicate balance prevents both thrombosis (clotting) and hemorrhage (bleeding).  The system includes proteins, known collectively as clotting factors, that work together with platelets and components of blood vessels to stem bleeding as the result of a tear or break in a blood vessel.  When the clot is no longer necessary, there are other proteins that naturally dissolve the clot so it does not obstruct blood flow.  For a number of different reasons, clots can form in the absence of a tear in the blood vessel, causing a clot or thrombus that can partially or completely obstruct blood flow through a vessel.  In these cases, physicians prescribe antithrombotic medication to prevent these abnormal clots from forming.  Anticoagulant

5

medicines help prevent the formation of blood clots. They also prevent a clot that has already formed from getting larger and reduce the likelihood that pieces of a clot will break off and cause a heart attack or stroke.

14.     Anticoagulant drugs are prescribed for a number of conditions. For example, they are used to prevent clots from forming during or after certain surgical procedures, including open heart surgery, heart valve replacement, abdominal surgery, knee replacement surgery, and hip replacement surgery. They are also used to reduce the risk of ischemic stroke or another heart attack after a first heart attack.

15.     Acute coronary syndromes ("ACS") represent a spectrum of disease caused by the disruption of an atherosclerotic plaque, which activates a chain of reactions that culminate in an occlusive thrombus (clot). Therapy for ACS has evolved over the last decade and now includes anticoagulant drugs to inhibit the formation or function of clotting factors and antiplatelet drugs that interfere with platelet function. Current American College of Cardiology (ACC) and American Heart Association (AHA) guidelines for the management of unstable angina and certain heart attacks (specifically, non-ST-segment elevation myocardial infarction) include treatment with anti-platelet therapy and preferentially recommend LOVENOX® as an anticoagulant in these patients in the absence of renal failure and unless coronary artery bypass graft is planned within 24 hours. The guidelines also recommend an early invasive treatment strategy including coronary angiography and revascularization, if possible. These guidelines are often cited and relied upon by Aventis. Interventional cardiologists have expressed concern regarding the use of low-molecular-weight heparins in this patient population when early invasive strategies are used because the level of anticoagulant activity cannot be easily monitored.

6

16.     Treatment options for patients requiring anticoagulation therapy changed within the past several years with the introduction of low-molecular-weight heparin products. The principal advantages of low-molecular-weight-heparin over standard heparin include a more predictable pharmacokinetic profile and the ability to administer the drug subcutaneously (below the skin) using weight-adjusted dosing. The pharmacokinetic profile of a drug describes the action of that drug over a period of time including its absorption and distribution, where in the body it acts, how it is transformed over time and how it is excreted.

17.     Low-molecular-weight heparins have better bioavailability at low doses when compared to standard heparin, resulting in a more predictable dose response for many patients. Because they are a modified heparin, low-molecular-weight-heparins still produce a several fold range of anticoagulation among patients. In some patient populations, including those who are critically ill, those with renal insufficiency or morbid obesity, as well as the elderly, the pharmacokinetics of low-molecular-weight heparin may be altered. The pharmacokinetics of a drug also may be altered in complicated disease states such as cancer. Like standard heparin, low-molecular-weight heparins produce their major pharmacodynamic effect by activating a naturally occurring inhibitor that circulates in blood. The pharmacodynamic profile describes the actions and effects of the drug and can differ from individual to individual. The pharmacodynamic profile for low-molecular-weight heparins, as well as standard heparin, is dependent on the drug as well as the availability of this circulating inhibitor and the clotting factors it affects.

18.     Historically, the lack of a readily available method to monitor low-molecular-weight heparin has resulted in anticoagulation decisions based principally on the pharmacokinetic properties for normal patient populations and data available from clinical trials

7

in patients treated for venous thromboembolism. Safety issues have been the subject of more recent publications evaluating expanded indications for low-molecular-weight heparin, especially in the more critically ill patient and those treated in conjunction with other powerful antithrombotic drugs. Issues of safety are related not only to the individual's variable drug response, but also to the day-to-day dynamics of patient management. In these cases, monitoring provides more objective information addressing very practical concerns including the confirmation that the drug has been administered and the identification of those individuals who do not respond to the drug as predicted for the majority of the population.

19.     Aventis has sponsored and is sponsoring ongoing trials using LOVENOX® at various doses due to the uncertainty of the optimal drug dose for percutaneous intervention. Even if these trials are successful in identifying an optimal drug dose, the need for monitoring remains.

### Aventis's LOVENOX® Product and PharmaNetics's ENOX® Test Card

20.     LOVENOX® is a low-molecular-weight heparin product approved for the following uses, either alone or in combination with other drugs as indicated in its FDA-approved label:

(1)     the prophylaxis of deep vein thrombosis, which may lead to pulmonary embolism:

(a)     in patients undergoing abdominal surgery who are at risk for thromboembolic complications;

(b)     in patients undergoing hip replacement surgery, during and following hospitalization;

8

(c)     in patients undergoing knee replacement surgery;

(d)     in medical patients who are at risk for thromboembolic complications due to severely restricted mobility during acute illness.

(2)     the prophylaxis of ischemic complications of unstable angina and non-Q-wave myocardial infarction, when concurrently administered with aspirin;

(3)     the inpatient treatment of acute deep vein thrombosis with or without pulmonary embolism, when administered in conjunction with warfarin sodium; and

(4)     the outpatient treatment of acute deep vein thrombosis without pulmonary embolism when administered in conjunction with warfarin sodium.

21.     After approximately two years of research and development, in August of 2002 the United States Food and Drug Administration ("FDA") granted marketing clearance to PharmaNetics for its ENOX® Test Card, a state-of-the-art test designed specifically to assess the anticoagulant effects of LOVENOX®.

### Aventis's False Advertising ("No Routine Monitoring Required")

22.     The FDA-approved labeling for LOVENOX® states that monitoring is required when it is co-administered with other agents. Specifically, the "PRECAUTIONS" section of the LOVENOX® label states:

> Drug Interactions: Unless really needed, agents which may
> enhance the risk of hemorrhage should be discontinued prior to
> initiation of LOVENOX® Injection therapy. These agents include
> medications such as: anticoagulants, platelet inhibitors including

9

acetylsalicylic acid, salicylates, NSAIDs (including ketorolac tromethamine), dipyridamole, or sulfinpyrazone. If co-administration is essential, conduct close clinical and laboratory monitoring . . . .

Therefore, the LOVENOX® label expressly includes the precaution to physicians that "close clinical and laboratory monitoring" is "essential" when LOVENOX® is co-administered with certain other drugs, including specifically anticoagulants and acetylsalicylic acid. Warfarin is an anticoagulant and aspirin is acetylsalicylic acid.

23.     The Indications and Usage section of the LOVENOX® label includes co-administration as an essential element of several of the drug's approved indications:

- LOVENOX® Injection is indicated for the prophylaxis of ischemic complications of unstable angina and non-Q-wave myocardial infarction, **when concurrently administered with aspirin.**

- LOVENOX® Injection is indicated for:
  ⇒     the inpatient treatment of acute deep vein thrombosis with or without pulmonary embolism, **when administered in conjunction with warfarin sodium;**
  ⇒     the outpatient treatment of acute deep vein thrombosis without pulmonary embolism **when administered in conjunction with warfarin sodium.**

Therefore, because co-administration of drugs that increase the risk of hemorrhage are an essential element of LOVENOX's approved indications, the monitoring of LOVENOX® therapy is an essential element of the drug's use according to the FDA.

24.     The Precautions section of the LOVENOX® label also specifically recommends monitoring for certain geriatric patients, providing in pertinent part:

> Geriatric Use:  . . . . **Monitoring of geriatric patients with low body weight (<45 kg) and those predisposed to decreased renal function should be considered.**

25.     Despite these FDA directives, one of the cornerstones of Aventis's promotional campaign for LOVENOX® is that it requires "no routine monitoring." Aventis prominently makes this claim in the majority of its advertising and promotional material for LOVENOX®. Journal advertisements, detail aids, and websites for LOVENOX® all contain this claim. Aventis's sales representatives are systematically trained to tell physicians that "no routine monitoring" is required with LOVENOX®. In order to make LOVENOX® a commercial success and achieve a competitive advantage over competing products that require monitoring, Aventis has made "no routine monitoring" a key component of its promotional campaign for LOVENOX®.

26.     Aventis's claim of "no routine monitoring" is false and misleading, as demonstrated by numerous facts. First, as noted above, this claim directly contradicts the FDA-approved label for LOVENOX®.

27.     Second, monitoring is the recognized standard of care for anticoagulant therapy. As noted above, there is a delicate physiological balance that must be maintained to prevent both blood clotting and hemorrhaging. Traditionally, monitoring is a tool that has been used to guide clinical decisions that balance the risks associated with anticoagulation therapy against the benefits the treatment is likely to provide. In the absence of clinically overt symptoms of

thrombosis or hemorrhage, monitoring provides an objective method to identify patients who may be at increased risk of thrombosis or hemorrhage because they are not adequately anticoagulated. While monitoring is most often employed to evaluate the pharmacodynamic effects of anticoagulation therapy, issues regarding compliance, medication and transcription errors, and clinical practice present equally important practical reasons to employ the use of monitoring in antithrombotic strategies. In the ELECT study, the first prospective study of the ENOX® test, patients were anticoagulated with LOVENOX®, using dosing regimens according to a protocol. Two patients, among the 445 studied, died during the study as a result of thrombotic complications, and both had measured low levels of LOVENOX® activity. In the first case, it is believed that a drug delivery problem was the cause of inadequate anticoagulation. In the second case, it was discovered that the patient had inadvertently not received the ordered, pre-procedural LOVENOX® before coronary intervention. If available to the treating physicians, both the ENOX® test and the anti-Xa test would have provided an indication of inadequate anticoagulation and would likely have resulted in clinical decisions resulting in different outcomes for both patients. These clinical scenarios are not aberrations or inconsequential, and demonstrate the great importance of monitoring.

28.     Third, there is scientific evidence and data, some from Aventis itself, demonstrating that patients have a variable and often unpredictable pharmacodynamic response to LOVENOX® and therefore need monitoring. Although the necessary levels of Xa inhibition for benefit has not been prospectively verified by Aventis, most trials, including those designed to investigate patients with venous thromboembolism, arterial thromboembolism, and mechanical heart value replacement, have chosen doses to achieve anti-Xa levels of 0.5 to 1.0 IU/mL. Most often, anti-Xa results are discussed and conclusions are drawn on the basis of

12

population means with less emphasis on the ranges of anti-Xa levels observed. This analysis generally ignores individual patient response and suggests that every patient responds similarly. NICE 1 and NICE 4, two Aventis sponsored registration trials evaluating single intravenous dosing regimens of LOVENOX® resulted in substantially higher mean anti-Xa values than predicted, while actual anti-Xa levels ranged from 0.7-3.5 IU/mL and 0.3-2.7 IU/mL, significantly broader than the therapeutic ranges that have been proposed for percutaneous intervention. The PEPCI trial, a smaller Aventis sponsored study which used a combination of single subcutaneous injection of LOVENOX® followed after eight hours with an IV bolus, also revealed a broader range of observed anti-Xa levels versus predicted. In fact, two individuals had results suggestive of ineffective IV administration. A more recent study by Collet evaluated a group of patients undergoing percutaneous intervention after receiving more than 48 hours of subcutaneous LOVENOX® therapy. Even after receiving steady state dosing, generally accepted as three to four doses, 2.4% of patients were sub-therapeutic as defined by the investigators. Moreover, the investigators chose to make dose adjustments on the basis of age and renal function, and in a subset of patients adjusted LOVENOX® doses based on anti-Xa levels. Even in these controlled studies, there were patients, presumably therapeutically anticoagulated based on pharmacokinetic models, that were actually inadequately anticoagulated and potentially at increased risk for thrombosis or hemorrhage. These studies demonstrate that the patient population as a whole has a variable response to the drug, that the degree of variation is unpredictable from patient to patient, and that monitoring provides a method to identify those patients who may be at increased risk to suffer adverse events because their response to LOVENOX® is unpredictable.

13

29.     Fourth, Aventis itself has acknowledged that monitoring is necessary with LOVENOX®. This is demonstrated by numerous facts:

(a)     Aventis entered a multi-million dollar contract with PharmaNetics to develop a test for LOVENOX®. If Aventis did not believe monitoring was necessary, it would not have invested millions of dollars to develop a monitoring test.

(b)     Aventis initially trained its sales force to promote the test to physicians. (Despite Aventis initially training its sales force, its sales force has since stopped promoting the monitoring test in the manner agreed by Aventis and instead has been instructed by Aventis to promote the drug as not requiring routine monitoring.) Aventis would not have initially trained its sales force to promote the test if it thought that monitoring was not required.

(c)     Certain Aventis sales representatives and scientific managers have acknowledged the need for the test and for monitoring LOVENOX® even though that is not consistent with Aventis's promotional message of "no routine monitoring."

(d)     Over the past few years, Aventis has either issued or approved press releases in which the need for monitoring was acknowledged. The following is a sample of these public acknowledgements:

(i)     "Our decision to collaborate with PharmaNetics in the development of a rapid test was made after many months of evaluating our

14

product strategy and customer needs. We have established Enoxaparin as a safe and efficacious replacement for unfractionated heparin for existing indications because of the drug's unique pharmacological properties and predictable anticoagulant response. However, the ability to monitor the drug in potential new areas of study such as Percutaneous Coronary Intervention, Oncology and in certain patient populations has been an increasingly important issue. We believe that by providing access to a rapid test for Enoxaparin, we will strengthen the drug's leadership position, facilitate administration in acute-care settings and help physicians manage difficult sub-sets of patients." (PharmaNetics Press Release approved by Aventis: "PharmaNetics Signs Agreement with Aventis Pharmaceuticals to Develop Theranostic Test for Enoxaparin," April 18, 2000.)

(ii)     "[T]here may be certain situations where providing physicians with this test will enable them to customize treatment regimens and optimize care. This will increase the product's value to physicians and its benefits to their patients." (Aventis/PharmaNetics Joint Press Release: "PharmaNetics and Aventis Pharmaceuticals Sign Exclusive Agreement for Enoxaparin Test," September 5, 2000, quoting Gerald P. Belle, President of Aventis Pharmaceuticals North America.)

(iii)     "Utilizing the test may help overcome drug management concerns [with LOVENOX®] in certain cardiology patients." (PharmaNetics Press

Release approved by Aventis: "PharmaNetics Announces Fourth Quarter and Year-End Results," February 28, 2003.)

(iv)     "PharmaNetics was founded on its belief that rapid bedside testing could provide physicians with the necessary information to determine individual patients' anticoagulant status and, therefore, allow them to rapidly adjust therapy accordingly." (PharmaNetics Press Release approved by Aventis: "PharmaNetics Announces Collaborative Sales and Marketing Program with Aventis for Launch of Enoxaparin Test," January 9, 2003.)

(v)     "The final payment represents the conclusion of a $5 million two year test development program as PharmaNetics and Aventis now initiate a collaborative marketing and promotion program to promote the use of the ENOX® test to detect the anticoagulant effects of Aventis Pharmaceuticals' enoxaparin sodium (LOVENOX®), the number-one selling low-molecular weight heparin (LMWH) in the world." (PharmaNetics Press Release approved by Aventis: "PharmaNetics Receives Final Milestone Payment From Aventis," December 19, 2002.)

(vi)     "The ENOX® Test Card is intended to provide interventional cardiologists with the means of detecting the anticoagulant effect of enoxaparin in patients prior to percutaneous coronary interventions." (PharmaNetics Press Release approved by Aventis: "PharmaNetics

16

Introduces ENOX® Test at Transcatheter Cardiovascular Therapeutics (TCT) Meeting in Washington, D.C.," October 17, 2002.)

**Aventis's False Advertising ("Therapeutic From Dose One")**

30.     In addition to Aventis's false and misleading claim that no routine monitoring is required with LOVENOX®, another similar claim is that LOVENOX® is "therapeutic from dose one" and, similarly, that it provides "predictable first dose protection." Nothing in the LOVENOX® label supports this claim. In addition, there are no data demonstrating that LOVENOX® is therapeutic in all patients from its first dose. On the contrary, there are data and reports indicating that many patients are not adequately anticoagulated following a single LOVENOX® dose.

31.     In recent medical journal advertisements for LOVENOX® that make the claim of "therapeutic from dose one," Aventis cites various publications to support this claim. However, none of the studies discussed in the publications were designed to determine whether LOVENOX® is therapeutic from its first dose. Aventis cannot point to a single, properly-designed clinical study to support its claim of "therapeutic from dose one."

32.     In addition to the fact that neither the LOVENOX® label nor any other well-controlled clinical study supports the claim of "therapeutic from dose one," this claim is directly contradicted by other materials from Aventis. For instance, the LOVENOX® website created and maintained by Aventis contains the following statement admitting that the anticoagulant benefit of LOVENOX® may not be achieved until two doses — not one dose — of LOVENOX® have been administered:

"[F]ull anticoagulant benefit can be achieved with 1 or 2 fixed subcutaneous doses daily, depending on the indication." (http://www.lovenox.com.)

33.     Aventis's claim of "therapeutic from dose one" also conflicts with the recommended standard of care for certain LOVENOX® uses. For example, in the "Enoxaparin Dosing Algorithm for [Percutaneous Coronary Intervention] PCI," an area of expanded use for LOVENOX®, multiple doses of LOVENOX® are recommended:

> Therapeutic Anti-Xa Levels. To ensure that ACS patients promptly achieve therapeutic anti-Xa levels, a 30 mg IV loading dose of enoxaparin is recommended, followed by administration of 1 mg/kg SC q 12 hrs. Therapeutic anti-Xa levels also are achieved after $\geq$ 2 doses of enoxaparin 1 mg/kg SC q 12 hrs have been administered, even in the absence of an initial loading dose.

(Interventional Cardiology Consensus Reports: Acute Coronary Syndromes, May 1, 2003.) The development and publication of the above consensus guidelines were supported by an educational grant from Aventis. In addition, although LOVENOX® is not approved for PCI, Aventis nonetheless has engaged in off-label promotion of its drug for PCI, as demonstrated, for example, by Aventis' LOVENOX® advertisements in invasive cardiology publications such as "Cath Lab Digest" and "The Journal of Invasive Cardiology."

34.     Additionally, Aventis reviewed and approved a press release issued by PharmaNetics regarding a case study published in the "Journal of Invasive Cardiology" involving LOVENOX® and the ENOX® test card. In the press release reviewed and approved by Aventis, there is an acknowledgement that in up to twenty percent of patients, a single dose of LOVENOX® is not necessarily a therapeutic dose:

"The case describes a patient who presents for PCI having received a single subcutaneous dose of enoxaparin. It demonstrates that unlike patients who present to the catheterization laboratory after several doses of enoxaparin where steady state anticoagulation might have been achieved, a patient who presented soon after administration of a single dose of subcutaneous enoxaparin may not have had an adequate level of anticoagulation for PCI.

Commenting on the report Dr. Sadanandan said 'We have observed similar results in 10 - 20% of the patients presenting for early angiography following treatment with SC enoxaparin where the ENOX test and anti-Xa data confirmed a subtherapeutic level of anticoagulation . . . . The availability of the ENOX test has made detection of the anticoagulation effects of enoxaparin possible in the catheterization laboratory and may remove the uncertainty when using the drug in certain clinical situations. Reducing that uncertainty is a critical step in proper treatment that may lead to cost efficiency and better patient outcomes'."

(PharmaNetics Press Release approved by Aventis: "Case History in Journal of Invasive Cardiology Demonstrates Role of ENOX Test in Patients Treated with Subcutaneous (SubQ) Enoxaparin," May 21, 2003.)

35. Other data and reports also contradict Aventis's claim of "therapeutic from dose one." In a supplement to "Invasive Cardiology," Dr. Jose Diez, Director of Interventional Cardiology at Tulane University Health Sciences Center, described a series of cases in which patients receiving LOVENOX® had sub-therapeutic anticoagulation levels following administration of a single dose of LOVENOX®. (Invasive Cardiology, Clinical Case Update, "Enoxaparin in Percutaneous Interventions: When to Monitor?," July 2003.)

19

36.     This is consistent with data from clinical studies and reports known to Aventis in which it was determined that not all patients receiving subcutaneous doses of LOVENOX® achieved therapeutic anticoagulation levels.

### Aventis's False and Disparaging Statements Regarding the ENOX® Test Card and Interference with PharmaNetics's Business Relationships

37.     The ENOX® Test Card is approved by the FDA specifically for use in detecting the anticoagulant effects of LOVENOX®.

38.     Despite this approval by FDA and the ENOX® Test Card's efficacy in detecting the anticoagulant effects of LOVENOX®, Aventis, through its sales representatives, have made false, misleading and disparaging statements to physicians and hospitals regarding the effectiveness and utility of the ENOX® Test Card.

39.     As a result of these statements by Aventis, physicians and hospitals have not purchased the ENOX® Test Card, or purchased fewer quantities of the ENOX® Test Card, causing significant damage to PharmaNetics.

40.     Despite their legal, regulatory, and contractual obligation to promote the test and the significant safety reasons for encouraging, rather than discouraging, monitoring and testing the anticoagulant effects of their powerful LOVENOX® drug, Aventis has instead chosen to:  (1) minimize the significant safety issues associated with LOVENOX®, (2) misrepresent the FDA-approved labeling for LOVENOX®, and (3) mislead physicians into believing that the ENOX® test is not effective.

41.     Aventis has thoughtfully, intentionally and aggressively orchestrated a massive, systematic promotional campaign designed to mislead physicians to believe that patients

20

receiving LOVENOX® do not need to be monitored or tested. Instead, according to Aventis, physicians simply need to give patients a single dose of LOVENOX®, after which no monitoring of the patient is required. Aventis is intentionally placing the public at risk for the sole purpose of increasing its bottom line.

42. In reliance upon Aventis's false and misleading promotional campaign regarding LOVENOX®, physicians have been using the drug without monitoring and with the belief that LOVENOX® is always therapeutic from the first dose. In addition, in reliance upon Aventis's false and misleading statements regarding the ENOX® Test Card, physicians have not been using the ENOX® Test Cards and hospitals have not been purchasing the ENOX® Test Cards.

43. Aventis's false and misleading promotional campaign has caused PharmaNetics damages, including the loss of substantial sales.

### Aventis's Breach of the Parties' Collaborative Development Agreement

44. Beginning in late 1999 and early 2000, the parties held initial meetings to discuss the development of a test for detecting the anticoagulant effects of LOVENOX®. Those discussions culminated in the Collaborative Development Agreement (the "Agreement") executed by the parties on August 30, 2000. The Agreement is attached hereto as Exhibit A.

45. Under the terms of the Agreement, PharmaNetics was responsible for developing and obtaining FDA approval of a test card and analysis device to be used solely with LOVENOX®. Many aspects of the development of the test card were a joint undertaking under the Agreement.

46.     However, with respect to the test card development, Aventis erected numerous obstacles and caused significant delays in submitting the test card to the FDA for approval. PharmaNetics relied on the scientific expertise provided by Aventis to develop the appropriate range for the test card.  However, during the course of development, Aventis changed its expectations regarding the test card's therapeutic range and asserted the need for increased sensitivity in the higher ranges despite information already in Aventis's possession to the contrary and without disclosing a clinical strategy designed to utilize subcutaneous rather than intravenous dosing regimens. As a consequence, the test is now optimized in higher ranges and has reduced utility to monitor therapy for the prophylaxis of venous thromboembolism as originally intended in the contract.  The result of the delay and reduced utility of the test card to PharmaNetics was that it lost a substantial number of sales of its test card and it has been excluded from certain test card markets.

47.     Aventis has also breached the Agreement with respect to the commercialization of the Test Card.  Under the terms of the Agreement, once the ENOX® Test Card was approved, both Aventis and PharmaNetics were to educate physicians about its availability and use, both would jointly promote its sale to hospitals and physicians, and co-label the product with both companies' trademarks.  Section 4.7.5 of the Agreement requires the Aventis sales force to promote the ENOX® Test Card:

> Aventis's United States Advanced Therapeutics sales representatives shall include the
> [ENOX® Test Card] Product in promotion of LOVENOX® to appropriate physician
> groups in a manner which is not inconsistent with the Product's labeling and is in
> accordance with applicable law.  Such promotion shall include (1) informing such
> physicians as to the availability of the Product, (2) making available approved

22

informational materials with respect to the Product, and (3) providing contacts whereby customers can obtain additional information.

Although the Agreement states that Aventis "shall" promote the ENOX® Test Card, and to do so would be in the best interests of patient care, Aventis has not fulfilled this contractual obligation. In fact, there are documented reports of Aventis sales representatives telling physicians that they should not use the ENOX® Test Card. Furthermore, certain Aventis sales managers have instructed their sales representatives not to promote the ENOX® Test Card, resulting in very limited support to PharmaNetics's sales efforts.

48. Aventis's false and misleading promotion of LOVENOX® and failure to promote the ENOX® Test Card is a breach of its contract with PharmaNetics. Under the terms of its contract with PharmaNetics, Aventis is required, among other things, to inform and educate physicians about the availability of the ENOX® test and to promote the test through its sales force. It has repeatedly refused to do so.

49. In summary, Aventis's systematic, false, and misleading promotion of LOVENOX® is putting patients at risk. It is also directly causing significant damage to PharmaNetics and preventing PharmaNetics from effectively promoting its ENOX® Test Card.

### Aventis's Fraudulent Inducement

50. As PharmaNetics and Aventis engaged in deliberations over their strategic alliance, Aventis expressed concerns over the financial viability of PharmaNetics and its ability to deliver test cards and analyzers in sufficient quantity to meet market demand. This concern by Aventis arose in response to test card sales forecasts prepared by Aventis's employees. These forecasts also formed the basis for financial presentations to investors and financial analysts

providing market coverage for PharmaNetics. Moreover, Aventis employees did not only prepare these forecasts, but when PharmaNetics included the forecasts in proposed press releases, senior employees of Aventis approved the releases. It was necessary for PharmaNetics to raise additional capital to ensure that it could produce test cards in the quantities that would be needed. PharmaNetics moved forward in good faith and, relying upon numbers generated by Aventis, raised capital and made investments based upon these forecasts.

51. Specifically, in April of 2001, PharmaNetics raised approximately $19 million in capital through the issuance of shares of common stock. Additionally, in May of 2003, PharmaNetics raised approximately $9 million in additional capital through a private equity placement of shares of stock.

52. PharmaNetics and its investors relied to their significant detriment on Aventis's sales forecasts. It was clear to Aventis at the time of the forecasts that the indicated level of ENOX® Test Cards would constitute virtually all of PharmaNetics's revenue. Aventis knew, or should have known, that the failure of Aventis to fulfill its obligations under the Agreement and failure to support the test card would be catastrophic to PharmaNetics and its shareholders in terms of lost profits and diminished share value. Upon information and belief, Aventis never intended to promote the Test Card as provided under the Agreement and, therefore, knew that the forecasts that it had prepared were substantially higher that the amount that PharmaNetics would ever be able to realize.

53. Aventis's false and misleading promotion of LOVENOX® and its failure to fulfill its obligations under the Agreement contributed substantially to a reduced value of

24

PharmaNetics' share price and diminished value of PharmaNetics. Aventis's actions also resulted in substantial lost profits for PharmaNetics.

### Aventis's Further Breaches

54. In addition to its breach of the Collaborative Development Agreement, Aventis made numerous other promises and representations to PharmaNetics regarding it promotion of the ENOX® Test Card which it has failed to live up to. For example, despite an agreement to do so, Aventis has failed to provide its sales organization and scientific managers with a coordinated corporate message that demonstrably supports the positioning statement it provided to PharmaNetics. The lack of coordination and direction to Aventis sales representatives and scientific managers has caused confusion in the marketplace, negatively impacting sales. Aventis also agreed to develop and distribute co-branded promotional literature containing both drug and test card package inserts, but has not routinely distributed it to customers asking about monitoring in general or specifically about the ENOX® test. Aventis also agreed to undertake a physician educational strategy to include symposia, continuing medical educational programs, and consultant programs, all of which Aventis has failed to do in the manner represented by Aventis to PharmaNetics.

55. PharmaNetics reasonably relied upon these statements and promises, the result of which has caused significant damages to PharmaNetics.

56. These actions constitute a breach of contract and have caused significant damage to PharmaNetics in terms of lost sales and profits, as well as damage to its reputation and the reputation of its ENOX® Test Card.

25

## Count I: False Advertising Under the Lanham Act

57.     PharmaNetics repeats and realleges all previous paragraphs of this Complaint as if fully set forth herein.

58.     Aventis's promotion of LOVENOX® using the statements "no routine monitoring required" and "therapeutic from dose one" is false and/or is likely to mislead or confuse consumers. Aventis's promotion of LOVENOX® constitutes false advertising and violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

59.     Aventis's false statements were made in commercial advertisements about its products, the false statements actually deceived or have the tendency to deceive a substantial segment of its audience, the deceptions are material in that they are likely to influence the purchasing decision, the defendant caused its false statements to enter interstate commerce, and PharmaNetics has been or is likely to be injured as a result of the false statements.

## Count II: Common Law Unfair Competition

60.     PharmaNetics repeats and realleges all previous paragraphs of this Complaint as if fully set forth herein.

61.     The false and fraudulent statements, acts and practices of Aventis have occurred in various states, including but not limited to Illinois.

62.     The acts of Aventis constitute unfair competition under the common law, including the law of the State of Illinois.

63.     Aventis has sold LOVENOX® within various states, including Illinois, by means of false and fraudulent statements with respect to the effect of this drug and the need to monitor patients after LOVENOX® is administered.

64.     Aventis made these false representations knowing at all times that the representations were false and untrue and likely to misled the consuming public.

65.     But for the false and fraudulent statements of Aventis, consumers in Illinois and various other states, would have purchased ENOX® Test Cards from PharmaNetics.

66.     Aventis has diverted trade from PharmaNetics by fraudulently representing that the goods of Aventis have qualities which in fact they do not have. Upon information and belief, Aventis made these representations intending and believing that its statements would divert trade from PharmaNetics.

67.     Aventis is guilty of unfair competition and false and fraudulent advertising and representations in violation of common law, including but not limited to the law of Illinois.

68.     Aventis's conduct violates standards of commercial morality.

69.     PharmaNetics has been damaged as a direct and proximate result of Aventis's wrongful conduct.

### Count III:  Breach of Contract

70.     PharmaNetics repeats and realleges all previous paragraphs of this Complaint as if fully set forth herein.

27

71.     Aventis contracted with PharmaNetics through the Collaborative Development Agreement.

72.     Aventis also orally contracted with PharmaNetics.  PharmaNetics agreed to raise substantial capital to be able to satisfy Aventis that PharmaNetics could produce enough ENOX® Test Cards to meet Aventis's sales projections for the ENOX® Test Card.

73.     Aventis's false advertising, refusal to promote the ENOX® Test Card, and the disparaging comments made by Aventis's sales representatives to PharmaNetics's actual and prospective customers, constitute a breach of its contracts with PharmaNetics, including but not limited to the implied obligation of good faith and fair dealing.

74.     As a result of Aventis's breaches of contract, PharmaNetics has suffered and will continue to suffer damage and irreparable injury for which there is no adequate remedy at law.

## Count IV:  Tortious Interference With Contract and With Prospective Economic Advantage

75.     PharmaNetics repeats and realleges all previous paragraphs of this Complaint as if fully set forth herein.

76.     Upon information and belief, Aventis's sales representatives have disparaged the ENOX® Test Card to PharmaNetics's customers and prospective customers, including but not limited to Long Island Jewish Hospital, South Austin Medical Center and Charlotte Regional Medical Center, by informing these customers and prospective customers that the ENOX® Test Cards are either ineffective and/or unnecessary.  As a result, these prospective customers have either refused to purchase the ENOX® Test Card or have purchased the test in much smaller quantities than they otherwise would have.

28

77.     Aventis intentionally, fraudulently and maliciously induced these customers and prospective customers to refrain from doing business with PharmaNetics without justification for doing so.

78.     A contract would have ensued between PharmaNetics and these customers and prospective customers but for the interference by Aventis.

79.     PharmaNetics has suffered actual damage as a result of Aventis's wrongful conduct.

80.     The foregoing acts of Aventis constitute tortious interference with contract and/or prospective economic advantage under the common law of the states in which these disparaging comments were made, including, but not limited to, North Carolina, New York, Texas and Florida.

## Count V:  Fraud in the Inducement

81.     PharmaNetics repeats and realleges all previous paragraphs of this Complaint as if fully set forth herein.

82.     Aventis knowingly made false representations to PharmaNetics concerning sales projections and forecasts, and its intentions to promote and co-label the ENOX® Test Card.

83.     Aventis made these false statements with the intent to deceive PharmaNetics in order to induce PharmaNetics to enter into a contract with Aventis.

84.     PharmaNetics relied on Aventis's false representations to its detriment. PharmaNetics both raised substantial amounts of capital and invested heavily in developing the

ENOX® Test Card based on Aventis's promises of future promotions and sales, when in fact, Aventis never intended on performing these promises.

85.     PharmaNetics was damaged by Aventis's false representations in that PharmaNetics's sales have only been a fraction of what Aventis projected, causing, in whole or in part, PharmaNetics's stock value to plummet.

86.     The foregoing acts of Aventis constitute fraud in the inducement under the common law.

### Count VI:  Violations of North Carolina's Unfair and Deceptive Trade Practices Act

87.     PharmaNetics repeats and realleges all previous paragraphs of this Complaint as if fully set forth herein.

88.     Aventis was, at all times relevant to this Complaint, engaged in commerce as defined by N.C. Gen. Stat. § 75-1.1.

89.     All activities of Aventis described herein are business activities affecting commerce in the State as described by N.C. Gen Stat. § 75-1.1.

90.     The conduct of Aventis, as described above, constitutes a violation of N.C. Gen. Stat. § 75-1.1 and an unfair and deceptive trade practice.

91.     Aventis's actions, representations and misrepresentations, constitute unethical, unscrupulous, unfair, or deceptive trade practices affecting the commerce of this State.

92.     The foregoing acts of Aventis injured not only PharmaNetics, but also consumers in North Carolina and in interstate commerce.

93.     PharmaNetics was injured and suffered damages as a result of the foregoing unfair and deceptive acts of Aventis.

94.     PharmaNetics is entitled to recover its attorneys' fees pursuant to prevailing law.

## Punitive Damages

95.     PharmaNetics repeats and realleges all previous paragraphs of this Complaint as if fully set forth herein.

96.     As set out above, the conduct of Aventis was fraudulent.

97.     Aventis acted with malice in connection with the wrongful acts alleged in the Complaint.

98.     The conduct of Aventis was willful and wanton.

99.     Upon information and belief, the officers, directors or managers of Aventis participated in or condoned this conduct.

100.    An award of punitive damages against Aventis would be just and proper.

## Prayer for Relief

WHEREFORE, Plaintiff prays for judgment against Defendant, granting Plaintiff the following relief:

(1)      issue a preliminary and permanent injunction ordering that Aventis, its agents, servants, employees, representatives, subsidiaries and affiliates refrain from directly or indirectly using in commerce or causing to be published or otherwise

disseminated any promotional materials or activities containing any of the false and misleading claims described in this Complaint;

(2)    issue a preliminary and permanent injunction ordering that Aventis, its agents, servants, employees, representatives, subsidiaries and affiliates refrain from directly or indirectly using in commerce any claim or statement that (a) suggests that no routine monitoring is required with LOVENOX®; (b) suggests that LOVENOX® is therapeutic from the first dose or provides predictable first dose protection; (c) suggests that LOVENOX® should be routinely used in the absence of monitoring; (d) suggests that the ENOX® Test Card is not effective in detecting the anticoagulant effects of LOVENOX®; and (e) makes any other false or misleading claims about LOVENOX® or the ENOX® Test Card;

(3)    issue a preliminary and permanent injunction directing Aventis to include in prominent type face, in all written advertising and promotional materials, websites and activities for LOVENOX®, the following statement that is consistent with the FDA-approved label for LOVENOX®: "If LOVENOX® is co-administered with other agents that may enhance the risk of hemorrhage, including anticoagulants and aspirin, conduct close clinical and laboratory monitoring";

(4)    issue a preliminary and permanent injunction directing Aventis to include in prominent type face, in all written advertising and promotional materials, websites and activities for LOVENOX®, the following statement that is consistent with the FDA-approved label for LOVENOX®: "Monitoring should be considered for geriatric patients with low body weight (<45 kg) and those predisposed to decreased renal function";

32

(5)     issue a preliminary and permanent injunction directing Aventis to adequately and routinely train its sales managers, sales representatives, marketing personnel and all other employees responsible for the marketing and sale of LOVENOX® that LOVENOX® shall not be advertised, promoted or sold in a manner that is false and misleading as described in this Complaint;

(6)     issue a preliminary and permanent injunction directing Aventis to include in its promotion and advertising of LOVENOX® that the ENOX® Test Card may be used for detecting the anticoagulant effects of LOVENOX®;

(7)     issue a preliminary and permanent injunction directing Aventis to place appropriate corrective advertisements, reasonably designed to reach all persons to whom the LOVENOX® advertisements and oral communications were directly or indirectly disseminated, and retracting the false, misleading, and unfair claims contained in those advertising and oral statements; and

(8)     issue a preliminary and permanent injunction directing Aventis to place appropriate corrective advertisements, reasonably designed to reach all persons to whom all communications regarding the ENOX® Test Card were directly or indirectly disseminated, and retracting the false, misleading, and unfair claims that were made by Aventis regarding the ENOX® Test Card;

(9)     award PharmaNetics:

(a)     judgment on the foregoing counts in the amount of PharmaNetics's actual damages (which greatly exceed $75,000), prejudgment interest, and such other amounts as may be deemed appropriate;

(b)     all profits made by Aventis resulting from its false and misleading promotion of LOVENOX®, such damages to be trebled pursuant to 15 U.S.C. § 1117;

(c)     an amount of damages equivalent to the amount spent by Aventis in promoting LOVENOX® in a false and misleading manner;

(d)     all damages sustained by PharmaNetics by reason of Aventis's unlawful conduct, including all expenditures required to correct the false, misleading, unfair, and disparaging descriptions and representations alleged herein, such damages to be trebled pursuant to 15 U.S.C. § 1117;

(e)     all damages sustained by PharmaNetics by reason of Aventis's breach of the Collaborative Development Agreement;

(f)     all damages sustained by PharmaNetics and its shareholders by reason of its reasonable reliance upon the representations made by Aventis;

(g)     exemplary and punitive damages as the Court finds appropriate to deter any future willful and/or malicious conduct;

(h)     all damages sustained by PharmaNetics by reasons of Aventis's violation of North Carolina General Statutes Section 75-1.1, such damages to be

trebled pursuant to North Carolina General Statutes Section 75-16 and attorneys'

fees pursuant to North Carolina General Statutes Section 75-16.1 and

      (i)     pre-judgment and post-judgment interest on the foregoing sums;

   (10)   award PharmaNetics attorneys' fees and costs and disbursements of this

action; and

   (11)   grant such other and further relief as the Court deems just and proper.

**PharmaNetics demands a trial by jury.**

This the _3ʳᵈ_ day of November, 2003.

                         HUNTON & WILLIAMS

By:           /s/ Christopher D. Browning, Jr.
                Douglas W. Kenyon
                N.C. State Bar No. 13242
                Christopher G. Browning, Jr.
                N.C. State Bar No. 13436
                Post Office Box 109
                Raleigh, North Carolina 27602
                (919) 899-3000


                Gregory N. Stillman
                Brent L. VanNorman
                500 East Main Street
                Norfolk, Virginia 23510


                Gary C. Messplay
                1900 K Street, N.W.
                Washington, D.C. 20006-1109

## VERIFICATION

STATE OF NORTH CAROLINA      )
                                      ) To-wit:

COUNTY OF WAKE                 )

I, John P. Funkhouser, being first duly sworn, declare under the penalties for perjury that I am President and Chief Executive Officer of PharmaNetics, Inc., that I am an authorized and designated representative of PharmaNetics, Inc. for the purpose of executing this document on its behalf and that the matters stated in this **Complaint** are true and correct to the best of my knowledge.

PharmaNetics, Inc.

By:  John P. Funkhouser
Its:  President and Chief Executive Officer

Sworn to and subscribed to before me this the 3rd day of November, 2003.



Notary Public
My Commission Expires: 1/3/2005



EXHIBIT

_A_

# COLLABORATIVE DEVELOPMENT AGREEMENT

This Agreement is made and entered into this 30th day of August, 2000 by and between PHARMANETICS, INC., a North Carolina corporation ("PharmaNetics"), and AVENTIS PHARMACEUTICALS PRODUCTS INC., a Delaware corporation ("Aventis"). PharmaNetics and Aventis are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

**WHEREAS,** PharmaNetics is an *in-vitro* diagnostic manufacturer that markets analyzer test cards for certain blood markers to be used with card analyzer instrumentation systems; and

**WHEREAS,** Aventis is a global pharmaceutical company that desires to have PharmaNetics develop and gain approval of an enoxaparin test card and analysis devices and to manufacture and supply such test cards and devices to exclusively support Lovenox® in the Territory.

**NOW, THEREFORE,** in consideration of the foregoing and the covenants and promises contained in this Agreement, the Parties agree as follows:

## ARTICLE 1

## DEFINITIONS.

As used herein, the following terms shall have the following meanings:

1.1 "Act" means the Federal Food, Drug and Cosmetic Act of 1938, as the same may be amended or re-enacted from time to time.

1.2 "Affiliate" means a corporation, partnership, trust or other entity that directly, or indirectly through one or more intermediates, controls, is controlled by or is under common control with a Party to this Agreement. For such purposes, "control," "controlled by" and "under common control with" shall mean the possession of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting stock or partnership interest, by contract or otherwise. In the case of a corporation, the direct or indirect ownership of more than fifty percent (50%) of its outstanding voting shares shall in any event be deemed to confer control, it being understood that the direct or indirect ownership of a lesser percentage of such shares shall not necessarily preclude the existence of control.

1.3 "Agreement" shall mean this document and any annex, addendum, exhibit, attachment, schedule or modification hereto.

1.4 "Aventis Know-how" means all Information that is (a) owned or Controlled by Aventis at any time during the Term of this Agreement and (b) useful or necessary in the Field.

1.5 "Control" or "Controlled" when used in connection with intellectual property rights, means that the Party owns or has a license to such intellectual property rights and has legal authority, right and ability to grant to the other Party access, a license, or a sublicense to such intellectual property rights or to otherwise disclose proprietary or trade secret information to such other Party, as provided for in this Agreement, without violating any agreement with or the rights of a third party.

1.6 "FDA" means the United States Food and Drug Administration or any successor entity thereto.

1.7 "Field" means the development, manufacture, use and sale of the Product that are or could be developed and sold under this Agreement.

1.8 "First Commercial Sale" means, with respect to any Product, the first sale for end use or consumption of such Product in the United States after all applicable required Regulatory Approvals have been granted in the United States.

1.9 "GMP" means Good Manufacturing Practices as promulgated under the Act at 21 CFR (chapters 210, 211, 600 and 610), as the same may be amended or re-enacted from time to time.

1.10 "Improvement" means any enhancement of or improvement to Product and/or its use or indication, whether or not patentable, developed by or for, invented or acquired by, or coming under the Control of, PharmaNetics during the term of this Agreement.

1.11 "Information" means (i) techniques and data relating to the Field, including, but not limited to, ideas (including patentable inventions), inventions, practices, methods, knowledge, know-how, trade secrets, skill, experience, documents, apparatus, clinical and regulatory strategies, test data, including pharmacological, toxicological and clinical test data, analytical and quality control data, manufacturing, patent and legal data or descriptions and (ii) devices, algorithms, chemical formulations, compositions of matter, Product samples and assays relating to the Field.

1.12 "Lovenox®" means both the Lovenox® and Clexane® (enoxaparin sodium) Injection brand prescription pharmaceutical product for which Aventis Pharmaceuticals Products Inc. (then known as Rhone-Poulenc Rorer

Confidential

Pharmaceuticals Inc.) filed an NDA on July 26, 1991 which was re-filed on December 30, 1991 and received FDA approval on March 29, 1993.

1.13 "NDA" means the new drug applications related to Product, submitted to the FDA under Sections 505, 507 or 512 of the Act and applicable regulations related thereto.

1.14 "PharmaNetics Know-how" means all Information that is (a) owned or Controlled by PharmaNetics at any time during the Term of this Agreement and (b) useful or necessary in the Field. PharmaNetics Know-how does not include PharmaNetics Patents.

1.15 "PharmaNetics Patent(s)" means all U.S. patents and patent applications, including all additions, divisions, continuations, continuations-in-part, substitutions, extensions, patent term extensions and renewals, and patents issued thereon generally directed to one or more aspects of Product that are or become owned or Controlled by PharmaNetics prior to or during the term of this Agreement.

1.16 "Product" means an enoxaparin test card and test card system that are approved and labeled exclusively for use with Lovenox®.

1.17 "Regulatory Approval" means (a) in the United States, approval by the FDA of all authorizations, licenses or permits required and satisfaction of any related applicable FDA registration and notification requirements (if any) and (b) in any country other than the United States, approval by regulatory authorities having jurisdiction over such country of a single application or set of applications filed by PharmaNetics for approval of all authorizations, licenses or permits required and satisfaction of any related applicable regulatory and notification requirements, if any, together with any other approval necessary to make and sell commercially the Product in such country, including, where applicable, satisfactory labeling and pricing approval.

1.18 "Term of this Agreement" means the period of time during which this Agreement is in effect under Article 11.

1.19 "Territory" means all the countries of the world.

Confidential

# ARTICLE 2

# DEVELOPMENT

2.1    Joint Development Committee.

    2.1.1    Organization. On the Effective Date, the Parties shall organize a Joint Development Committee ("JDC") consisting of three members from each Party. Each Party will elect one of its three members to serve as a co-chairperson. The JDC shall be dissolved as soon as practicable after First Commercial Sale of Product in the United States.

    2.1.2    Function. The function of the JDC shall be to plan, coordinate and manage the clinical development of Product until the First Commercial Sale of Product and to serve as a forum for communication between the Parties. Each co-chairperson of the JDC will be responsible for keeping the Party he or she represents informed of the status of the development activities. The JDC is not intended to replace any internal management procedures of either Party.

    2.1.3    Decision Making. The JDC will operate by consensus, with the representatives of each party having one vote in total, except as set forth in Section 2.1.5.

    2.1.4    Governing Rules. The rules governing the JDC shall include the following:

        (a)    The timing, agenda and minutes of each JDC meeting will be the responsibility of the co-chairperson hosting the meeting.

        (b)    The location of the JDC meeting will alternate between PharmaNetics' facility and one of Aventis' facilities.

        (c)    The JDC will meet no less than four times annually.

        (d)    Non-members of the JDC are welcome to participate provided prior notice is given.

        (e)    Minutes of each JDC meeting will be summarized within two weeks after the meeting and will not be official until the non-drafting co-chairperson has agreed to them.

        (f)    Each Party will bear its own travel and lodging expenses associated with the JDC and its meetings.

Confidential

(g)    JDC members reporting to a Party may be changed from time to time at the sole discretion of the Party with notice to the other Party.

2.1.5  Dispute Resolution. If the JDC fails to reach consensus on any matter within its jurisdiction, the parties shall refer the matter to the Chief Executive Officer of PharmaNetics and to a Senior Executive Officer of Aventis. If the executive officers can not reach a decision on any material matter, including but not limited to the design of registration enabling trials, within five (5) business days of the matter being referred to them, then either Party shall have the right to provide notice of termination of this Agreement to be effective sixty (60) days from the date of the end of such period. If and only if PharmaNetics terminates this Agreement pursuant to the terms of this Section 2.1.5 and such termination is subsequent to completion of registration enabling trials for the Product designed for the purpose of obtaining Regulatory Approval in the United States, PharmaNetics shall be subject to a term of non-competition in accordance with Section 11.4. If and only if Aventis terminates this Agreement pursuant to the terms of this Section 2.1.5 and such termination is subsequent to completion of registration enabling trials for Product designed for the purpose of obtaining Regulatory Approval in the United States, Aventis shall be subject to a term of non-competition in accordance with Section 11.4.

2.2    Development Studies.

2.2.1  PharmaNetics shall be responsible for, and shall use reasonable efforts to conduct, all work and perform all studies necessary for, obtaining Regulatory Approval for the Product. Notwithstanding the foregoing, Aventis shall provide reasonable assistance to PharmaNetics with respect to any issues or questions relating to Lovenox® and use reasonable efforts to provide access to those clinical trial sites and related data required to collect the information necessary to obtain regulatory approval for the Product.

2.2.2  Aventis hereby grants to PharmaNetics a limited, nonexclusive, worldwide license to Aventis Know-how in the Field for the sole purpose of conducting studies for the development of Product.

2.2.3  PharmaNetics shall record, to the extent practicable, all Information relating to the development of Product, in standard laboratory notebooks, which shall be signed, dated and witnessed. To the extent practicable, such notebooks shall be kept separately from notebooks documenting other development activities of PharmaNetics. PharmaNetics shall require its employees and consultants to disclose any inventions relating to the Product in writing promptly after conception.

Confidential

2.3    Manufacturing.

    2.3.1    PharmaNetics shall be responsible for manufacturing testing, release and supply of the Product at its sole cost and expense. The Product will be manufactured and tested in accordance with GMPs, and all other laws, guidelines and regulations applicable to the manufacture of Product within the Territory and the terms and requirements set forth in this Agreement.

    2.3.2    The Product will be provided free of charge to Aventis by PharmaNetics as requested by Aventis for use in those development studies being conducted to provide the information required to obtain regulatory approval of the Product.   Should Aventis request Products for use in additional developmental studies, then PharmaNetics will provide the Product at the prices specified in Exhibit A.

2.4    Inspection and Regulatory Compliance.

    2.4.1    During regular business hours and upon reasonable notice, Aventis personnel shall be permitted to inspect the facilities of PharmaNetics to observe manufacturing activities and review Product relevant documentation including complaint history and on time delivery performance, for the extent necessary for assessing compliance with applicable regulatory, environmental and other governmental regulations and identifying safety and occupational risks (if any) associated with the manufacturing activities.

    2.4.2    PharmaNetics will inform Aventis of the outcome of all regulatory compliance inspections or regulatory action that impact the Product within two (2) business days.  PharmaNetics will make copies of all pertinent inspection reports, regulatory action letters and corrective action submissions available to Aventis within one week of receipt/submission.

    2.4.3    PharmaNetics will inform Aventis of all recalls regarding the Product within forty-eight (48) hours of recall commencement.


## ARTICLE 3

## REGULATORY AND LABELING

3.1    Regulatory Filings.  PharmaNetics shall be responsible for the preparation of suitable applications for Regulatory Approval in the Territory and shall be the owner and party of record of all such applications.

Confidential

3.2   <u>Ownership of the Data and Regulatory Approvals.</u>  PharmaNetics will be the sole owner of (a) all the data generated by the testing of the Product, (b) the database for such data, and (c) all Regulatory Approval submissions filed for clinical studies of the Product and any comparable regulatory filings outside the United States.

3.3   <u>Review of Materials.</u>  PharmaNetics shall provide Aventis with drafts of any documents or other correspondence to be submitted to the FDA or such similar regulatory authority outside of the United States, as well as all communications with investigators, including but not limited to all protocols and presentations to investigators.  Aventis shall have ten (10) business days to review and comment on such materials before submission or other communication may be made.  PharmaNetics will use reasonable efforts to accommodate Aventis' comments prior to submission, presentation or publication of the materials.

<u>Labeling</u>.

      The labeling for the Product will be such that the only approved drug or pharmaceutical product with which the Product is approved for usage is Lovenox®.

3.4.2   PharmaNetics shall be responsible for all costs associated with labeling the Products; provided, however, that should Aventis have any special requirements with respect to labeling, then Aventis will be responsible for any excess charges over and above PharmaNetics' standard costs.

3.4.3   Aventis shall supply PharmaNetics with all camera-ready artwork and trademarks of Aventis to be applied to the Product and the labels.

3.4.4   Aventis shall have 15 days to review and comment on all labeling of Product and any submissions to the FDA or applicable regulatory authority with respect to such labeling, and PharmaNetics will use reasonable efforts to accommodate Aventis' comments prior to submission

## ARTICLE 4

## COMMERCIALIZATION

4.1   <u>Joint Commercialization Committee.</u>  Not later than the commencement of the registration enabling trials for the Product, the Parties shall organize a Joint Commercialization Committee ("JCC") consisting of three members from each Party.  Each Party will elect one of its three members to serve as a co-chairperson.

Confidential

4.1.1  <u>Function</u>.  The function of the JCC shall be to establish the overall strategy and oversee the commercialization of Product in the Territory.  The JCC will have the opportunity to review and advise the Parties on, with respect to the Product, all market research plans and research results and similar items, as well as PharmaNetics' proposed marketing and sales budget for Product, for the purpose of advising and assisting in establishing a commercialization strategy in the Territory. The JCC is not intended to replace any internal management procedures of either Party.  The JCC shall be organized hereunder for consultative purposes only and shall have no decision-making authority binding on either Party.

4.1.2  <u>Decision Making</u>.  The objective of the JCC shall be to reach agreement by consensus on all matters falling within its authority hereunder, including, but not limited to the design, claims and content of promotional materials and the timing of launch of the Product within the Territory.  The representatives of each party shall have one vote in total on the JCC.

4.1.3  <u>Exception to Joint Decision Making</u>.  Except with respect to registration enabling trials, which shall be governed by the principles set forth in Article 2, Aventis, in its sole discretion, shall have the option to incorporate  the Product into any of its ongoing clinical studies involving Lovenox®. PharmaNetics shall provide reasonable assistance to Aventis with respect to any issues or questions related to the Product.  Aventis agrees to make the results of such clinical studies, to the extent that such results relate to the Product, available to PharmaNetics.  Neither Party shall initiate, conduct, or enable a third party to conduct clinical studies for the development of the Product except pursuant to this Agreement.

4.2    <u>Dispute Resolution.</u>

4.2.1  <u>Referral of Unresolved Matters to Executive Officers</u>.  In the event of a deadlock on the JCC, then the Parties shall refer the matter to the Chief Executive Officer of PharmaNetics and to a Senior Executive Officer of Aventis to be resolved by negotiation in good faith as soon as is practicable but in no event later than five (5) business days after referral. Such resolution, if any, of a referred issue by the executive officers shall be final and binding on the parties.  If resolution of the deadlock is not achieved within such five (5) day period, then this Agreement shall automatically terminate at the end of sixty (60) days from such date; provided, however, the parties shall be entitled to continue to attempt to

Confidential

resolve the deadlock during such period, in which case the parties may mutually terminate the automatic sixty (60) day termination.

4.2.2 <u>Independent Experts</u>. Each executive shall have the right to engage the services of any number of independent experts in the field in question (the individuals) so engaged by each executive officer to be engaged under obligations of confidentiality) to assist the executive officer in making a determination on the unresolved matter, and each executive officer shall be obligated to consider in good faith the analysis and opinions of any such independent experts engaged by either of them in making a determination.

4.3 <u>Efforts</u>. PharmaNetics will use reasonable efforts to commercialize and sell the Product in the Territory.

4.4 <u>Limitations to Field of Commercialization</u>. Except for those particular patient subgroups approved by the JCC (i.e., patients such as those with obesity and renal impairment that could potentially span the full range of Lovenox®. indications), neither Party will promote the Product in the fields of oncology or venous thromboembolism prophylaxis or treatment.

4.5 <u>Advertising/Marketing/Sales Costs</u>. PharmaNetics and Aventis shall each bear their own advertising, marketing and sales costs associated with the Product distribution, promotion and education.

4.6 <u>Packaging</u>. PharmaNetics shall be responsible for all costs of packaging the Product; provided, however, that any additional costs incurred as the result of any special packaging request received from Aventis shall be paid by Aventis.

4.7 <u>Advertising and Promotional Materials</u>.

4.7.1 PharmaNetics shall be responsible for assuring that all promotional material that it produces relating to the Product is in material compliance with applicable law.

4.7.2 PharmaNetics and Aventis shall be jointly responsible for developing and reviewing all advertising, promotional material, labeling and other literature used on, or in connection with, the Product.

4.7.3 PharmaNetics shall provide to Aventis, for use by Aventis' sales force, advertising and promotional materials and literature used in connection with the Product, in quantities reasonably requested by Aventis, at cost to Aventis.

Confidential

4.7.4 PharmaNetics shall provide adequate training to the applicable Aventis United States Advanced Therapeutics sales force, with the frequency and content to be determined by mutual agreement of the Parties, to allow for detailing of the Product in a manner consistent with Aventis' obligations as further set forth herein. Such training shall not be conducted more than semi-annually. Training will take place at central locations to be mutually agreed on by the Parties, and will be provided by PharmaNetics at no additional cost to Aventis, except that Aventis shall pay for all travel and related expenses for its personnel.

4.7.5 Aventis' United States Advanced Therapeutics sales representatives shall include the Product in promotion of Lovenox® to appropriate physician groups in a manner which is not inconsistent with the Product's labeling and is in accordance with applicable law. Such promotion shall include (1) informing such physicians as to the availability of the Product, (2) making available approved informational materials with respect to the Product, and (3) providing contacts whereby customers can obtain additional information.

4.7.6 It shall be the obligation of PharmaNetics to arrange for the provision of the additional information referred to in clause (3) of Section 4.7.5 above primarily utilizing a sales force knowledgeable in the sale of the Product, and where appropriate either through the use of educational videos or telephone support.

4.7.7 In addition to its obligation to promote the Product as described in Section 4.7.5 herein, Aventis shall provide PharmaNetics (to the extent permissible by applicable law or regulation), with space on any exhibit designed to promote Lovenox® to appropriate physician groups at professional meetings and medical conventions or at appropriate educational symposia Aventis sponsors or promotes. Each Party shall be responsible for its own travel and related costs. Pharmanetics shall reimburse Aventis for costs related to the provision of space designed exclusively to promote the Product at meetings, conventions or symposia where such costs are approved in advance by PharmaNetics.

4.7.8 Aventis shall have no obligation to promote (as such activities are described in Section 4.7.5 herein), and PharmaNetics, no obligation to market and distribute, the Product outside of the United States unless otherwise determined by the JCC. In the event that the JCC determines that the Product shall be marketed, distributed and promoted in any country outside the United States, the obligations of the Parties with respect to promotional activities and support shall be consistent with the

Confidential

obligations of the Parties in the United States at a scale appropriate for such country. Marketing, distribution or promotion of the Product in any country outside of the United States shall not obligate Aventis to pay any milestone payments in addition to those set forth in Section 5.1, nor shall such marketing, distribution or promotion have any effect on the timing of such milestone payments.

4.8     Customer Contact. In addition to any advertising and promotional materials PharmaNetics supplies with the Product, PharmaNetics shall, prior to First Commercial Sale: (1) create and host an informational website, or a portion of an already existing website, dedicated to the Product; and (2) establish a toll free number whereby consumers can contact PharmaNetics representatives with any questions such consumer may have regarding the Product.

4.9     Provision of Analyzers. The Parties acknowledge that in order to effectively promote and sell the Product, it will be necessary for all relevant customer targets to have ready access to PharmaNetics' dry chemistry Thrombolytic Assessment System within which test cards are analyzed. Accordingly, PharmaNetics will use reasonable efforts to make the Thrombolytic Assessment System commercially available to heart catheterization laboratories in the United States that in the determination of the JCC routinely perform coronary interventions.

## ARTICLE 5

## PAYMENT TERMS

5.1     Milestone Payments. Aventis shall make the following nonrefundable milestone payments to PharmaNetics upon occurrence of the following events:

5.1.1   $1,000,000 within 15 days of the execution of this Agreement;

5.1.2   $1,000,000 upon completion of registration enabling trials for the Product designed for the purpose of obtaining Regulatory Approval in the United States.

5.1.3   $1,500,000 upon issuance by the FDA of a Regulatory Approval for the Product; and

5.1.4   $1,500,000 upon First Commercial Sale of Product in the United States.

5.2     Currency of Payment. All payments to be made by Aventis to PharmaNetics hereunder shall be made in U.S. Dollars.

Confidential

## ARTICLE 6

### EXCLUSIVITY

6.1 <u>Competitors of Lovenox®</u>. From the Effective Date of this Agreement through the fourth anniversary of First Commercial Sale: (1) neither PharmaNetics nor Aventis shall develop, have developed, assist in the development of, market, have marketed, assist in the marketing of, manufacture, have manufactured or assist in the manufacture of a Low Molecular Weight Heparin ("LMWH") test card or system for Lovenox®, other than in furtherance of this Agreement, or for any LMWH drug which competes with Lovenox® in the Territory; and (2) in furtherance of this objective, the Parties agree, for as long as this Agreement is effective, that , in no communications with third parties, whether orally or in writing, will the Product be referred to as a "LMWH Test Card" but instead as an Enoxaparin or Lovenox® Test Card.

6.2 <u>Enabling of Product</u>. From and after the Effective Date, neither PharmaNetics nor Aventis shall knowingly enable any third party to use the Product for any drug or pharmaceutical product other than Lovenox®.

## ARTICLE 7

### INTELLECTUAL PROPERTY

7.1 <u>Trademarks</u>.

7.1.1 Each Party acknowledges that any and all trademarks and service marks (the "Marks") of the other Party are, and shall remain, the sole property of the other Party.

7.1.2 Except as expressly stated herein, no license of, or ownership interests in, either Party's Marks to the other Party is created pursuant to this Agreement. Such use shall be in accordance with good intellectual property practices including, but not limited to, protecting the value of the good will residing in such Marks.

7.1.3 Neither Party shall use the other Party's Marks in a manner that disparages such other Party or its products or services, or portrays the other Party or its products or services in a false, competitively adverse or negative light.

7.2 <u>Patents</u>. PharmaNetics shall take all reasonable steps to maintain for the full life thereof all issued Patents, owned or Controlled by PharmaNetics, which underlie the Product.

Confidential

7.3     Improvements. Each Party acknowledges that Improvements shall be the sole property of PharmaNetics. Aventis agrees to take any and all action reasonably required by PharmaNetics, including execution of assignments or other documentation, to perfect PharmaNetics' rights in and to such Improvements.

7.4     Infringement of Third Party Rights.

    7.4.1   Costs of Defense. PharmaNetics shall be responsible for the reasonable fees and costs of attorneys and consultants, together with the court costs, incurred by both Parties in defending against claims by third parties that the Product violates any third party intellectual property right (a "Product Claim"). Aventis shall be responsible for the reasonable fees and costs of attorneys and consultants, together with the court costs, incurred by both Parties in defending against any claims that Lovenox® violates any third party intellectual property rights (a "Lovenox® Claim").

    7.4.2   Payments to Third Parties. If either Party is required by a final court order or a settlement agreement entered into in good faith to make royalty payments or other payments to a third party in connection with the disposition of any Product Claim, PharmaNetics shall make or reimburse to Aventis all such payments. If either Party is required by a final court order or a settlement agreement entered into in good faith to make royalty payments or other payments to a third party in connection with the disposition of any Lovenox® Claim, Aventis shall make or reimburse to PharmaNetics all such payments.

    7.4.3   No Third Party Effect. Neither this Article 7, nor any exercise of rights or fulfillment of obligations under this Article 7, shall affect by itself any indemnification or contribution rights of either Party against any third party.

7.5     Infringement by Third Parties.

    7.5.1   Notice. If any of the PharmaNetics Patent Rights or PharmaNetics Know-how in the Field is infringed by a third party, the Party first having knowledge of such infringement shall promptly notify the other in writing. The notice shall set forth the facts of such infringement in reasonable detail.

    7.5.2   Prosecution of Actions Related to Product.

        (a)     PharmaNetics shall have the primary right to institute, prosecute and control any action or proceeding with respect to any infringement of Product, by counsel of its own choice and reasonably acceptable to Aventis. Aventis shall cooperate at

Confidential

PharmaNetics' cost with PharmaNetics at PharmaNetics' reasonable request in the prosecution of such action or proceeding.

(b) If PharmaNetics fails to bring an action or proceeding within a period of thirty (30) days after receiving written notice from Aventis or otherwise having knowledge of that infringement, Aventis shall have the right to bring and control any such action by counsel of its own choice and expense.

(c) No settlement, consent judgment or other voluntary final disposition of a suit under this Article 7 may be entered into without the joint consent of Aventis and PharmaNetics (which consent shall not be withheld unreasonably).

(d) If PharmaNetics brings such an action, PharmaNetics shall retain any damages or other monetary awards recovered by PharmaNetics.

(e) If PharmaNetics fails to bring such an action and Aventis brings action, any damages or other monetary awards recovered by Aventis shall be retained by Aventis.

## ARTICLE 8

## REPRESENTATIONS AND WARRANTIES

8.1 Representations by PharmaNetics. PharmaNetics hereby represents and warrants to Aventis as follows:

8.1.1 The Product (a) shall be manufactured and packaged in compliance with current GMPs, as established and revised from time to time by the FDA, applicable Regulatory Approval applications, and all other U.S. and other governmental rules and regulations applicable to the Product and its manufacture, (b) shall conform to the specifications for the Product in effect at the time of delivery, (c) shall not be adulterated or misbranded within the meaning of the Act, nor constitute an article that may not be introduced into interstate commerce under the provisions of Section 505 of the Act, (d) shall conform to the certificates of analysis supplied with the shipment of the Product, (e) shall be packaged and shipped in accordance with mutually agreed to procedures, and (f) shall be free and clear of any lien or encumbrance;

8.1.2 PharmaNetics has delivered to Aventis copies of all PharmaNetics Know-how, together with any other information now owned or controlled by

Confidential

PharmaNetics that PharmaNetics believes is reasonably necessary or useful to a complete understanding of the prospects for the Product, including without limitation complete reports on all serious adverse experiences associated with the use of Product with any pharmaceutical product or other substance;

8.1.3  All PharmaNetics Know-how and other Information of a material nature delivered by PharmaNetics to Aventis was accurate and correct ;

8.1.4  PharmaNetics has sufficient legal and/or beneficial right, title and interest in, to and under the PharmaNetics Patent Rights, the PharmaNetics Know-how and its other intellectual property rights to perform its obligations under this Agreement;

8.1.5  The conduct of its business as proposed under this Agreement would not to the knowledge of PharmaNetics violate any of the intellectual property rights of any other person or entity relating to the Product;

8.1.6  PharmaNetics believes that there is no material unauthorized use, infringement or misappropriation of any PharmaNetics Know-how or PharmaNetics Patent Rights;

8.1.7  PharmaNetics' execution and delivery of this Agreement and its performance of its obligations under this Agreement will not violate any federal, state, municipal statute or regulation or any order of any court or other governmental department, authority, agency or instrumentality;

8.1.8  All of PharmaNetics' employees, officers, relevant subcontractors and relevant consultants have executed agreements requiring assignment to it of all inventions made during the course of and as a result of their association with it and obligating the individual to maintain as confidential the confidential information of it, as well as the confidential information of a third party which it may receive;

8.1.9  PharmaNetics has not, and during the Term of this Agreement will not, grant any right to any third party relating to PharmaNetics Patents and PharmaNetics Know-how which would conflict with the rights granted to Aventis hereunder; and

8.1.10 During the Term of this Agreement, PharmaNetics will not knowingly infringe any valid third party intellectual property rights related to the Product in its conduct of any activity under the Project.

Confidential

8.2 <u>Representations and Warranties of Aventis</u>. Aventis hereby represents and warrants to PharmaNetics as follows:

8.2.1 Aventis' execution and delivery of this Agreement and its performance of its obligations under this Agreement will not violate any federal, state, municipal statute or regulation or any order of any court or other governmental department, authority, agency or instrumentality;

8.2.2 Aventis has delivered to PharmaNetics copies of all Aventis Know-how, together with any other information now owned or controlled by Aventis that Aventis believes is reasonably necessary or useful to a complete understanding of the prospects for developing the Product to support Lovenox®;

8.2.3 All Aventis Know-how and other Information of a material nature delivered by Aventis to PharmaNetics was accurate and correct;

8.2.4 Aventis has not, and during the Term of this Agreement will not, grant any right to any third party relating to Aventis Know-how in the Field which would conflict with the rights granted to PharmaNetics hereunder; and

8.2.5 Aventis will not knowingly infringe any valid third party intellectual property rights related to Product in its conduct of any activity under the Project.

8.3 <u>Disclaimer of Warranties</u>. EXCEPT FOR THE WARRANTIES CONTAINED IN THIS SECTION 8, THE PARTIES HEREBY DISCLAIM ANY AND ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, PERFORMANCE, SATISFACTORY QUALITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 9

## INDEMNIFICATION AND INSURANCE

9.1 <u>Employees</u>. Each Party shall indemnify the other Party, such other Party's successors and assigns, and the directors, officers, employees, agents and counsel thereof (the "Other Party's Indemnitees"), defend and hold each Other Party's Indemnitee harmless from and against, on an after-tax basis, any and all liabilities, damages, settlements, claims, actions, suits, penalties, fines, costs or expenses (including without limitation reasonable attorneys' fees) (any of the foregoing being referred to collectively as "Damages") incurred by or asserted

Confidential

against any Other Party's Indemnitee by or on behalf of the indemnifying Party's employees that arise out of a breach of this Agreement by such employees.

9.2 <u>Aventis' Right to Indemnification</u>. PharmaNetics shall indemnify each of Aventis, its successors and assigns, and the directors, officers, employees, agents and counsel thereof (the "Aventis Indemnitees"), defend and hold each Aventis Indemnitee harmless from and against, on an after-tax basis, any and all Damages incurred by or asserted against any Aventis Indemnitee of whatever kind or nature, including, without limitation, any claim or liability based upon negligence, warranty, strict liability, violation of government regulation or infringement of patent or other proprietary rights, but only to the extent arising from or occurring as a result of a third party claim against any Aventis Indemnitee because of (a) breach of any warranty made by PharmaNetics in Section 8; (b) the failure of PharmaNetics to manufacture, process or test Product according to specifications, ; (c) the failure of PharmaNetics to disclose any material or drug safety information in PharmaNetics' possession to Aventis regarding any Product; (d) the labeling, warehousing, distribution or detailing of a Product by PharmaNetics that is not in conformity with representations and warranties made under this Agreement by PharmaNetics; (e) any breach of this Agreement by PharmaNetics, or (f) any product liability claim resulting in a judgment against, or a negotiated settlement entered into by, PharmaNetics relating to the Product, except, in each such case, to the extent that such Damages result from the negligence or misconduct of Aventis or its licensees (except activities undertaken by PharmaNetics), or the breach by Aventis of any obligation or warranty under this Agreement, or any claims compromised or settled without PharmaNetics' prior written consent. Aventis shall promptly notify PharmaNetics of any third party claim, upon becoming aware thereof, and permit PharmaNetics at PharmaNetics' cost to defend Aventis against such third party claim and to control the defense and disposition (including, without limitation, all decisions to litigate, settle or appeal) of such third party claim and shall cooperate in the defense thereof. Aventis may, at its option and expense, have its own counsel participate in any proceeding that is under the direction of PharmaNetics and will cooperate with PharmaNetics and its insurer in the disposition of any such matter. PharmaNetics shall not be liable for any litigation costs or expenses incurred by the Aventis Indemnitees without PharmaNetics' prior written authorization.

9.3 <u>PharmaNetics' Right to Indemnification</u>. Aventis shall indemnify each of PharmaNetics, its successors and assigns, and the directors, officers, employees, agents and counsel thereof (the "PharmaNetics Indemnitees"), defend and hold each PharmaNetics Indemnitee harmless from and against, on an after-tax basis, any and all Damages incurred by or asserted against any PharmaNetics Indemnitee of whatever kind or nature, including, without

Confidential

limitation, any claim or liability based upon negligence, warranty, strict liability, violation of government regulation or infringement of patent or other proprietary rights, but only to the extent arising from or occurring as a result of a third party claim against any PharmaNetics Indemnitee because of (a) breach of any warranty made by Aventis in Section 8; (b) any breach of this Agreement by Aventis, except, in each such case, to the extent that such Damages result from the negligence or misconduct of PharmaNetics or its licensees (except activities undertaken by Aventis), or the breach by PharmaNetics of any obligation or warranty under this Agreement, or any claims compromised or settled without Aventis' prior written consent. PharmaNetics shall promptly notify Aventis of any third party claim, upon becoming aware thereof, and permit Aventis at Aventis' cost to defend PharmaNetics against such third party claim and to control the defense and disposition (including, without limitation, all decisions to litigate, settle or appeal) of such third party claim and shall cooperate in the defense thereof. PharmaNetics may, at its option and expense, have its own counsel participate in any proceeding that is under the direction of Aventis and will cooperate with Aventis and its insurer in the disposition of any such matter. Aventis shall not be liable for any litigation costs or expenses incurred by the PharmaNetics Indemnitees without Aventis' prior written authorization.

9.4     <u>Insurance</u>. PharmaNetics represents and warrants to Aventis that it has sufficient insurance to adequately protect PharmaNetics and Aventis (a) from any and all claims by employees of PharmaNetics for bodily injury (including death), whether or not such claims are under applicable worker's compensation act; and (b) from any and all claims for injury (including death), loss or damage to any person or property which may arise or result from any allegedly tortious act, omission or statement of PharmaNetics or any person employed by or under contract with PharmaNetics. PharmaNetics shall require subcontractors, if any, to carry worker's compensation insurance and adequate liability insurance. These insurance provisions in no way alter either party's indemnification obligations as set forth in this Agreement. In no event shall the type, form and amount of insurance coverage maintained by PharmaNetics be less than the following minimum amounts:

| <u>Type</u> | <u>Amount</u> |
| --- | --- |
| Worker's Compensation Ins. | As required by law |
| Employer's Liability | $1,000,000 |
| Comprehensive General Liability (CLS) | $500,000 |

Confidential

| | |
|---|---|
| Third Party Liability Bodily Injury / Property Damage (includes Independent Contractor Coverage, Completed Operations or Product Coverage, Blanket Contractual, Explosion, Collapse, underground, Broad Form Property Damage, 30-Day Notice of Cancellation, Aventis as an Additional Insured) | $1,000,000 |
| Automobile Liability (CLS) Bodily Injury | $1,000,000 |
| Umbrella Liability Coverage (with Aventis named as an additional insured) | $14,000,000 |

Aventis represents and warrants to PharmaNetics that it is adequately insured to protect PharmaNetics and Aventis against Aventis' liabilities and risks under this Agreement.

## ARTICLE 10

### CONFIDENTIALITY

10.1  <u>Confidentiality of Disclosed Information</u>.  Except to the extent expressly authorized by this Agreement or otherwise agreed in writing, the Parties agree that, for the Term of this Agreement and for ten (10) years thereafter, the receiving Party shall keep confidential and shall not publish or otherwise disclose or use for any purpose other than as provided for in this Agreement any Information or other information furnished to it by the other Party pursuant to this Agreement (collectively, "Confidential Information").

10.2  <u>Exceptions</u>.  Confidential Information shall not include information that:

    (a)    Was already known by the receiving Party, other than under an obligation of confidentiality, at the time of disclosure to the receiving Party;

    (b)    Was generally available to the public or otherwise part of the public domain at the time of disclosure to the receiving Party;

    (c)    Became generally available to the public or otherwise part of the public domain after the time of disclosure to the receiving Party

Confidential

other than through any act or omission of the receiving Party in breach of this Agreement; or

(d) Was disclosed to the receiving Party, other than under an obligation of confidentiality, by a third party not obligated to the disclosing Party not to disclose such Information to others.

In addition, the provisions of this Section 10 shall not preclude the receiving Party from disclosing Confidential Information to the extent such Confidential Information is required to be disclosed by the receiving Party or its Affiliates to comply with applicable laws, to defend or prosecute litigation or to comply with governmental regulations, provided that the receiving Party provides prior written notice of such disclosure to the disclosing Party and takes reasonable and lawful actions to avoid and/or minimize the degree of such disclosure. Specific information shall not be deemed to be within any of the foregoing exclusions merely because it is embraced by more general information falling within these exclusions.

10.3 <u>Employee and Advisor Obligations</u>. PharmaNetics and Aventis each agree that they shall provide Confidential Information received from the other Party only to their respective employees, consultants and advisors who have a need to know and have an obligation to treat such information and materials as confidential.

## ARTICLE 11

## TERM AND TERMINATION

11.1 <u>Term</u>. This Agreement shall commence as of the Effective Date and, unless sooner terminated in whole or in part as specifically provided in the Agreement, shall continue in effect for perpetuity.

11.2 <u>Termination for Default</u>. If either Party is in default of any of its material obligations under this Agreement and (1) fails to remedy that default within 30 days after receipt of written notice of such default or (2) the default is the second such default in 12 months, the Party not in default may terminate this Agreement immediately by giving written notice of such termination. A termination of or material change to a Regulatory Approval for the Product shall constitute an event of default.

11.3 <u>Termination for Bankruptcy</u>. In the event that a Party becomes bankrupt or insolvent, a receiver or a trustee is appointed for the property or estate of such Party and said receiver or trustee is not removed within 60 days, or such Party makes an assignment for the benefit of its creditors, and whether any of the aforesaid events be the outcome of the voluntary act of that Party, or otherwise,

Confidential

the other Party shall be entitled to terminate this Agreement forthwith by giving written notice to such Party.

11.4 <u>Early Termination for Failure to Resolve Dispute; Non-Compete</u>. Either Party shall have the right to terminate this Agreement in accordance with the provisions of Section 2.1.5 and Section 4.2.4. In the event of such termination, and subject to the provisions and limitations of Section 2.1.5 and Section 4.2.4, (A) PharmaNetics agrees that, other than the sale of the Products, neither it nor any of its Affiliates shall , by license or otherwise, manufacture, market, sell, detail, promote or distribute a Low Molecular Weight Heparin test, and/or a system for any Low Molecular Weight Heparin drug that competes with Lovenox; and (B) Aventis agrees that neither it nor any of its subsidiaries shall, by license or otherwise, manufacture, market, sell, detail, promote or distribute a Low Molecular Weight Heparin test and/or system.  The time period for which such obligations apply shall be as follows:

    (a)    If such termination right is exercised prior to the payment of the milestone for completion of registration enabling trials set forth in Section 5.1.2, then for three (3) years from First Commercial Sale of Product; provided, however, if such termination right is exercised by Aventis, then there shall be no restrictions on PharmaNetics.

    (b)    If such termination right is exercised within two years of payment of the milestone for completion of registration enabling trials set forth in Section 5.1.2, then for three (3) years from the effective date of such early termination;

    (c)    If such termination right is exercised between the second and third anniversary of payment of the milestone for completion of registration enabling trials set forth in Section 5.1.2, then for two (2) years from the effective date of such early termination; or

    (d)    If such termination right is exercised between the third and fourth anniversary of payment of the milestone for completion of registration enabling trials set forth in Section 5.1.2, then for one (1) year from the effective date of such early termination.

11.5 <u>Surviving Rights</u>. The obligations of the Parties under Articles 9 and 10 and Sections 3.2, 7.3, 8.3, 11.4 and 11.7 will survive the termination or expiration of this Agreement.

11.6 <u>Accrued Rights; Surviving Obligations</u>. Termination, relinquishment or expiration of the Agreement for any reason shall be without prejudice to any rights that shall have accrued to the benefit of either Party prior to such termination,

Confidential

relinquishment or expiration. Such termination, relinquishment or expiration shall not relieve either Party from obligations that are expressly indicated to survive termination or expiration of the Agreement.

11.7 <u>Record Keeping and Audits</u>.

11.7.1 <u>PharmaNetics</u>. PharmaNetics shall keep complete and accurate records pertaining to the development, use and sale of Product in sufficient detail to permit Aventis to confirm PharmaNetics' research and development efforts, its manufacturing and processing activities, its clinical research, and regulatory approval and commercialization efforts. Such records shall be maintained for the longer of: a) four (4) years following the year in which any such efforts were made hereunder and b) such longer period as may be required by law.

11.7.2 <u>Aventis</u>. Aventis shall keep complete and accurate records pertaining to its promotion of the Product in sufficient detail to permit PharmaNetics to confirm Aventis' efforts to actively promote the Product as described in Section 4.5.5 herein. Such records shall include all information collected by Aventis relating to the Product, including but not limited to information documenting (1) the training of Aventis' Advanced Therapeutics sales force on the operation and promotion of the device and (2) the adequate provision of promotional materials to the Aventis sales force necessary for the promotion of the Product. Such records shall be maintained for the longer of: (a) 4 years following the year in which any such efforts were made hereunder and (b) such longer period as may be required by law.

11.7.3 <u>Audit Requests</u>. Each Party shall have the right to audit the records maintained by the other Party to comply with this Section 11.7, at its own expense and on an annual basis, to determine, with respect to any calendar year, the correctness of any report made, or the performance of such other Party's obligations, under this Agreement, but only once with respect to each calendar year. If a Party desires to audit the other Party's records, it shall do so itself or engage an independent, certified public accountant reasonably acceptable to the other Party, to examine such records. Any Information received by a Party pursuant to this Section 11.7 shall be deemed to be Confidential Information. This Section 11.7 shall survive any termination of this Agreement for a period of four (4) years.

Confidential

## ARTICLE 12

### GENERAL

12.1 <u>Agency</u>. Neither Party is, nor shall be deemed to be, an employee, agent, co-venturer or legal representative of the other Party for any purpose. Neither Party shall be entitled to enter into any contracts in the name of, or on behalf of the other Party, nor shall either Party be entitled to pledge the credit of the other Party in any way or hold itself out as having the authority to do so.

12.2 <u>Assignment</u>. Except as otherwise provided herein, neither this Agreement nor any interest hereunder shall be assignable by any Party without the prior written consent of the other; provided, however, that either party may assign this Agreement to an Affiliate in a manner such that the assignor shall remain liable and responsible for the performance and observance of all its duties and obligations hereunder. This Agreement shall be binding upon the successors and permitted assignees of the Parties and the name of a party appearing herein shall be deemed to include the names of such Party's successor's and permitted assigns to the extent necessary to carry out the intent of this Agreement. Any assignment not in accordance with this Section shall be void.

12.3 <u>Further Actions</u>. Each Party agrees to execute, acknowledge and deliver such further instruments, and to do all such other acts, as may be necessary or appropriate in order to carry out the purposes and intent of the Agreement.

12.4 <u>Notices</u>. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given and received (a) upon personal delivery, (b) on the fifth day following mailing by registered or certified mail, return receipt requested, postage prepaid, addressed to the PharmaNetics and Aventis at their respective addresses as listed below (or at such other address for a Party as shall be specified by like notice; provided, that notices of a change of address shall be effective only upon receipt thereof), (c) upon transmission of telegram or facsimile (with telephonic notice), or (d) upon confirmed delivery by overnight commercial courier service:

If to Aventis, addressed to:   Aventis Pharmaceuticals Products Inc.
             Global Marketing & Medical
             Route 202-206
             PO Box 6800
             Bridgewater, NJ 08807
             Attention: Product Director - Lovenox®

With copy to:       Vice-President, Legal Corporate Development

Confidential

If to PharmaNetics, addressed to:    PharmaNetics, Inc.
    5301 Departure Drive
    Raleigh, North Carolina 27616
    Attention: President

With copy to:    Larry E. Robbins, Esq.
    Wyrick Robbins Yates & Ponton LLP
    4101 Lake Boone Trail, Suite 300
    Raleigh, North Carolina 27607

12.5    <u>Amendment; Approval</u>.  No amendment, modification or supplement of any provision of the Agreement shall be valid or effective unless made in writing and signed by a duly authorized officer of each Party.  No approval provided for in this Agreement shall be valid or effective unless confirmed in writing.

12.6    <u>Waiver</u>.  No provision of the Agreement shall be waived by any act, omission or knowledge of a Party or its agents or employees except by an instrument in writing expressly waiving such provision and signed by a duly authorized officer of the waiving Party.

12.7    <u>Severability</u>.  Whenever possible, each provision of the Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of the Agreement In the event of such invalidity, the Parties shall seek to agree on an alternative enforceable provision that preserves the original purpose of this Agreement.

12.8    <u>Entire Agreement of the Parties</u>.  This Agreement, including the other written agreements referred to herein and the Exhibits attached hereto, constitutes and contains the complete, final and exclusive understanding and agreement of the Parties hereto and cancels and supersedes any and all prior negotiations, correspondence, understandings and agreements, whether oral or written, between the Parties respecting the subject matter hereof.  To the extent appropriate, the provisions of this Agreement shall apply to the other agreements referred to herein.

12.9    <u>Counterparts</u>.  This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one instrument.

Confidential

12.10 <u>Descriptive Headings</u>. The descriptive headings of this Agreement are for convenience only, and shall be of no force or effect in construing or interpreting any of the provisions of this Agreement.

12.11 <u>Governing Law</u>. This Agreement shall be governed by and interpreted in accordance with the substantive laws of the State of Delaware, without regard to choice of law rules.

12.12 <u>Public Announcements</u>. Neither party shall make any public announcement concerning the transactions contemplated herein, or make any public statement which includes the name of the other party or any of its Affiliates, or otherwise use the name of the other party or any of its Affiliates in any public statement or document, except as may be required legally by law or judicial order, without the prior written consent of the other party, which consent shall not be unreasonably withheld. A party proposing a public announcement will provide the other party a copy for comment at least five (5) business days in advance or such lesser period of time if not practicable. The parties agree that upon execution of this Agreement, that the Parties shall issue a joint press release, in the form attached hereto as Exhibit B.

12.13 <u>Third Party Beneficiaries</u>. None of the provisions of this Agreement shall be for the benefit of or enforceable by any third party, including, without limitation, any creditor of either party hereto. No such third party shall obtain any right under any provision of this Agreement or shall by reasons of any such provision make any claim in respect of any debt, liability or obligation (or otherwise) against either party hereto.

12.14 <u>Force Majeure</u>. No party shall be liable for failure of or delay in performing obligations set forth in this Agreement, and no party shall be deemed in breach of its obligations, if such failure or delay is due to natural disasters or any causes reasonably beyond the control of such party.

[Remainder of page intentionally left blank]

Confidential

**IN WITNESS WHEREOF**, the Parties hereto have as of the Effective Date duly executed this Agreement, including the attached Exhibits that are incorporated herein and made a part hereof.

**AVENTIS PHARMACEUTICALS PRODUCTS INC.**

By: _____

Name: John R. Leone

Title:  Sr. Vice President & COO

U.S. Commercial Operations

By: _____

Name: J. David Owens

Title:  Vice President, Global Marketing & Medical – Cardiology / Thrombosis

**PHARMANETICS, INC.**

By: _____

Name:  John Funkhouser

Title: President & CEO

Page 26

Confidential

## EXHIBIT A

### Clinical Test Pricing

Cost to be negotiated on a trial-by-trial basis, but not to exceed the following:

| | | |
|---|---|---|
| Enoxaparin Test Card | Prior to First Commercial Sale | $25.00 each |
| Enoxaparin Test Card | After First Commercial Sale | $12.50 each |

Confidential

Exhibit B

Final Draft

AUGUST 31, 2000

**PharmaNetics and Aventis Pharmaceuticals Sign
Exclusive Agreement for Enoxaparin Test**

RALEIGH, N.C. and PARSIPPANY, N.J. (September 2, 2000) – PharmaNetics, Inc. (NASDAQ NM: PHAR) and Aventis Pharmaceuticals, the U.S. pharmaceutical company of Aventis S.A. (NYSE: AVE), today announced the signing of a five-year agreement to partner in the development and commercialization of a new therapeutic diagnostic test for use with Aventis Pharmaceuticals' enoxaparin sodium (Lovenox®/Clexane®). With 1999 worldwide sales exceeding $780 million, enoxaparin is the number-one selling low-molecular-weight heparin (LMWH) in the world.

"We are pleased to align ourselves with a company that is dedicated to maintaining its market leadership through a comprehensive clinical development program and innovative marketing strategy that will provide value-added services and benefits to their customers," said John Funkhouser, President and CEO of PharmaNetics. "This partnership may serve as a future example for other pharmaceutical companies proactively addressing the needs of the medical community for total healthcare solutions."

The terms of the agreement provide for PharmaNetics to work exclusively with Aventis Pharmaceuticals for a five-year period on a LMWH test card. In return, Aventis has agreed to pay $5 million in milestone payments to PharmaNetics over the next 12 months. The test will be specifically calibrated for optimal response to enoxaparin, and will be unsuitable for use with other LMWHs. Carrying the trade names and corporate logos of both companies, the card will be labeled and indicated for use as an enoxaparin test.

The companies will form two committees to oversee the completion of the test development through filing of registration (510(k)) with the FDA, and will formulate a joint clinical trial and

Confidential

global commercialization strategy. In addition, the agreement includes provisions for the co-development of educational materials for the medical community. PharmaNetics will expand its sales and technical service group to provide access to the technology and training to the 1,000 U.S. medical centers that will be the focus of the initial program. The Aventis Pharmaceuticals sales force will be provided with the training, literature and materials necessary to inform physicians of the test's utility in managing patients receiving enoxaparin for certain indications and its availability through PharmaNetics.

"Numerous studies have already established Lovenox as a safe and effective replacement for unfractionated heparin for existing indications because of its unique pharmacological properties and predictable anticoagulant response," said Gerald P. Belle, President, Aventis Pharmaceuticals North America. "However, there may be certain situations where providing physicians with this test will enable them to customize treatment regimens and optimize patient care. This will increase the value of the product for physicians and its benefits to their patients."

Enoxaparin was approved in the U.S. and Canada in 1993, and is indicated for the prevention and treatment of deep-vein thrombosis, unstable angina and non-Q wave myocardial infarction. Enoxaparin is marketed under the trade name Lovenox® in the U.S. and the brand names Lovenox, Clexane® and Klexane® in other parts of the world.

PharmaNetics' technology is uniquely capable of evaluating drugs that influence both clot formation and dissolution and, as such, the Company's strategy is to expand its menu by developing theranostic tests to assess multiple therapeutic agents. The Company intends to provide physicians with a single platform capable of monitoring numerous antithrombotic therapies, both those on the market as well as those being investigated in the treatment of diseases such as sepsis, stroke, unstable angina, deep vein thrombosis, and pulmonary and arterial emboli.

Aventis Pharmaceuticals conducts the U.S. business of Aventis Pharma AG, the pharmaceutical company of Aventis S.A. (NYSE: AVE). Aventis Pharmaceuticals is dedicated to treating and preventing human disease through the discovery, development, manufacture and sale of innovative pharmaceutical products aimed at satisfying unmet medical needs. Aventis Pharmaceuticals focuses on important therapeutic areas such as cardiology, oncology, infectious

Confidential

diseases, arthritis, allergies and respiratory disorders, diabetes, and central nervous system disorders. The corporate headquarters for Aventis Pharmaceuticals is in Parsippany, N.J.

Aventis Pharma comprises Aventis Pharmaceuticals; Aventis Pasteur, a world leader in vaccines, with corporate headquarters in Lyon, France; and Aventis Behring, a world leader in therapeutic proteins, with corporate headquarters in King of Prussia, Pa. The corporate headquarters of Aventis Pharma is in Frankfurt, Germany.

One of the world's leading life sciences companies, Aventis S.A. is focused on two core business areas: pharmaceuticals and agriculture. With global headquarters in Strasbourg, France, Aventis employs around 95,000 people in more than 120 countries. Aventis was created in December 1999 by the combination of Hoechst AG and Rhône-Poulenc, S.A.

*This press release contains forward-looking statements regarding future events and the future performance of PharmaNetics that involve risks and uncertainties, such as risks related to market acceptance, clinical trials and dependence on third-party distributors and collaborative partners that could cause actual results to differ materially from those projected in the forward-looking statements. Information concerning these and other of the factors that could cause actual results to materially differ from those in the forward-looking statements is contained in the Company's SEC filings, including Form 10-K, Form 10-Q and Form 8-K reports.*

*Statements in this news release other than historical information are forward-looking statements subject to risk and uncertainties. Actual results could differ materially depending on factors such as the availability of resources, the timing and effects of regulatory actions, the strength of competition, the outcome of litigation, and the effectiveness of patent protection. Additional information regarding risks and uncertainties is set forth in the current Annual Report on Form 20-F of Aventis on file with the Securities and Exchange Commission.*

# # #

Confidential