## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* | ) | |
| KATY KENNEDY and FRANK A. MATOS, | ) | |
| THE STATE OF ILLINOIS *ex rel.* | ) | |
| KATY KENNEDY and FRANK A. MATOS, and | ) | |
| KATY KENNEDY, individually | ) | |
| | ) | Case No. 03-C-2750 |
| Plaintiffs, | ) | |
| | ) | Honorable Matthew F. Kennelly |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| AVENTIS PHARMACEUTICALS, INC., | ) | |
| and PHARMANETICS, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

To: All Counsel of Record

  Please take notice that on December 31, 2008, I caused to be filed with the Clerk of the US District Court, Northern District of Illinois, Eastern Division, **Plaintiffs' Fourth Amended Complaint**, a copy of which is attached hereto and served upon you.

s/ Michael C. Rosenblat
Attorney for Plaintiff

Michael C. Rosenblat
**MICHAEL C. ROSENBLAT, P.C.**
33 North LaSalle Street, Suite 2900
Chicago, IL 60602
312-948-0006


Clinton A. Krislov
Kenneth T. Goldstein
**KRISLOV & ASSOCIATES, LTD.**
20 North Wacker Drive, Suite 1350
Chicago, IL 60606
312-606-0500

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* ) | |
| KATY KENNEDY and FRANK A. MATOS, ) | |
| THE STATE OF ILLINOIS *ex rel.* ) | |
| KATY KENNEDY and FRANK A. MATOS, and ) | |
| KATY KENNEDY, individually ) | |
| ) | 03C- 2750 |
| Plaintiffs, ) | |
| ) | Honorable Matthew J. Kennelly |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| AVENTIS PHARMACEUTICALS, INC., ) | |
| and PHARMANETICS, INC. [1] ) | |
| ) | |
| ) | |
| Defendants. ) | |

**FOURTH AMENDED COMPLAINT**

Plaintiffs complain and state as follows:

## I.  NATURE OF THE ACTION

1.      This is an action to recover damages and civil penalties on behalf of the United

States of America under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended ("the

FCA"), and a related state false claims act, the Illinois Whistleblower Reward and Protection

Act, 740 ILCS §§ 175/1 *et seq.*  (Hereinafter the FCA and the Illinois Whistleblower Reward and

Protection Act will be referred to as the "FCAs."  The United States and the State of Illinois are

hereinafter referred to as the "Governments.")  This is also an action to recover damages on

behalf of Katy Kennedy, under the whistleblower protection provisions of the FCAs, and the

---

[1] On July 17, 2008 all claims against Defendant PharmaNetics Inc., were dismissed with prejudice [Doc. 142] subsequent to Relators' filing of a consent motion for dismissal [Doc 141].

Illinois Whistleblower Act, 740 ILCS §§ 171/1 *et seq*.,  against Defendant Aventis Pharmaceuticals, Inc.

2.  The FCAs causes of action arise from false statements, records, and claims by Defendants Aventis Pharmaceuticals, Inc. and PharmaNetics, Inc. ("Defendants") and/or their agents, employees and co-conspirators in violation of the FCAs.  These violations involve false or fraudulent claims for payment or approval presented, or caused to be presented, and/or false records Defendants have made, used, or caused to be made or used, in order to get false or fraudulent claims paid or approved by the Governments, and/or conspired to defraud the Governments by getting false or fraudulent claims allowed or paid.

3.  These claims are based on Defendants' knowing dissemination of off-label information relating to the prescription drug Lovenox® ("Lovenox"), which is the brand name of the generic drug enoxaparin, and on Defendant Aventis' payment of kickbacks to induce health care program business.  Lovenox is an anticoagulant and is prescribed by physicians almost exclusively for inpatient hospital use.  "Off-label" promotion is any communication of information relating to a product not contained in the Federal Drug Administration's ("FDA") approved labeling.  The FDA's approved labeling is the product's package insert.

4.  In August 2000, Defendants entered into an agreement under which Defendant PharmaNetics would develop a test to detect the anticoagulant effects of Aventis Pharmaceutical's Lovenox on patients with unstable angina.  The purpose of this test was to overcome objections from interventional cardiologists, who have patients who will transition to the catheterization  laboratory, and who were unwilling to perform interventional procedures on patients with unstable angina who were receiving Lovenox.  Lovenox does not have an FDA approved application for use in the catheterization  laboratory where patients with unstable

angina would be treated with interventional procedures. Defendants conspired to create a new marketing tool designed specifically to market Lovenox for an unapproved use.

5.     Simply put, Defendants' off-label promotion of Lovenox caused physicians to prescribe Lovenox for off-label uses. Defendants' knowing off-label promotion of Lovenox caused physicians to prescribe Lovenox under the erroneous belief that Lovenox was indicated for those off-label uses. This in turn caused physicians and hospitals to submit false claims to the Governments. The off-label use of a particular drug is not covered under federal or state health plans unless its use is supported by certain criteria. In addition, based on information and belief, Defendants' off-label promotion of Lovenox has created a threat to public health and safety, and has resulted in injuries and patient deaths. In fact, Dr. Ben Gladden, Aventis Scientific Manager, has acknowledged bleeds, patient deaths, and inappropriate dosing.

6.     Aventis Pharmaceuticals also offered things of value to physicians and others to induce health care program business for Lovenox. These items of value included tickets to sporting events, programs without educational value, grants and other items of value, for physicians and others who were in positions to prescribe or influence prescriptions for Lovenox.

## II.    PARTIES

7.     Relator, KATY KENNEDY ("Kennedy" or "Relator") is a resident of Des Plaines, Illinois and was an employee and sales representative of Defendant Aventis Pharmaceuticals, Inc. ("Aventis") from January 2002 to February 2004. Ms. Kennedy was employed by Aventis as a senior sales associate for the prescription drug Lovenox for two years. Ms. Kennedy has had employment in the pharmaceutical industry as a pharmaceutical sales representative for six years. Ms. Kennedy brings this action for violations of the FCAs as set forth herein, upon personal knowledge as to herself and her own acts and upon information and

belief as to all other matters, on behalf of herself and the Governments under their respective *qui tam* provisions. Ms. Kennedy also brings this action for herself under the whistleblower protection provisions of the FCAs, and the Illinois Whistleblower Act.

8.     Relator, FRANK A. MATOS ("Matos" or "Relator") is a resident of Hoffman Estates, Illinois and an employee and senior specialty sales associate of Aventis. Mr. Matos has been employed as a pharmaceutical sales representative for twenty-one years and was employed by Aventis from March 1998 to October 18, 2005. Mr. Matos was first assigned as a Lovenox sales representative in 2001, along with his other responsibilities, and became a full-time Lovenox sales representative in January 2002. Mr. Matos brings this action for violations of the FCAs as set forth herein, upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters, on behalf of himself and the Governments under their respective *qui tam* provisions.

9.     Defendant AVENTIS PHARMACEUTICALS, INC. is a Delaware corporation. Aventis' principal place of business is located at 300 Somerset Corp Blvd., Bridgewater, New Jersey. Aventis' parent corporation is Sanofi-Aventis, U.S., L.L.C., and is the manufacturer of Lovenox. Aventis' U.S. sales of Lovenox were $958 million in 2002 and $1.2 billion in 2003. Lovenox is Defendant's second largest selling drug after Allegra®.

10.     Defendant PHARMANETICS, INC. ("PharmaNetics") is a North Carolina corporation. PharmaNetics' principal place of business is in Morrisville, North Carolina. PharmaNetics is a leading medical diagnostic company, which develops, among other tests, diagnostics to assess blood clot formation and dissolution.

### III.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

12.     This Court has supplemental jurisdiction over the *qui tam* Relators' state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case and controversy under Article III of the United States Constitution. This Court also has jurisdiction over the state's claims pursuant to 31 U.S.C. § 3732(b), as the state's claims arise from the same transactions and occurrences as the federal action.

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process.  Defendants transact business in the United States.  Defendants can be found in, reside in, and/or transact or have transacted business related to the allegations in this complaint within the Northern District of Illinois.

14.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), as Defendants can be found in, reside in, and/or transact business in the Northern District of Illinois.

15.     This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

16.     To the extent that there has been a public disclosure unknown to Relators, Relators are an original source under 31 U.S.C. §3730 (e)(4), 740 ILCS 175/4(e)(4), and other state whistleblower statutes.  Relators have direct and independent knowledge of the information

on which the allegations are based and have voluntarily provided the information to the Governments before filing an action under these sections.

17.     Relators Kennedy and Matos have served on the Attorney General of the United States, the United States Attorney for the Northern District of Illinois, and the Illinois Attorney General, substantially all  material evidence and information they possess in accordance with the provisions of 31 U.S.C. §3730(b)(2), and 740 ILCS 175/4(b)(2).

## IV.     THE FEDERAL FALSE CLAIMS ACT

18.     The False Claims Act provides, in pertinent part that:

> (a)  Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $ 10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person,
>
> * * *
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

> (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government.  The action shall be brought in the name of the Government.  The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.
> (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be

- 6 -

served on the Government pursuant to Rule 4(d)(4) of the Federal
Rules of Civil Procedure. The complaint shall be filed in camera,
shall remain under seal for at least 60 days, and shall not be served
on the defendant until the court so orders. The Government may
elect to intervene and proceed with the action within 60 days after
it receives both the complaint and the material evidence and
information.
(3) The Government may, for good cause shown, move the court
for extensions of the time during which the complaint remains
under seal.

31 U.S.C. § 3730.

19.     The False Claims Act's whistleblower protection provision provides in pertinent

part that:

Any employee who is discharged, demoted, suspended, threatened,
harassed, or in any other manner discriminated against in the terms
and conditions of employment by his or her employer because of
lawful acts done by the employee on behalf of the employee or
others in furtherance of an action under this section, including
investigation for, initiation of, testimony for, or assistance in an
action filed or to be filed under this section, shall be entitled to all
relief necessary to make the employee whole. Such relief shall
include reinstatement with the same seniority status such employee
would have had but for the discrimination, 2 times the amount of
back pay, interest on the back pay, and compensation for any
special damages sustained as a result of the discrimination,
including litigation costs and reasonable attorneys' fees. An
employee may bring an action in the appropriate district court of
the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h)

## V.     THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

20.     The Illinois Whistleblower Reward and Protection Act provides, in pertinent part:

(a) Liability for certain acts. Any person who:
(1) knowingly presents, or causes to be presented, to an officer or
employee of the State or a member of the Guard a false or
fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false
record or statement to get a false or fraudulent claim paid or
approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

* * *

is liable to the State for a civil penalty of not less than $ 5,000 and not more than $ 10,000, plus 3 times the amount of damages which the State sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.

(b) Knowing and knowingly defined. As used in this Section, the terms "knowing" and "knowingly" mean that a person, with respect to information:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

§ 740 ILCS 175/3

(b) Actions by private persons. (1) A person may bring a civil action for a violation of Section 3 [*740 ILCS 175/3*] for the person and for the State. The action shall be brought in the name of the State. . . .

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the State. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. . . .

(3) The State may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. . . .

§ 740 ILCS 175/4

21. The Illinois Whistleblower Reward and Protection Act's whistleblower protection provision provides, in pertinent part:

g) Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Section, including investigation for, initiation of, testimony for, or

assistance in an action filed or to be filed under this Section, shall
be entitled to all relief necessary to make the employee whole.
Such relief shall include reinstatement with the seniority status
such employee would have had but for the discrimination, 2 times
the amount of back pay, interest on the back pay, and
compensation for any special damages sustained as a result of the
discrimination, including litigation costs and reasonable attorneys'
fees. An employee may bring an action in the appropriate circuit
court for the relief provided in this subsection (g).

740 ILCS 175/4(g)

## VI. THE CLAIMS PROCESS

22.     Before the digital age, it was easy to understand and visualize the claims process.
When the False Claims Act was enacted in 1865, a contractor would produce a written paper
claim and present it to the government. Today, the Medicare claims process is electronic. The
claims data collected by the hospitals is electronically transmitted to a fiscal intermediary[2] who
processes the data supplied and determines the amount of payment due the hospital. Because
this claims data is submitted electronically, the false claims can be produced in an electronic
form.

23.     The "bill" hospitals send to the fiscal intermediary is not similar to the bill
individuals receive from their doctor or hospital or comparable to the explanation of benefits
patients receive from their insurance carrier. The Universal Billing Form is sent to the fiscal
intermediary as electronic data, and the appropriate data is extracted by the fiscal intermediary,
which then generates the payment. The off-label Lovenox charge is also extracted and included
in the cost reports by the hospitals and submitted electronically to the fiscal intermediary. The
simple inclusion of a non-reimbursable item on the cost report affects the ultimate settlement of

---

[2] Private contractors serve as fiscal intermediaries and process claims for reimbursement in the
Medicare program. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 683 (7th Cir. Ill.
2000)

the notice of program reimbursement settlement amount and each and every outlier payment made to the hospital whether or not the individual who received that outlier payment was prescribed Lovenox off-label. Thus each claim identified herein causes the hospital's cost to charge ratio to be fraudulently calculated, and causes each outlier payment calculation to be fraudulently calculated and is material to the government's decision to pay not only outlier payments associated with a patient prescribed Lovenox off-label, but to each outlier payment and to the cost report settlement amount. Additionally, the off-label use of Lovenox, when included on the UB Form for a Medicare Part B patient, increases the reimbursement amount for that patient's treatment.

24.    Today, when a patient is admitted to a hospital, they are assigned a UPC barcode. When a drug is removed from the pharmacy, its barcode is scanned along with the patient's to whom it is prescribed. This claims data is then included on the Universal Billing Form ("UB Form") and in the patient's records.

25.    The patients' records are reviewed after discharge by the medical records office, and ICD-9 procedure codes are assigned. These ICD-9 codes reflect the specific procedures performed on the patient. The ICD-9 codes in turn generate the patient's DRG. The DRG is the code that defines the patient's main condition requiring treatment. Each patient is assigned only one DRG. All of this information is electronically stored on the UB Form. This claims data is submitted electronically from the hospital to the fiscal intermediary. This claims data which is extracted from the UB Form then becomes a payment to the hospital, either as an interim payment or part of the notice of program settlement amount. If the extracted data relating to a specific patient generates costs above the outlier threshold an additional payment above the DRG payment amount is made to that hospital for that patient's care. The hospital does not submit any

additional data, or generate a separate request for an outlier payment.  The outlier payment is based entirely on the claims data submitted, including the non-reimbursable Lovenox.  A separate bill is not generated for the DRG claim or for an outlier payment. The only claim submitted is the UB Form.

26.     An outlier payment is a payment from the government in additional to the DRG reimbursement, when the patient's hospital stay is extraordinarily costly relative to other hospital stays for that DRG.  The outlier payment is based on the DRG plus certain standard reimbursements, plus the outlier threshold, to equal the outlier cutoff point.

27.     These outlier calculations are based on the data submitted by the hospital.  This claims data, which is the demand for payment, causes not only the reimbursement under the DRG but also the reimbursement under the outlier payment system.  No separate claim for the DRG or the outlier payment is submitted by the hospital.  All of the data needed to generate a payment for the DRG and outlier payments are included on the electronic UB Form.

28.     When an outlier payment is made for a hospital stay, each charge associated with that patient's treatment is reimbursed on a percentage basis, including the off-label use of Lovenox.  These outlier payments can be substantial.  For example, in 2005 Alexian Brother's Medical Center received an additional $4,242,701 as an outlier payment in addition to its inpatient reimbursement of $65,963,416.  (See Worksheet E – Part A, line 16 for inpatient reimbursement and line 2.01 for outlier payments). Other hospitals received in addition to their inpatient reimbursement outlier payments as follows:

| Hospital | Date | Inpatient reimbursement | Outlier Payment |
|---|---|---|---|
| Alexian Brothers | 2001 | $42,936,593 | $3,723,790 |
| Alexian Brothers | 2002 | $49,576,714 | $3,260,318 |

| | | | |
|---|---|---|---|
| Alexian Brothers | 2003 | $52,683,680 | $2,199,106 |
| Alexian Brothers | 2004 | $59,728,285 | $2,223,675 |
| Alexian Brothers | 2005 | $65,963,416 | $4,242,701 |
| Alexian Brothers | 2006 | $71,997,777 | $5,374,884 |
| Alexian Brothers | 2007 | $71,018,333 | $5,322,201 |
| Lutheran General | 2001 | $82,980,926 | $2,103,211 |
| Lutheran General | 2002 | $98,340,600 | $1,708,183 |
| Lutheran General | 2003 | $100,385,888 | $1,142,774 |
| Lutheran General | 2004 | $105,751,547 | $2,125,949 |
| Lutheran General | 2005 | $115,176,472 | $2,543,120 |
| Lutheran General | 2006 | $114,891,846 | $2,785,291 |
| Lutheran General | 2007 | $112,222,150 | $3,221,715 |
| Provena | 2001 | $56,151,299 | $1,561,858 |
| Provena | 2002 | $60,603,714 | $1,514,538 |
| Rockford Memorial | 2002 | $45,675,013 | $2,988,276 |
| Christ Hospital | 2002 | $139,369,656 | $2,546,963 |

See Group Exhibit A1 through A18.

29. The false claims at issue in this Complaint can be divided into several categories.

   a) claims affecting the Medicare Part B program, which are claims that are reimbursed based on the actual charges;

   b) claims affecting outlier payments generally through improper cost to charge ratio calculations based on non-reimbursable Lovenox being include in the cost reports;

   c) claims affecting outlier payments tied to an individual who was prescribed Lovenox off-label [these are a subset of subparagraph b]; and

      d)   claims affecting the NPR Settlement amount through the inclusion of non-reimbursable Lovenox in the cost report.

30.     Each type of claim identified above is identified herein.

31.     The inclusion of Lovenox as a covered charge on the UB Form, is always material in that it always affects the government's decision to pay, not based on the DRG assigned to the individual Medicare patient, but on every outlier payment made from a hospital in which the off-label use of Lovenox was prescribed and included as a covered charge on the UB Form.

## VII.   OUTLIER PAYMENTS

32.     Outlier payments supplement the standard payment under Medicare's prospective payment system (PPS).  Under the PPS, Medicare pays hospitals a fixed amount for each patient stay depending on a patient's diagnosis.  This amount is called the Diagnosis-Related Group (DRG) payment.  Outlier payments are made to supplement the DRG payments in situations where a patient's hospital stay is extraordinarily costly relative to other hospital stays for similar conditions or illnesses.  The outlier statute provides that hospitals may request these outlier payments for cases "where charges, adjusted to cost" exceed a certain cutoff point.  42 U.S.C. 1395ww(d)(5)(A)(ii).  The outlier payments are required to "approximate the marginal cost of care" above the cutoff point.  42 U.S.C. 1395ww(d)(5)(A)(iii).  This amount to trigger an outlier payment is automatically calculated due to the excess over the hospital's specific DRG payment. The sum of the total charges is the result of the chargeable items submitted on the UB form.

33.     When calculating the outlier payment, the "charge" is the amount submitted as a chargeable line item on the UB form.  The charge is adjusted to an "estimate" of cost based on the cost to charge ratio from the previous years' hospital charges submitted on the UB Form and compared to the costs submitted on the hospital's cost report.

34.     In determining outlier payments, the hospital's charges on the UB Form are adjusted to reflect the hospital's cost as stated above.  It is this aspect in which the charging of off-label items directly affects all outlier payments to the hospital, not just the outlier payment specifically tied to the patient given the Lovenox.  Due to this variation in the multiplier, the outlier payment on the claims submitted from hospitals that have included non-reimbursable Lovenox as a charge on the UB Form will be slightly increased each year due to the higher charges.  Thus each and every one of the outlier payment identified in Paragraph 28 are based at least in part on the affect that off-label Lovenox use had on the hospitals cost to charge ratio.

35.     Next, the hospital's charges, adjusted to costs, are compared with the "cutoff point," which is intended to cut off from outlier payment eligibility all hospital stays that are not extraordinarily costly.   The cutoff point is the sum of the DRG payment, certain other standard Medicare reimbursements (e.g., payments to the hospital for disproportionate share and/or graduate medical education programs), and a fixed dollar amount assigned by CMS that changes each year and is commonly known as the "outlier threshold."  This outlier formula can be summarized as follows:

```
 DRG
+ Certain other standard Medicare reimbursements
+ Outlier Threshold
----------------
= Cutoff point
```

36.     The final calculation of the outlier payment is based on a formula adopted by Medicare to estimate the marginal cost of the care furnished to the patients in excess of the outlier threshold.  Specifically, Medicare pays the hospital 80 percent of the difference between the hospital's "charges, adjusted to costs," as defined above.  The inclusion of non-reimbursable Lovenox as chargeable, affects the cost to charge ratio and the cut-off point.

- 14 -

37.     The outlier payment, after determining the cut-off point is determined as follows:

```
 Charges adjusted to cost
-      Cutoff point
      -----------------------------------
X   Marginal Cost Factor (80%)
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _
=  Outlier Payment
```

## VIII.   COST REPORTS

38.     The inclusion of non-reimbursable expenses, the off-label use of Lovenox in the hospital cost reports, affects the Notice of Program Reimbursement ("NPR") Settlement Amount.  The NPR Settlement Amount is the balance due the hospital and it based on the difference between the total inpatient reimbursement amount and the total of interim payments for the cost reporting period, less any tentative payments made by the fiscal intermediary.  The figure is obtained from the cost report's worksheet E, Part A, line 29.  The goal is to achieve a zero NPR settlement amount.  (See Exhibits A1 through A18).

39.     At the close of the fiscal year the hospital must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the proportion of the costs to be allocated to Medicare. The fiscal intermediary reviews the cost report, determines the amount of Medicare reimbursement due the hospital and issues the NPR Settlement amount.

40.     For example for fiscal year 2005, Alexian Brothers Medical Center, submitted a cost report to its fiscal intermediary, Mutual of Omaha, and has Total Inpatient Reimbursement of $65,963,416, total Inpatient Costs of $86,478,892 and an NPR Settlement of $232,712.  (See Exhibits A5 and B5, line 49.)

41.     The inclusion of Lovenox as a covered cost is included in Worksheet D-1, Part II, line 49, and is false.  Line 49, is the sum of including line 39, general inpatient routine service costs, which also included the cost of off-label Lovenox use.  This affects the NPR Settlement

- 15 -

Amount, and the outlier payments for future years. (See Exhibits B, Worksheet D-1, Part II, line 49).  Thus, all cost reports which contain off-label Lovenox as a chargeable cost are false.

42.     Below is an example of calculating an outlier payment, albeit somewhat simplified, note that the cost to charge ratios vary by hospital and by year.

Assumptions – Fiscal Year 2005; Outlier threshold $25,800; Patient charge $83,000; Lovenox off-label charge $3200.

| | |
|---|---|
| $9500 | DRG plus certain other standard Medicare reimbursements |
| 25800 | target threshold |
| <u>35300</u> | cut-off point |
| | |
| 38733 | charges adjusted to cost |
| (35300) | cut-off point |
| 3433 | amount subject to 80% |
| <u>2747 </u> | 80% marginal threshold |
| $105.90 | attributable to Lovenox off-label |

43.     The calculation used to determine the outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR § 412.84(i)(2).  Thus, the inclusion of non-reimbursable Lovenox in the hospital's cost report, will affect the cost to charge ratio, and will adversely affect cost outlier reimbursement, whether or not Lovenox was used off-label for that specific patient whose treatment resulted in an outlier payment.  The false claim, when it relates to an outlier payment, is not just the payment associated to a patient who receives an outlier payment, but to all outlier payments received by that hospital in any subsequent year, based on the false cost report. The inclusion of Lovenox as a chargeable expense on Alexian Brothers' cost reports, directly affected Alexian Brothers' outlier payment of $4,242,701 for fiscal year 2005, and adversely affected the outlier payments referenced in Paragraph 28.  (See Exhibit A1 through A18.)  False cost reports were filed by every hospital that had a patient prescribed Lovenox off

label and who had that off-label use of Lovenox included as a chargeable expense on the UB

Form and the cost report.

## IX.    THE FALSE CLAIMS

44.    As described in the proceeding paragraphs, Aventis caused hospitals to prescribe

Lovenox for off-label and for non-reimbursable indications.  These prescriptions in turn were

electronically recorded on the hospital's UB Form.  The information, claims, on the UB Form is

then used to determine outlier payments, the cost to charge ratio, patient reimbursement based on

the DRG assigned (Medicare Part A), patient reimbursement under Medicare Part B, which is

paid based on individual charges, and in the cost reports.  The inclusion of a non-reimbursable

expense has wide-ranging implication in the Medicare reimbursement structure as described

herein.

## X.    THE COST REPORTS

45.    These off-label uses, which are not covered, are included as covered charges in

the hospitals' cost reports. Hospitals are required, to submit these reports annually. 42 C.F.R.

413.20(b).  The cost report contains information including costs and charges. Hospitals under the

PPS are required to maintain cost reports in electronic format, and to submit the reports to

"achieve settlement of costs for health services rendered to Medicare beneficiaries."  42 C.F.R.

424.32(d)(viii)(B)(2) and 42 U.S.C. 1395g(a)).  The cost report data is also used to develop cost

limits, and must conform to the requirements and the principles set forth in 42 C.F.R. 412, and

413. The cost reports are such an integral part of the reimbursement system that the failure to file

a cost report will result in all DRG/PPS payments to be determined to be over payments. In other

words, the cost and charges to the hospital are included in the cost report and are used to not only

determine cost limits, i.e. DRG reimbursement rates, but also settle the cost of heath services provided to Medicare beneficiaries and determines cost to charge ratios and outlier payments.

XI.    THE DEFENDANTS' SCHEME TO DEFRAUD

46.    Lovenox is approved by the FDA for seven indications.  Those indications are: (1) Prophylaxis of deep vein thrombosis, which may lead to pulmonary embolism, in patients undergoing abdominal surgery who are at risk for thromboemobolic complications; (2) Prophylaxis of deep vein thrombosis, which may lead to pulmonary embolism, in patients undergoing hip replacement surgery, during and following hospitalization; (3) Prophylaxis of deep vein thrombosis, which may lead to pulmonary embolism, in patients undergoing knee replacement surgery; (4) Prophylaxis of deep vein thrombosis, which may lead to pulmonary embolism, in medical patients who are at risk for thromboemobolic complications due to severely restricted mobility during acute illness; (5) Prophylaxis of ischemic complications of unstable angina and non-Q-wave myocardial infarction, when concurrently administered with aspirin; (6) Inpatient treatment  of acute deep vein thrombosis with or without pulmonary embolism, when administered in conjunction with warfarin sodium; and (7) the outpatient treatment of acute deep vein thrombosis without pulmonary embolism when administered in conjunction with warfarin sodium. [3]

47.    Any marketing by Defendants for the use of Lovenox for indications other than the seven FDA approved uses is prohibited.  Defendants train and encourage, both overtly and covertly, its Lovenox and ENOX sales representatives to market Lovenox for off-label uses. Off-label promotion is strictly prohibited by the FDA.  Off-label promotion includes a pharmaceutical sales representative telling a physician or other customer about an unapproved

---

[3] Subsequent to the filing of this action, the FDA approved Lovenox for an eighth indication, the treatment of acute ST-segment elevation myocardial infarction ("STEMI").

use, referring to a research paper, and emphasizing a particular point by highlighting an approved document. Joe Levato, Aventis District Manager stated, in April 2003 that 60% of Lovenox sales were off-label.

## XII. THE OFF-LABEL PROMOTION AND MARKETING OF LOVENOX

48. Defendants engaged in a nationwide scheme to market Lovenox for off-label uses. Defendants sent their sales associates out into the medical community with instructions to market Lovenox for unapproved uses and to mislead physicians as to the approved uses of Lovenox. Defendants made false statements which they knew were false, and would result in false claims for off-label uses being submitted to Medicaid or other federal and state payors. Instances of such off-label marketing are stated below.

49. On August 10, 2001, Relator Matos received a copy of an email concerning renal dosing for enoxaparin, which was given to Alexian Brothers Medical Center, Elk Grove Village, Illinois. The FDA has not approved enoxaparin dosing guidelines for this patient population.

50. In May 2002 Sheetal Bahel, District Manager for Chicago South Region, Aventis, instructed a subordinate to make a binder containing off-label information, information which sales representatives are prohibited from disseminating to physicians or hospitals. This binder was provided by Sheetal Bahel to the Lovenox sales associates in her district for the purpose of marketing Lovenox for off-label uses. The binder is divided into eight sections, (1) Trauma, (2) General Surgery, (3) Stroke, (4) Neurosurgery, (5) Spinal Cord Injuries, (6) Obstetrician/Gynecology/Pediatrics, (7) Heparin Induced Thrombocytopenia (HIT), and (8) Other. None of these eight conditions are indicated uses for Lovenox.

51. On or about beginning May 2002 Relator Matos informed senior Aventis personnel, including Steve Kanovsky, Legal Department; Mailet Manassian, Human Resources;

- 19 -

Michael Johnson, VP Human Resources; and Tony Rizzello, Director Human Resources concerning unapproved/off-label clinicals being distributed by Aventis. Unapproved cardiology studies were distributed at a meeting, held on May 29, 2002, in Oakbrook, Illinois. These unapproved/off-label clinicals included NICE 1, 2, 3, and 4, Interact, Entire-Timi 23, FRIC, and FRISC.

52.     In May 2002, a Lovenox dosing guideline booklet, paid for with Aventis funds, was made by Julie Fitzpatrick, Aventis, and given to Relator Kennedy. On February 4, 2003, Relator Kennedy visited Resurrection Hospital, Park Ridge, Illinois, where an assistant to the Pharmacy Director showed Relator Kennedy approximately one hundred and fifty (150) of these guides. The FDA has not approved Lovenox/Enoxaparin dosing guidelines for special patient populations as indicated in the booklet.

53.     Clinical workshop materials were distributed to the Lovenox sales force at the 2003 Lovenox National Sales Meeting held between January 13 and 16, 2003 in Hollywood, Florida. This National Sales Meeting was attended by approximately 700 Lovenox sales associates, 100 management associates, and several high-ranking Aventis personnel, including Aventis company executives from France. The Clinical workshop materials that were distributed were divided by tabs. Under Tab A, "Cardiology Update," there is a discussion of the off-label use of Lovenox in the catheterization laboratory using unapproved IV dosing; Under Tab B, there is a discussion of unapproved IV dosing of Lovenox; Under Tab C, "DVT Prophylaxis Update," there is a discussion of unapproved IV dosing for Lovenox.

54.     At the January 2003 National Sales Meeting the entire Lovenox national sales force was informed via a slide presentation that Lovenox is "Therapeutic within 30 minutes."

55.     On or about between March 3 and 7, 2003, Advanced Training was conducted at Northwestern Memorial Hospital, Chicago, during which a significant amount of time was spent in the cardiac catheterization laboratory even though Lovenox is not indicated for such use.

56.     The Lovenox Clinical Reference Guide was received by Relator Matos on March 3, 2003, and was accompanied by a memorandum, from the Lovenox Brand Team, dated February 2003, which states "The Guide should provided you with a solid scientific platform upon which you can base your discussions with physicians." However, the information in the Guide is not for promotional use, is off-label, and may not be discussed by the sales associates with physicians.

57.     During ID Advanced Boot Camp, held on or about between March 21 and 22, 2002 Relator Matos was trained on the dissemination of unapproved information and participated in role-playing, which encouraged the discussion of unapproved information to overcome physician's objections.

58.     A Lovenox Sales Booklet, *Cardiology Workshop Marketing Overview, January 2003*, states, "Lovenox® reaches therapeutic levels within...1/2 Hour." This booklet was given to the entire U.S. Lovenox sales force in mid to late May 2003. During a sales practice role-play, held on May 27, 2003, Neil Wolf, Director of Lovenox Marketing, told Relators Kennedy and Matos, and two other sales associates, who were also participating in the role-play, that therapeutic levels are reached in 60-90 minutes, not within the 1/2 hour as stated in the Sales Booklet.

59.     The Lovenox sales team was also provided reprints of articles containing off-label indication for Lovenox. These include articles from *Orthopedics; Thromboprophylaxis and Neuraxial Anesthesia; Percutaneous Coronary Intervention After Subcutaneous Enoxaparin*

*Pretreatment in Patients With Unstable Angina Pectoris; Clinical Cardiology Consensus Report, October 15, 2003; Cardiology Workshop Marketing Overview, January 2003; An Update on Heparins at the Beginning of the New Millennium; Formulary, LMWHs: Review of their Role for unstable angina/non Q-wave myocardial infarction, December 2002; Low-Molecular-Weight Heparins: Formulary Drug Class Review, Reprinted from September 2001, Pharmacy and Therapeutics*; *Enoxaparin, A Pharmacoeconomic Review of its Use in the Prevention and Treatment of Venous Thromboembolism and in Acute Coronary Syndromes; Hospital Medicine Consensus Reports*; *The Lancet, reprint August 25, 2001*; *Applying Scientific Criteria to Therapeutic Interchange: A balanced Analysis of Low-Molecular-Weight Heparins, Reprinted from the Journal of Thrombosis and Thrombolysis, May 2001; European Heart journal, reprinted from February 2002; American Heart Journal, October 2002*; *Circulation, Journal of the American Heart Association, February 6, 2001.* All of these were given to Aventis' Lovenox sales associates to assist them in the selling of Lovenox for off-label indications.

60. The off-label marketing schemes employed by Defendants, consist of the marketing of Lovenox for any indication other than those indications approved by the FDA. These off-label marketing schemes of Defendants caused Lovenox to be used or prescribed for the following off-label indications: (1) atrial fibrillation (bridging), (2) acute myocardial infarction (Lovenox IV Bolus), (3) mechanical heart valve replacement (bridging), (4) coronary artery bypass graft surgery ("CABG"), (5) ST-elevation myocardial infarction (Lovenox IV Bolus), (6) bariatric surgery also known as gastric bypass surgery, (7) arthroscopic-assisted surgery, (8) hemodialysis patients/renal insufficient patients, (9) hip fracture surgery, (10) trauma, (11) lower or upper extremity fractures, (12) neurosurgery, (13) spinal cord injuries, (14) acute ischemic stroke, (15) stroke, (16) percutaneous coronary intervention ("PCI") (Lovenox IV

Bolus), (17) general surgery, (18) obstetric/gynecological/pediatrics, (19) heparin-induced

thrombocytopenia ("HIT"), (20) IV dosing, and (21) cardiac catheterization.

61.     As a result of Defendants' off-label marketing schemes, Lovenox was used for

indications, other than the FDA approved indications, as identified in Exhibits A and B, attached

and incorporated herein.

## XIII.  THE ANTI-KICKBACK STATUTE

62.     The Anti-Kickback Statute states in pertinent part;

> (b) Illegal remunerations
>
> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind -
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program,
>                          * * *
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program,
>                          * * *
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. 1320a-7b.

63.      The Anti-Kickback Statute prohibits the knowing and willful offer, payment,

solicitation, or receipt of remuneration to induce federal health care program business.  The Anti-

Kickback Statute is designed to prevent financial incentives from influencing medical decisions.

64.     The Anti-Kickback Statute is intended to prohibit any type of remuneration that can tend to influence health care decisions. To protect the federal healthcare programs from these harms, Congress enacted a *per se* prohibition against kickbacks in any form, even if the particular kickback does not result in over utilization or poor quality of care. The statute creates liability for both parties involved in the kickback transaction. For purposes of the Anti-Kickback Statute, remuneration includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly, including free services.

65.     Persons who violate the anti-kickback statute forfeit their right to bill federal health care programs, and FCA liability will attach as a matter of law.

66.     The Anti-Kickback Statute prohibits any person from offering or paying anything of value to induce the recipient to refer, arrange for, or recommend a health care item or service covered by a federal health care program. 42 U.S.C. § 1320-7b(b)(2). The Anti-Kickback Statute also prohibits solicitation and receipt of anything of value. 42 U.S.C. § 1320a-7b(b)(1).

67.     The Anti-Kickback Statute is violated if the party paying or offering the remuneration intended to induce a referral of health care business. The Anti-Kickback Statute has been interpreted to create liability if any portion of the remuneration was to induce a referral.

68.     Medicare providers are required to enter into provider agreements with the government in order to participate in the Medicare program. Medicare providers certify that they will comply with all laws and regulations concerning proper practices for Medicare providers. One of the laws included in the certification is the Anti-Kickback Statute. The Federal Government has taken the position that a Medicare provider's compliance with its provider agreement is a condition for receipt of payment under the Medicare program. Providers who

violate the Anti-Kickback Statute are ineligible to participate in government health care programs, including Medicare, Medicaid, and Tricare. A provider who is in violation of the Anti-Kickback Statute is prohibited from submitting claims to the government. A violation of the Anti-Kickback Statute and the subsequent submission of claims for payment that the claimant knows are not owed makes the claims false under the FCAs.

69.     The State of Illinois' version of the federal Anti-Kickback Statute can be found at 305 ILCS § 5/8A-3.

## XIV.  THE MEDICARE AND MEDICAID PROGRAMS

70.     The Medicare program was enacted under Title XVIII of the Social Security Act, in 1965, to pay for certain healthcare services based primarily on age. 42 U.S.C §§ 426, 426A. Part A of the Medicare program authorized payment for institutional care, including hospitals, skilled nursing facilities and home health care. 42 U.S.C §§ 1395c-1395i-4. Medicare Part B helps to cover the cost of doctors' services and outpatient care. Unlike Medicare Part A, Part B services are not paid on a DRG basis. Services are reimbursed under Part B based on the services performed adjusted to the geographic area. Lovenox used off-label and billed to Medicare Part B are attached in Exhibit Q.

71.     The Department of Health and Human Services ("HHS") administers the Medicare Program 42 U.S.C §§1395 et seq., and the Medicaid Program Title XIX of the Social Security Act, 42 U.S.C §§1396 et seq. The Center for Medicare and Medicaid Services ("CMS") is the agency of HHS that is directly responsible for the administration of the Medicare Program. Typically, insurance companies act as fiscal intermediaries to assist in the administration of Medicare Part A.

72.     Medicaid is a program, which provides medical assistance for individuals and families with low incomes.  The Medicaid program became law in 1965 and is jointly funded by the states and the federal government.

73.     Medicaid is administered by the Illinois Department of Healthcare and Family Services formerly know as the Illinois Department of Public Aid.

74.     In order to receive payment from Medicare, hospitals submit to the government cost reports.  Cost reports are the final claim that a provider submits for items and services provided to Medicare beneficiaries.

75.     At the end of the hospital's fiscal year, the hospital files a cost report, stating the amount of reimbursement it believes it is due for services provided to beneficiaries during the year.  42 U.S.C § 1395g(a); 42 C.F.R. § 413.20, see also 42 C.F.R. § 405.1801(b)(1).  Medicare relies and uses the cost report to determine whether the provider is entitled to additional reimbursement or owes a refund to Medicare in relation to the interim payments already received from Medicare to the provider, known as the NPR Settlement Amount.  The hospitals and the fiscal intermediary, based on the interim payments seek to achieve a zero NPR Settlement Amount.

76.     Every cost report contains a certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.  Hospital cost reports include a certification page, which includes the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

77.     Every provider who will submit claims through a fiscal intermediary must submit a certification statement, which includes the following:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

78.     The provider is also required to immediately notify the Medicare program if the provider becomes aware that the information in the application is not true, correct, or complete.

79.     A provider is required to disclose all known errors and omissions in its claims for Medicare reimbursement to the fiscal intermediary.  Providers have a specific duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulent to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure  . . . be guilty of a felony.

80.     All hospitals that prescribed Lovenox off-label did at all times material to this complaint submitted cost reports that attested among other things to the certifications noted above.

## XV.   ANTI-KICKBACK VIOLATIONS

81.     Aventis encouraged, overtly or covertly, its Lovenox sales representatives to

provide items of value to physicians and others in order to induce health care program business for Lovenox. These items of value included grants and other items of value for physicians, pharmacists and others who were in a position to influence the purchase of Lovenox. These acts violated the Anti-Kickback Act, 42 U.S.C. § 1320a-7b.

82.     Aventis also paid excessive fees to speakers to encourage their continued use and or promotion of Lovenox for unapproved indications.

83.     Ben Muoghalu, a pharmacist was paid $20,000 in 2001 by Aventis over a five-day period in 2001 to give ten sham one-hour talks. Muoghalu was paid to speak on the prophylaxis of ischemic complications of unstable angina. Muoghalu was paid in order to induce him to keep Lovenox on hospital formularies that are under his control. On October 22, 2001, Muoghalu was paid to speak at 8 am in Elgin, Illinois, at 12 p.m. in Aurora, Illinois, and 3 p.m. in Joliet, Illinois. On October 23, 2001, Mr. Muoghalu was paid to speak at 8 a.m. in Waukegan, Illinois, and at 12 p.m. in Kankakee, Illinois. On October 25, 2001, Muoghalu was paid to speak at 11 a.m. in Urbana, Illinois and at 3 p.m. in Danville, Illinois. On October 26, 2001, Muoghalu was paid to speak at 8 a.m. in Joliet, Illinois.

84.     Aventis would also give kickbacks disguised as unrestricted grants to organizations to induce their continued use and or promotion of Lovenox for unapproved indications. An unrestricted grant of $16,000 was given to Rockford Memorial Hospital, agreement date June 17, 2002. An unrestricted Grant of $30,000 was given to Midwest Heart Foundation, agreement date June 7, 2002. An unrestricted Grant of $25,000 was given to Illinois Bone and Joint Institute, agreement date, January 24, 2003.

85.     Additional kickbacks disguised as grants were given by Aventis to Arlington Convention Center, $10,000; Midwest Heart Foundation, $10,000; Illinois Bone and Joint

Institute, $25,000; Illinois Bone and Joint Institute $15,000; Marc Cohen, $23,500; Eastern

Vascular Society, $6,000; New York Chapter American College of Emergency Physicians,

$5,000; American Heart Association, $6,000; Atlantic Health Systems, $6,000; St. Barnabus,

$20,000;  Henry Ford Health System, $10,500; The Care Group, $15,700; the Cleveland Clinic

Foundation, $20,000; Cardiology Associates, $7,000; the Linder Center for Research and

Education, $50,000; the Cleveland Clinic Foundation $25,000;  Owen-Cardinal Health

Company, $10,000;  Coastal Bend Health, $10,000; Trauma and Critical Care Foundation,

$15,000; Ochsner Clinic Foundation, $5,000; American Heart Association, $5,000; Southern

Colorado Heart Institute, $5,000; Cardiovascular Institute of the South, $25,000; UTMB

Continuing Education, $14,970; University of Texas, Medical School, $10,000; Arlington

Convention Center; Ben Taub General Hospital, $15,000; the Texas Society of Hospital

Pharmacists, $10,000; Dallas Academy of Internal Medicine, $15,000; Orthopedic Research

Institute, Inc. via Christi Regional Medical Center, $10,000; Cardiovascular Institute of the

South, $12,500; University of Kansas, $6,000; California Orthopedic Association, $5,000;

Rockwood Clinic, $5,000; Scripps Mercy Hospital, San Diego, $10,000; American Heart

Association, $6,000; Scripps Clinic Academic Affairs, $15,000; Orthopedic Surgeons Network

of Arizona, $10,000; The Queen's Medical Center, $5,000; Henry Mayo Newhall Memorial

Hospital, $5,000; and William Beaumont Hospital, $10,000.

  86.  Defendant Aventis has engaged in a practice of offering remunerations in

exchange for the referral of Lovenox associated with federal health care business.  Corporations

such as Aventis can act only through the conduct of their agents and employees, or other persons

authorized or employed to act for it.

  87.  To prove a corporation liable for the actions of its employees the offense or act

must be committed by an agent or employee of the defendant. In committing the offense, the agent or employee must have intended, at least in part, to benefit the defendant, and the offense or act of the agent or employee must have been committed within the authority or scope of the agent's or employee's employment. An act is within the authority of the agent or employee if it concerns a matter whose performance is generally entrusted to the agent or employee by defendant. Moreover, it is not necessary that the particular act was itself authorized or directed by the defendant.

88. The employees/agents of Defendant, the sales representatives, and personnel charged with the speaker events and grant programs, were all authorized to act on Aventis' behalf and the offer of remunerations was done at least in part to benefit their employer Aventis. The increases sales of Lovenox benefited Defendant Aventis.

89. Specifically, Ben Muoghalu, a pharmacist at Provena St. Joseph Medical Center, Joliet, Illinois, and on that hospital's pharmacy formulary committee, conspired with Aventis Regional Manager Joseph Levato, to give and receive kickbacks to encourage the use of Lovenox and to recommend that Lovenox be placed or remain on the hospitals list of approved drugs.

90. On October 15, 2001, Levato initiated a bogus speaker event, program #1232, with Muoghalu as the event speaker. Levato sought Aventis to pay Muoghalu $2000.00 to speak at 8:00 am on October 22, 2001. This request for payment/kickback was processed through Aventis and approved by Aventis policy reviewer Tim Dukin, Policy Administration. Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback. (See Exhibit C).

91. On the same date, October 15, 2001, Levato initiated another bogus speaker

event, program #1249, with Muoghalu as the event speaker.  Levato again sought Aventis to pay Muoghalu $2000.00 to speak at 12:00 pm on October 22, 2001.  This payment/kickback was also approved by Aventis policy reviewer Tim Dukin, Policy Administration. Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback. (See Exhibit D).

92.     On October 15, 2001, Levato initiated another bogus speaker event, program #1353, and sought to have Aventis pay Muoghalu $2000.00 to speak at 3:00 pm on October 22, 2001, at Provena St. Joseph, Joliet, Illinois.  This request was processed through Aventis, approved by Policy Administration, and reviewed by Tim Dukin.  Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback. (See Exhibit E).

93.     On October 16, 2001, Levato initiated another bogus speaker event, program #1522, and sought to have Aventis pay Muoghalu $2000.00 to speak at 8:00 am on October 23, 2001, at St. Theresa, Waukegan, Illinois.  This request was processed through Aventis, approved by Policy Administration, and reviewed by Tim Dukin.  Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback.  (See Exhibit F).

94.     On October 16, 2001, Levato initiated another bogus speaker event, program #1527, and sought to have Aventis pay Muoghalu $2000.00 to speak at 12:00 pm on October 23, 2001, at St. Mary, Kankakee, Illinois.  This request was processed through Aventis, approved by Policy Administration, and reviewed by Tim Dukin. Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback. (See Exhibit G).

95.     On October 16, 2001, Levato initiated another bogus speaker event, program #1523, and sought to have Aventis pay Muoghalu $2000.00 to speak at 12:00 pm on October 23, 2001, at St Mary, Kankakee.  This request was processed through Aventis, approved by Policy Administration, and reviewed by Tim Dukin. Muoghalu was issued a check from Aventis and

- 31 -

was paid for this bogus speaker event as a kickback. This event, #1523 was scheduled at the same time as event #1527. (See Exhibit H).

96.     On October 16, 2001, Levato initiated another bogus speaker event program #1524, and sought to have Aventis pay Muoghalu $2000.00 to speak at 11:00 am on October 25, 2001, at Covenant, Urbana, Illinois. This request was processed through Aventis, approved by Policy Administration, and reviewed by Tim Dukin. Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback. (See Exhibit I).

97.     On October 16, 2001, Levato initiated another bogus speaker event, program #1528, and sought to have Aventis pay Muoghalu $2000.00 to speak at 11:00 am on October 25, 2001, at Covenant, Urbana, Illinois. This request was processed through Aventis, approved by Policy Administration, and reviewed by Tim Dukin. Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback. This event, #1528, was scheduled at the same time as event #1524. (See Exhibit J).

98.     On October 16, 2001, Levato initiated another bogus speaker event program #1525, and sought to have Aventis pay Muoghalu $2000.00 to speak at 3:00 pm on October 25, 2001, at United Samaritan, Danville, Illinois. This request was processed through Aventis, approved by Policy Administration, and reviewed by Tim Dukin. Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback. (See Exhibit K).

99.     On October 16, 2001, Levato initiated another bogus speaker event program #1526, and sought to have Aventis pay Muoghalu $2000.00 to speak at 8:00 am on October 26, 2001, at Silver Cross, Joliet, Illinois. This request was processed through Aventis, approved by Policy Administration, and reviewed by Tim Dukin. Muoghalu was issued a check from Aventis and was paid for this bogus speaker event as a kickback. (See Exhibit L).

100.    Ben Muoghalu was paid an additional $14,000 in 2002, as a kickback by Aventis and disguised as speaking engagements.   Muoghalu was paid $2,000 by Aventis for each of the following speaking engagements on Lovenox Managed Care Issues given on June 30, 2002, July 10, 2002, and August 10, 2002.  Muoghalu was paid $2,000 by Aventis for each of the following speaking engagements on Prophylaxis of DVT given on September 2, 2002 (Labor Day), October 16, 2002, November 7, 2002, and December 2, 2002.  Like the forgoing, each of these speaker events was bogus and this $14,000 was paid as kickback.

101.    Each and everyone of these payments was paid by Aventis as a kickback to Muoghalu in violation of the anti-kickback statute.  Muoghalu, as an agent and employee of Provena St. Joseph Medical Center, and Levato, as an agent and employee of Aventis, violated the Anti-Kickback statute, and caused Provena St. Joseph Medical Center to submitted claims to Medicare, when in fact Provena St. Joseph Medical Center and Aventis were ineligible to participate in any government health care program.  Provena St. Joseph Medical Center was reimbursed $56,151,299 for Medicare inpatient services for fiscal year 2001 when in fact Provena St. Joseph Medical Center was ineligible to participate in the Medicare Program. Provena St. Joseph Medical Center was reimbursed $60,603,714 for Medicare inpatient services for fiscal year 2002 when in fact Provena St. Joseph Medical Center was ineligible to participate in the Medicare Program.  (See Exhibit A15 and A16.)

102.    Aventis paid Rockford Memorial Hospital on June 19, 2002, $16,000.00 as a unrestricted grant when in fact this payment was a remuneration.  The Anti-Kickback Statute is designed to prevent financial incentives from influencing medical decisions, and the $16,000.00 payment from Aventis was designed to influence those medical decisions. This payment was initiated by Agatha McNeany on May 13, 2002, and approved by Stephen Ross, Sherri Beale,

and Levato on May 13, 2002. It was further approved by Tracy Cassaro, Policy Administration on June 18, 2002. Rockford Memorial Hospital was reimbursed $46,657,013 for Medicare inpatient services for fiscal year 2002 when in fact Rockford Memorial Hospital was ineligible to participate in the Medicare Program. (See Exhibit M and Exhibit A17, line 16).

103.    Aventis paid Christ Medical Center on May 3, 2002, $22,000.00 as a unrestricted grant when in fact this payment was a remuneration. The Anti-Kickback Statute is designed to prevent financial incentives from influencing medical decisions, and the $22,000.00 payment from Aventis was designed to influence those medical decisions. This payment was initiated by Sheetal Bahel on April 16, 2002, and approved by Stephen Ross, Joel Sangerman, Kevin Hinthorne, and Brent Stansbury, on April 16, 2002. It was further approved by Tracy Cassaro Policy Administration on April 30, 2002. Christ Hospital was reimbursed $139,369,656 for Medicare inpatient services for fiscal year 2002 when in fact Christ Hospital was ineligible to participate in the Medicare Program. (See Exhibit N and Exhibit A18, line 16).

104.    Each and everyone of the other "unrestricted grants" listed in paragraphs 85 and 86 were in fact kickbacks, and caused each of those entities to be ineligible to participate in any federal health care program.

105.    Defendant Aventis' knowing and willful offer and or payment of remuneration to physicians and others, as stated herein was to induce health care program business.

## XV.    THE ENOX ® TEST

106.    In August 2000, Defendants Aventis and PharmaNetics entered into an agreement under which Defendant PharmaNetics would develop a test to detect the anticoagulant effects of Lovenox on patients with unstable angina. The purpose of this test was to overcome objections from interventional cardiologists who were unwilling to perform interventional procedures on

patients with unstable angina who were receiving Lovenox. Lovenox does not have an FDA approved application for use in the catheterization laboratory. Defendants conspired together to create a new marketing tool designed specifically to market Lovenox for an unapproved use.

107.    On April 18, 2000, PharmaNetics issued a press release, approved by Defendant Aventis, which stated "the ability to monitor the drug [Lovenox] in potential new areas of study such as Percutaneous Coronary Intervention . . . has been an increasingly important issue. We believe that by providing access to a rapid test for Enoxaparin, we will strengthen the drug's leadership position, facilitate administration in acute-care settings and help physicians manage difficult sub-sets of patients." Lovenox is not approved for Percutaneous Coronary Intervention ("PCI") or acute-care settings.

108.    On October 17, 2002, PharmaNetics issued a press release, approved by Aventis, which stated, "The ENOX® Test Card is intended to provide interventional cardiologists with the means of detecting the anticoagulant effects of enoxaparin in patients prior to percutaneous coronary interventions." Lovenox is not approved for PCI.

109.    The ENOX test was developed by PharmaNetics to detect the anticoagulation effects of enoxaparin (Lovenox) in patients who will have an interventional procedure performed known as a PCI in the catheterization laboratory ("cath lab"). Aventis entered into an agreement with PharmaNetics to develop and promote the ENOX test in order to increase the use of Lovenox in the cath lab. In a memorandum from the Lovenox Brand Team to Aventis Advanced Therapeutics Associates, dated February 2, 2003, the Aventis Lovenox sales associates were informed of the ENOX test and told that the accompanying brochure "should help you to discuss management of patients on LOVENOX® who may transition to the cath lab. The Enox test card is now available and can be used to help give skeptical physicians the evidence they need to feel

confident using LOVENOX® in this scenario." Aventis representative were instructed to work closely with PharmaNetics personnel to identify accounts that could benefit from the ENOX test. The ENOX test is designed specifically for use with Lovenox [4] and does not produce reliable results for unfractionated heparin of other LMWH except enoxaparin, which is the generic equivalent of Lovenox. Lovenox is not indicated for PCI use and the test is used as a means of overcoming physician objections to PCI usage. Aventis paid PharmaNetics $5 million develop this test. The contract between Defendants to produce a testing method to be used in off-label applications and the memorandum, dated February 2, 2003, demonstrates Defendants' knowing promotion of Lovenox for off-label uses and the corresponding submissions of false claims. On July 30, 2003, Frank Matos met with Mike Calvert, Clinical Sales Specialist, PharmaNetics. Mr. Calvert contacted Mr. Matos seeking Mr. Matos' assistance in identifying accounts to promote the ENOX test. During this meeting Mr. Calvert gave Mr. Matos several clinicals and assorted documents containing discussions of off-label uses and a list of frequently asked questions including reimbursement and test pricing. These clinicals included: *Clinical Case Update, April 2003*, which discussed the off-label use of Lovenox and states that LMWH is superior to unfractionated heparin; *Clinical Case Update, May 2003*, which discusses off-label uses of LMWH; *Clinical Case Update, July 2003*, which contains a list of unapproved studies discussing the off-label use of Lovenox; *Supplement to Interventional Cardiology Consensus Reports,* which discusses LMWH dosing guidelines for PCI.

110.    Despite the fact that Defendants' knew that Lovenox is not approved for PCI Defendants conspired to market Lovenox for such use.

---

[4] Lovenox is a low molecular weight heparin ("LMWH").

111.     As Defendant PharmaNetics stated, "although LOVENOX® is not approved for PCI Aventis nonetheless has engaged in off-label promotion of its drug for PCI." (Paragraph 18, Complaint, *PharmaNetics v Aventis*, US District Court, Eastern District of North Carolina, 03-CV-817.) PharmaNetics' ENOX test was designed to overcome objections to the use of Lovenox for PCI. (October 17, 2002 PharmaNetics' press release.)

112.     Defendants were aware of these off-label promotions and illegal marketing plans including its mid-level and senior level officers and directors.

113.      Defendants sent their marketing representatives out into the medical community to market Lovenox for off-label uses, and to mislead doctors as to the approved and safe uses of Lovenox. These false statements to doctors, which Defendants knew were false, resulted in fraudulent claims for off-label uses being submitted to the Governments. Aventis tracks its sales of Lovenox and knew that its false statements were resulting in increased prescription usage and thus reimbursement from government health care programs. These claims were either statutorily prohibited or were fraudulently induced. The illegal marketing of Lovenox is the direct cause of Lovenox's astonishing volume of off-label sales. These increased sales put patients at risk for the sole purpose of increasing Lovenox's market share.

114.     Defendants fraudulently induced physicians to write prescriptions for off-label uses by false and fraudulent misrepresentations regarding Lovenox. Defendants caused false claims to be submitted even if a particular payor does not have a specific prohibition on unapproved uses because the physician's judgment to prescribe Lovenox was tainted by the fraudulent statements made by Defendants' representatives. The fraud surrounding the efforts of Defendants to cause doctors to write prescriptions for Lovenox for unapproved uses was for the

purpose of obtaining government payments.  The initial fraudulent marketing of Lovenox for off-label uses was a step in Defendants' ultimate goal of obtaining payments from the Governments. The inclusion of this non-reimbursable cost affects not only the NPR Settlement amount, but also any outlier payments made to a hospital, even if that patient's treatment is not what triggered the outlier payment.  The hospital's outlier payments is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2).  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

115.    In 2006 Alexian Brother Hospital included on its UB Form,  7 units of 40MG/0.4ML and 30MG/0.3ML of Lovenox related to a Medicare patient identified through invoice number 421, for an off-label use associated with a patient being treated for trauma and lower or upper extremity fractures.  Lovenox was marketed by Defendant for trauma and lower or upper extremity fractures.  (Paragraph 60 of Complaint).  Trauma and lower and upper extremity fractures are not FDA approved indications or listed in a compendia as safe and effective and are thus an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government.  (Exhibit O, line 18.)  This charge was then included on Lutheran General's Cost Report for Fiscal year 2007.  Specifically it was included under Revenue Code 250, Pharmacy, and was included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B6).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what

triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

116. Alexian Brothers also included on its UB Form and on its cost reports Lovenox uses associated with trauma and lower or upper extremities in 2001-2008. These charges are identified in lines 3-22 of Exhibit O, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B1-7). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

117. In 2007 Alexian Brother Hospital included on its UB Form, 11 units of 80MG/0.8ML of Lovenox related to a Medicare patient identified through invoice number 986, for an off-label use associated with a patient being treated for coronary artery bypass graft surgery. Lovenox was marketed by Defendant for coronary artery bypass graft surgery. (See Paragraph 60 of Complaint). Coronary artery bypass graft surgery is not an FDA approved indication or listed in a compendia as safe and effective and are thus an off-label and non-

reimbursable use. This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government. (Exhibit P, line 7) This charge was then included on Alexian Brother's Cost Report for Fiscal year 2007. Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B7.) The inclusion of these non-reimbursable expenses affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

118. Alexian Brothers also included on its UB Form and on its cost reports, Lovenox use associated with coronary artery bypass graft surgery patients in 2001-2007. Each of these charges are identified in lines 6-22 of Exhibit P, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B1-7). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

119.    In 2007, Alexian Brother Hospital included on it UB Form, 1 unit of

40MG/0.4ML of Lovenox related to a Medicare patient identified through invoice number 47,

for an off-label use associated with a patient being treated for atrial fibrillation.  Lovenox was

marketed by Defendant for atrial fibrillation (Paragraph 60 of Complaint).  Atrial fibrillation is

not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-

label and non-reimbursable use.  This Lovenox use was included under the invoice number

identified above and included on the UB Form and was charged to the government.  (Exhibit O,

line 42).  This charge was then included on Alexian Brother's Cost Report for Fiscal year 2007.

Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet

D-1, Part II, line 49 of the cost report.  (Exhibit B7).  The inclusion of these non-reimbursable

expenses affects not only the NPR Settlement amount, but also any outlier payments made to

Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment.  The

hospital's outlier payment is "based on either the most recent settled cost report or the most

recent tentative settled cost report, whichever is from the latest cost reporting period."  42 CFR

412.84(i)(2).  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio,

and consequently will affect the outlier payment to the hospital.  This inclusion of non-

reimbursable Lovenox is false and is material to the government's decision in determining the

NPR Settlement Amount and in determining the hospital's outlier payments.

120.    Alexian Brothers also included on its UB Form and on its cost reports Lovenox

use associated with atrial fibrillation in 2001-2008.  These charges are identified in lines 25-44 of

Exhibit O, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1,

Part II, line 49 of the cost report.  (Exhibit B1-7).  The inclusion of this non-reimbursable

expense affects not only the NPR Settlement amount, but also any outlier payments made to

Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

121. In 2007, Alexian Brother Hospital included on it UB Form, 5 units of 60MG/0.6ML of Lovenox related to a Medicare patient identified through invoice number 786, for an off-label use associated with a patient being treated for ST-elevation myocardial infraction. Lovenox was marketed by Defendant for ST-elevation myocardial infraction (Paragraph 60 of Complaint). ST-elevation myocardial infraction is not an FDA approved indication or listed in a compendia as safe and effective and is thus is an off-label and non-reimbursable use. This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government. (Exhibit O, line 63). This charge was then included on Alexian Brother's Cost Report for Fiscal year 2007. Specifically it was included under Revenue Code 250, Pharmacy, and was included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B7). The inclusion of these non-reimbursable expenses affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-

reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

122.     Alexian Brothers also included on its UB Form and on its cost reports Lovenox use associated with ST-elevation myocardial infraction in 2001-2007.  These charges are identified in lines 47-64 of Exhibit O, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B1-7).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment.  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

123.     In 2007, Alexian Brother Hospital included on it UB Form, 3 units of 60MG/0.6ML of Lovenox related to a Medicare patient identified through invoice number 44, for an off-label use associated with a patient being treated for stent placement/angioplasty.  Lovenox was marketed by Defendant for cardiac catheritization.  (Paragraph 60 of Complaint).  Stent placement/angioplasty are types of cardiac catheritization and are not FDA approved indications or listed in a compendia as safe and effective and are thus off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above, included on the UB Form, and was charged to the government.  (Exhibit O, line 84).  This charge was then included on Alexian Brother's Cost Report for Fiscal year 2007.  Specifically it was included under Revenue Code 250, Pharmacy, and was included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B7).  The inclusion of these non-reimbursable expenses affects

- 43 -

not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

124. Alexian Brothers also included on its UB Form and on its cost reports Lovenox use associated with cardiac catheritization in 2001-2007. These charges are identified in lines 67-85 of Exhibit O, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B1-7). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

125. In 2007 Alexian Brother Hospital included on it UB Form 3, units of 40MG/0.4ML of Lovenox related to a Medicare patient identified through invoice number 790, for an off-label use associated with a patient being treated for acute ischemic stroke. Lovenox was marketed by Defendant for acute ischemic stroke (Paragraph 60 of Complaint). Acute ischemic stroke is not an FDA approved indication or listed in a compendia as safe and effective

and is thus is an off-label and non-reimbursable use. This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government. (Exhibit O, line 110) This charge was then included on Alexian Brother's Cost Report for Fiscal year 2007. Specifically it was included under Revenue Code 250, Pharmacy, and was included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B7). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

126. Alexian Brothers also included on its UB Form and on its cost reports Lovenox use associated with acute ischemic stroke in 2001-2008. Each of these charges is identified in lines 90-113 of Exhibit O, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B1-7). The inclusion of these non-reimbursable expenses affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-

reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

127.    In 2007 Alexian Brother Hospital included on it UB Form 3, units of 40MG/0.4ML  and 80MG/0.8ML of Lovenox related to a Medicare patient identified through invoice number 54, for an off-label use associated with a patient being treated for acute renal failure.  Lovenox was marketed by Defendant for hemodialysis patient/renal insufficient patients (Paragraph 60 of Complaint).  Treatment of patients suffering from Hemodialysis patient/renal insufficiency is a not FDA approved indication or listed in a compendia as safe and effective and are thus an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government.  (Exhibit O, line 136).  This charge was then included on Alexian Brother's Cost Report for Fiscal year 2007.  Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B7).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment.  The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period."  42 CFR 412.84(i)(2).  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

128.    Alexian Brothers also included on its UB Form and on its cost reports Lovenox use associated with hemodialysis patient/renal insufficient patients in 2001-2008.  Each of these charges is identified in lines 116-139 of Exhibit O,  were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B1-7).  The inclusion of these non-reimbursable expenses affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment.  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

129.    In 2007 Alexian Brother Hospital included on it UB Form 6, units of 60MG/0.6ML  of Lovenox related to a Medicare patient identified through invoice number 536, for an off-label use associated with a patient being treated for a bariatric surgery also know as gastric bypass surgery.  Lovenox was marketed by Defendant for bariatric surgery also known as gastric bypass surgery (Paragraph 60 of Complaint).  Treatment of patients with bariatric surgery, also know as gastric bypass surgery, is not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government.  (Exhibit O, line 179).  This charge was then included on Alexian Brother's Cost Report for Fiscal year 2007.  Specifically it was included under Revenue Code 250, Pharmacy, and was included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B7).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's

treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

130. Alexian Brothers also included on its UB Form and on its cost reports Lovenox use associated with bariatric surgery also know as gastric bypass surgery patients in 2001-2008. These charges are identified in lines 164-182 of Exhibit O, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B1-7). The inclusion of these non-reimbursable expenses affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

131. In 2007, Alexian Brother Hospital included on it UB Form, 9 units of 40MG/0.4ML of Lovenox related to a Medicare patient identified through invoice number 639, for an off-label use associated with a patient being treated for neurosurgery. Lovenox was marketed by Defendant for neurosurgery. (Paragraph 60 of Complaint). Treatment of patients with Lovenox for neurosurgery is not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use. This Lovenox use was

included under the invoice number identified above and included on the UB Form and was charged to the government. (Exhibit P, line 27). This charge was then included on Alexian Brother's Cost Report for Fiscal year 2007. Specifically it was included under Revenue Code 250, Pharmacy, and was included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B7). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

132. Alexian Brothers also included on its UB Form and on its cost reports Lovenox use associated with neurosurgery patients in 2001-2007. These charges are identified in lines 25-40 of Exhibit P, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B1-7). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Alexian Brothers, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

133.    In 2006 Alexian Brother Hospital included on its UB Form 4, units of 40MG syringe of Lovenox related to a Medicare Part B patient identified through invoice number 6388, for an off-label use connected with a patient being treated for atrial fibrillation.  Lovenox was marketed by Defendant for atrial fibrillation.  (Paragraph 60 of Complaint).  Treatment of patients with Lovenox for atrial fibrillation is not an FDA approved indication or listed in a compendia as safe and effective and is an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government.  (Exhibit Q, line 37).  Services are reimbursed under Part B based on the services performed adjusted to the geographic area.  Alexian Brothers' submitted false claims seeking reimbursement for the off-label and non-reimbursable use of Lovenox for atrial fibrillation.  (Exhibit Q, lines 37, 32, 28, 27, 26, 19, 14, 7, and 6.)

134.    In 2004, Alexian Brother Hospital included on its UB Form 4 units of 100MG/1ML of Lovenox related to a Medicare Part B patient identified through invoice number 6340, for an off-label use associated with a patient being treated for ST-elevation myocardial infraction.  Lovenox was marketed by Defendant for ST-elevation myocardial infraction (Paragraph 60 of Complaint).  Treatment of patients with Lovenox for ST-elevation myocardial infraction is not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government.  (Exhibit Q, line 30).  Services are reimbursed under Part B based on the services performed adjusted to the geographic area.  Alexian Brothers submitted false claims seeking reimbursement for the off-label and non-reimbursable use of Lovenox for ST-elevation myocardial infraction.  (Exhibit Q, lines 30, 10 and 9.)

135.     In 2006 Alexian Brother Hospital included on it UB Form, 5 units of

60MG/0.6ML of Lovenox related to a Medicare Part A/B patient identified through invoice

number 101 Meditech Data2, for an off-label use associated with a patient being treated for

bariatric surgery also known as gastric bypass surgery.  Lovenox was marketed by Defendant for

bariatric surgery also known as gastric bypass surgery (Paragraph 60 of Complaint).  Treatment

of patients with Lovenox for bariatric surgery, also known as gastric bypass surgery, is not an

FDA approved indication or listed in a compendia as safe and effective and is thus an off-label

and non-reimbursable use..  This Lovenox use was included under the invoice number identified

above and included on the UB Form and was charged to the government.  (Exhibit Q, line 42).

Services are reimbursed under Part B based on the services performed adjusted to the geographic

area.  Alexian Brothers submitted false claims seeking reimbursement for the off-label and non-

reimbursable use of Lovenox for bariatric surgery also known as gastric bypass surgery.

(Exhibit Q, line 42.)

136.     In 2006 Alexian Brother Hospital included on it UB Form, 1 unit of

60MG/0.6ML of Lovenox related to a Medicare Part A/B patient identified through invoice

number 91 Meditech Data2, for an off-label use associated with a patient being treated for

trauma and lower or upper extremity fractures.  Lovenox was marketed by Defendant for trauma

and lower or upper extremity fractures (Paragraph 60 of Complaint).  Treatment of patients with

Lovenox for trauma and lower or upper extremity fractures are not FDA approved indications or

listed in a compendia as safe and effective and are thus an off-label and non-reimbursable use..

This Lovenox use was included under the invoice number identified above and included on the

UB Form and was charged to the government.  (Exhibit Q, line 39).  Services are reimbursed

under Part B based on the services performed adjusted to the geographic area.  Alexian Brothers

- 51 -

submitted false claims seeking reimbursement for the off-label and non-reimbursable use of Lovenox for bariatric surgery also known as gastric bypass surgery. (Exhibit Q, lines 39, 38, 20 (lower or upper extremity fractures only) and 16.)

137. In 2001, Alexian Brother Hospital included on it UB Form, 14 units of 30MG/0.3ML of Lovenox related to a Medicare Part B/Skilled Nursing Facility patient identified through invoice number 7547, for an off-label use associated with a patient being treated for a spinal cord injury. Lovenox was marketed by Defendant for spinal cord injuries (Paragraph 60 of Complaint). Treatment of patients with Lovenox for spinal cord injuries is not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use.. This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government. (Exhibit Q, line 15). Services are reimbursed under Part B based on the services performed adjusted to the geographic area. Alexian Brothers submitted false claims seeking reimbursement for the off-label and non-reimbursable use of Lovenox for bariatric surgery also known as gastric bypass surgery. (Exhibit Q, line 15.)

138. In 2004, Alexian Brother Hospital included on it UB Form, 9 units of 60MG/0.6ML of Lovenox related to a Medicare Part B patient identified through invoice number 6428, for an off-label use associated with a patient being treated for acute ischemic stroke or stroke. Lovenox was marketed by Defendant for acute ischemic stroke or stroke (Paragraph 60 of Complaint). Treatment of patients with Lovenox for acute ischemic stroke or stroke are not FDA approved indications or listed in a compendia as safe and effective and are thus an off-label and non-reimbursable use. This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government.

- 52 -

(Exhibit Q, line 29). Services are reimbursed under Part B based on the services performed adjusted to the geographic area. Alexian Brothers submitted false claims seeking reimbursement for the off-label and non-reimbursable use of Lovenox for acute ischemic stroke or stroke. (Exhibit Q, lines 29, 22, 21, and 11 (acute ischemic stroke only)).

139. In 2006 Alexian Brother Hospital included on it UB Form, 3 units of 40MG/0.4ML of Lovenox related to a Medicare Part A/B patient identified through invoice number 99 Meditech Data, for an off-label use associated with a patient being treated for cardiac catheritization and PCI. Lovenox was marketed by Defendant for cardiac catheritization and PCI (Paragraph 60 of Complaint). Treatment of patients with Lovenox for cardiac catheritization and PCI are not FDA approved indications or listed in a compendia as safe and effective and are thus an off-label and non-reimbursable use.. This Lovenox use was included under the invoice number identified above and included on the UB Form and was charged to the government. (Exhibit Q, line 41). Services are reimbursed under Part B based on the services performed adjusted to the geographic area. Alexian Brothers submitted false claims seeking reimbursement for the off-label and non-reimbursable use of Lovenox for cardiac catheritization and/or PCI. (Exhibit Q, lines 41, 40, 35, 34, 33, 26, 25, 18, 17, 4, 3, and 2).

140. On March 17, 2007, Lutheran General Hospital included on it UB Form a 30MG/0.3ML syringe of Lovenox related to a Medicare patient identified through invoice number 323068999, for an off-label use associated with a patient being treated for repair of open tibia fracture with internal fixation. Lovenox was marketed by Defendant for trauma and lower or upper extremity fractures. (Paragraph 60 of Complaint). An open tibia fracture is considered both trauma and an extremity fracture, both of which are not FDA approved indications or listed in a compendia as safe and effective and are thus an off-label and non-reimbursable use. This

Lovenox use was included under the invoice number identified above and include on the UB Form as a $120.00 charge to the government. (Exhibit R, line 5). This charge was then included on Lutheran General's Cost Report for Fiscal year 2007. Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

141. Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with trauma and upper or lower extremity fractures in 2001-2008. These charges, identified in lines 3-37 of Exhibit R, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B8-14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

- 54 -

142.    On  October 2, 2007, Lutheran General hospital included on it UB Form a 100MG/1ML syringe of Lovenox related to a Medicare patient identified through invoice number 324611813, for an off-label use associated with a patient being treated for atrial fibrillation.  Lovenox was marketed by Defendant for atrial fibrillation (Paragraph 60 of Complaint).  Atrial fibrillation is  not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and include on the UB Form as a $1,425.00 charge to the government.  (Exhibit R, line 42).  This charge was then included on Lutheran General's Cost Report for Fiscal year 2007.  Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B14).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period."  42 CFR 412.84(i)(2).  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

143.    Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with atrial fibrillation in 2001-2008.  Each of these charges is identified in lines 40-82 of Exhibit R,  were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B8-14).  The inclusion of this non-

reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

144.    On  January 13, 2005, Lutheran General hospital included on it UB Form a 100MG/1ML injection of Lovenox related to a Medicare patient identified through invoice number 316899160, for an off-label use associated with a patient being treated for ST-elevation myocardial infraction. Lovenox was marketed by Defendant for ST-elevation myocardial infraction. (Paragraph 60 of Complaint). ST-elevation myocardial infraction ("STEMI") was not an FDA approved indication or listed in a compendia as safe and effective and was thus an off-label and non-reimbursable use until 2008. This Lovenox use was included under the invoice number identified above and include on the UB Form as a $4,452.00 charge to the government. (Exhibit R, line 92). This charge was then included on Lutheran General's Cost Report for Fiscal year 2005. Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B12). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This

inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

145.    Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with ST-elevation myocardial infraction in 2001-2007.  Each of these charges is identified in lines 87-101 of Exhibit R,  were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B8-14).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

146.    On  April 11, 2007, Lutheran General hospital included on it UB Form a 100MG/1ML syringe of Lovenox related to a Medicare patient identified through invoice number 323308379, for an off-label use associated with a patient being treated for cardiac catheterization (outpatient).  Lovenox was marketed by Defendant for cardiac catheterization. (Paragraph 60 of Complaint).  Cardiac catheterization was not an FDA approved indication or listed in a compendia as safe and effective and was an off-label and non-reimbursable use until 2008.  This Lovenox use was included under the invoice number identified above and include on the UB Form as a $566.00 charge to the government.  (Exhibit R, line 107).  This charge was then included on Lutheran General's Cost Report for Fiscal year 2005.  Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B14).  The inclusion of this non-reimbursable expense affects not

only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

147.    Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with cardiac catheterization in 2001-2007. Each of these charges is identified in lines 106-118 of Exhibit R,  were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B8-14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

148.    On  July 3, 2004, Lutheran General hospital included on it UB Form a 100MG/1ML injection of Lovenox related to a Medicare patient (inpatient) identified through invoice number 315626994, for an off-label use associated with a patient being treated for cardiac catheterization.  Lovenox was marketed by Defendant for cardiac catheterization. (Paragraph 60 of Complaint).  Cardiac catheterization was not an FDA approved indication or

listed in a compendia as safe and effective and was thus an off-label and non-reimbursable use until 2008.  This Lovenox use was included under the invoice number identified above and include on the UB Form as a $2,654.00 charge to the government.  (Exhibit R, line 130).  This charge was then included on Lutheran General's Cost Report for Fiscal year 2004.  Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B11).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period."  42 CFR 412.84(i)(2).  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

149.     Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with cardiac catheterization in 2001-2007.  Each of these charges is identified in lines 121-136 of Exhibit R,  were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B8-14).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable

Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

150.     On  January 17, 2007, Lutheran General hospital included on it UB Form a 40MG/0.4ML injection of Lovenox related to a Medicare patient identified through invoice number 322623075, for an off-label use associated with a patient being treated for mechanical heart valve replacement.  Lovenox was marketed by Defendant for mechanical heart valve replacement.  (Paragraph 60 of Complaint).  Mechanical heart valve replacement is not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and include on the UB Form as a $572.00 charge to the government.  (Exhibit R, line 161).  This charge was then included on Lutheran General's Cost Report for Fiscal year 2007. Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B14).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period."  42 CFR 412.84(i)(2).  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

151.     Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with mechanical valve replacement in 2001-2007.  Each of these charges is

identified in lines 161-164 of Exhibit R, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B8-14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

152. On June 20, 2006, Lutheran General hospital included on it UB Form a 30MG/0.3ML syringe of Lovenox related to a Medicare patient identified through invoice number 318070869, for an off-label use associated with a patient being treated for trauma and the fracture of vertebral column with a spinal cord injury. Lovenox was marketed by Defendant for trauma and spinal cord injuries. (Paragraph 60 of Complaint). Treatment of trauma and spinal cord injuries are not FDA approved indications or listed in a compendia as safe and effective and are thus an off-label and non-reimbursable use. This Lovenox use was included under the invoice number identified above and include on the UB Form as a $3,630.00 charge to the government. (Exhibit R, line 145). This charge was then included on Lutheran General's Cost Report for Fiscal year 2006. Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B13). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest

cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

153. Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with cardiac catheterization in 2001-2007. Each of these charges is identified in lines 139-158 of Exhibit R, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B8-14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

154. On July 31, 2007, Lutheran General hospital included on it UB Form a 60MG/0.6ML injection of Lovenox related to a Medicare patient identified through invoice number 324119551, for an off-label use associated with a patient being treated for intracranial hemorrhage or cerebral infraction. Lovenox was marketed by Defendant for acute ischemic stroke. (Paragraph 60 of Complaint). Intracranial hemorrhage or cerebral infraction also known as acute ischemic stroke are not FDA approved indications or listed in a compendia as safe and effective and are thus an off-label and non-reimbursable use.. This Lovenox use was included under the invoice number identified above and include on the UB Form as a $2,470.00 charge to

- 62 -

the government.  (Exhibit R, line 169).  This charge was then included on Lutheran General's Cost Report for Fiscal year 2007.  Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period."  42 CFR 412.84(i)(2).  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

155.    Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with acute ischemic stroke in 2001-2007.  Each of these charges is identified in lines 167-182 of Exhibit R,  were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B8-14).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

156.    On July 8, 2007, Lutheran General hospital included on it UB Form a 40MG/0.4ML injection of Lovenox related to a Medicare patient identified through invoice number 323911966, for an off-label use associated with a patient being treated for placement of a gastric band.  Lovenox was marketed by Defendant for bariatric surgery also known as gastric bypass surgery, an off-label use.  Bariatric surgery is not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and included on the UB Form as a $715.00 charge to the government.  (Exhibit R, 1 line 186).  This charge was then included on Lutheran General's Cost Report for Fiscal year 2008.  Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B14).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period."  42 CFR 412.84(i)(2).  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

157.    Lutheran General also includes on its UB Form and on its cost reports Lovenox use associated with bariatric surgery in 2001, and 2003-2008.  Each one of these charges, identified in lines 184-193 of Exhibit R,  were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibits B8 and B10-14).  The

inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

158. On July 7, 2007, Lutheran General hospital included on it UB Form a 40MG/0.4ML injection of Lovenox related to a Medicare patient identified through invoice number 321126799, for an off-label use associated with a patient being treated for acute renal failure. Lovenox was marketed by Defendant for hemodialysis patients/renal insufficient patients also known as acute renal failure, an off-label use. Acute renal failure is not an FDA approved indications or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use. This Lovenox use was included under the invoice number identified above and included on the UB Form as a $1,179.00 charge to the government. (Exhibit R, line 200). This charge was then included on Lutheran General's Cost Report for Fiscal year 2007. Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-

reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

159.    Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with acute renal failure in 2001-2008.  Each one of these charges, identified in lines 196-211 of Exhibit R,  were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B8-14).  The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment.  The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital.  This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

160.    On  February 17, 2006, Lutheran General hospital included on it UB Form a 100MG/1ML injection of Lovenox related to a Medicare patient identified through invoice number 320036650, for an off-label use associated with a patient being treated for craniotomy.  Lovenox was marketed by Defendant for neurosurgery.  (Paragraph 60 of Complaint).  Craniotomy is a type of neurosurgery and is not an FDA approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use.  This Lovenox use was included under the invoice number identified above and include on the UB Form as a $1,280.00 charge to the government.  (Exhibit S, line 7).  This charge was then included on Lutheran General's Cost Report for Fiscal year 2006.  Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report.  (Exhibit B13).  The inclusion of this non-reimbursable expense affects not only the

- 66 -

NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

161. Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with neurosurgery in 2001-2008. Each of these charges is identified in lines 3-21 of Exhibit S, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B8-14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

162. October 9,2007, Lutheran General hospital included on it UB Form a 100MG/1ML syringe of Lovenox related to a Medicare patient identified through invoice number 324766088, for an off-label use associated with a patient being treated for coronary artery bypass graft surgery. Lovenox was marketed by Defendant for coronary artery bypass graft surgery. (Paragraph 60 of Complaint). Coronary artery bypass graft surgery is not an FDA

approved indication or listed in a compendia as safe and effective and is thus an off-label and non-reimbursable use. This Lovenox use was included under the invoice number identified above and include on the UB Form as a $849.00 charge to the government. (Exhibit S, line 26). This charge was then included on Lutheran General's Cost Report for Fiscal year 2007. Specifically it was included under Revenue Code 250, Pharmacy, and was include on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The hospital's outlier payment is "based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period." 42 CFR 412.84(i)(2). The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

163. Lutheran General also included on its UB Form and on its cost reports Lovenox use associated with coronary artery bypass graft surgery in 2001-2007. Each of these charges is identified in lines 26-41 of Exhibit S, were included under Revenue Code 250, Pharmacy, and included on Worksheet D-1, Part II, line 49 of the cost report. (Exhibit B8-14). The inclusion of this non-reimbursable expense affects not only the NPR Settlement amount, but also any outlier payments made to Lutheran General, even if this patient's treatment is not what triggered the outlier payment. The inclusion of the non-reimbursable Lovenox will affect the cost to charge ratio, and consequently will affect the outlier payment to the hospital. This inclusion of non-

reimbursable Lovenox is false and is material to the government's decision in determining the NPR Settlement Amount and in determining the hospital's outlier payments.

## XVI.   WHISTLEBLOWER PROTECTION

164.     Ms. Kennedy began her employment as a senior sales associate for Lovenox on January 24, 2002.  During that time, Ms. Kennedy's supervisors were Joe Levato, District Manager and Steve Ross, Regional Business Director.

165.      On or about May 2002, Ms. Kennedy received a message from Mr. Levato, via Aventis' voicemail.  Mr. Levato directed Ms. Kennedy and select sales representatives to spend all funds remaining in their expense accounts by July 1, 2002.  At the time, May 2002, Ms. Kennedy had approximately $17,000.00 in her expense account.

166.     Mr. Levato advised Ms. Kennedy that the expense account funds should be spent on events that will occur post July 1, 2002, including speaker programs, entertainment and honoraria.  Mr. Levato further advised Ms. Kennedy to create false entertainment invoices and to submit those for reimbursement.

167.     Ms. Kennedy questioned Mr. Levato to as whether this practice violated fraud and abuse and various company internal controls.

168.     On or about August 2002, Ms. Kennedy reported to Aventis Human Resources Department and Healthcare Compliance Department her concerns about inappropriate use of company funds.  Ms. Kennedy spoke with Melissa Milkewitz, Human Resources, Aventis.  Ms. Milkewitz violated Ms. Kennedy's confidentiality and informed Mr. Levato as to Ms. Kennedy's allegations regarding the inappropriate use of Aventis funds.

169.     On or about August 2002, Ms. Kennedy reported the inappropriate use of company funds to Michael Johnson, VP Human Resources, United States, Commercial Division, Aventis.

170.     On or about September – October 2002, Ms. Kennedy spoke to Michael Johnson, Senior VP Human Resources Aventis and Tony Rizzello, Director of Human Resources, Aventis, together and/or separately about the off-label promotion and marketing of Lovenox in the cath lab, the improper marketing of Lovenox, and the inappropriate use of company funds. Ms. Kennedy informed Mr. Johnson and Mr. Rizzello that Ms. Kennedy's District Manager, Mr. Levato was encouraging Ms. Kennedy, and other sales representatives to promote Lovenox in the cath lab for off-label uses, and that Sherri Beale, an area sales trainer, instructed sales representatives, including Ms. Kennedy, to promote and sell Lovenox for off-label uses in order to achieve increased sales.  Furthermore, in order to assist and support these off-label promotions, Ms. Beale provided off-label studies to Ms. Kennedy and others, on or about April 2002.  Ms. Kennedy provided a copy of these materials to Mr. Rizzello.

171.     During Ms. Kennedy's conversations with Mr. Johnson and Mr. Rizzello, Ms. Kennedy informed Mr. Johnson and Mr. Rizzello that off-label studies were never used to promote off-label while she was employed as a sales representative with Johnson & Johnson. Ms. Kennedy specifically told Mr. Johnson and Mr. Rizzello that it was wrong to promote off-label and that sales representatives can only use FDA approved studies to sell on-label for the drug's FDA approved indications.

172.     It was well known by Lovenox sales representative, by Ms. Kennedy and by Ms. Kennedy's Lovenox sales supervisors that Lovenox was widely prescribed to Medicare patients. Ms. Kennedy and Aventis personnel also were aware that government sponsored health care

programs would reimburse providers for Lovenox. Ms. Kennedy reasonably believed in good faith that Aventis was committing fraud against the governments by its off-label promotion and sale of Lovenox.

173.     Subsequent to these conversations Ms. Kennedy was threatened, harassed, and in other ways discriminated against in terms and conditions of her employment by Mr. Levato and Aventis. For example, Ms. Kennedy was told by Mr. Levato that he had no respect for her, that she did not fit in, and that he could fire her at any time. Ms. Kennedy was also ostracized by fellow sales associates and placed on "special assignment" which further created a hostile work environment for her. As a result of threats, harassment and discrimination, Ms. Kennedy was forced to resign her position with Aventis in February 2004.

174.     After these acts by Ms. Kennedy, done in furtherance of an action under the FCAs, and because of her refusal to participate in activities that would result in violations of state and or federal laws, rules, or regulations, Ms. Kennedy was threatened, harassed, retaliated and discriminated against by her employer Aventis.

175.     Aventis' senior personal were aware of the illegal off-label promotion of Lovenox and the threats, harassment, retaliation, and discrimination that Ms. Kennedy was subject to because of her whistleblowing activities which were done in furtherance of an action under the FCAs, and because of her refusal to participate in activities that would result in violations of State or Federal laws, rules, or regulations.

176.     As a result of Ms. Kennedy's acts done in furtherance of an action under the FCAs, Ms. Kennedy was threatened, harassed, and in other ways discriminated against in terms and conditions of her employment by Aventis.

177.    As a result of Ms. Kennedy's refusal to participate in activities that would result in violations of State or Federal laws, rules, or regulations, Ms. Kennedy was retaliated against by her employer Aventis.

**COUNT I**
(Federal False Claims Act – Presentation of False Claims)
(31 U.S.C. § 3729 (a)(1))

178.    Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

179.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

180.    By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT II**
(Federal False Claims Act – Making or Using a False Record or Statement)
(31 U.S.C. § 3729 (a)(2))

181.    Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

182.    Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

183.    By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT III**
(False Claims Act – Conspires to Defraud)
(31 U.S.C. § 3729 (a)(3))

184.    Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

185.    Defendants knowingly conspired to defraud the United States by getting a false or fraudulent claims allowed or paid by the United States.

186.    By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT IV**
(Illinois Whistleblower Reward and Protection Act – Presentation of False Claims)
(740 ILCS 175/3(a)(1))

187.    Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

188.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the State of Illinois.

189.    By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and therefore is entitled to multiple damages under the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT V**
(Illinois Whistleblower Reward and Protection Act – Making or Using a False Record or Statement)
(740 ILCS 175/3(a)(2))

190.    Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

191.     Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Illinois.

192.     By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and therefore is entitled to multiple damages under the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT VI**
(Illinois Whistleblower Reward and Protection Act – Conspires to Defraud)
(740 ILCS 175/3(a)(3))

193.     Relators repeat and reallege each and every allegation contained above as if fully set forth herein.

194.     Defendants knowingly conspired to defraud the State of Illinois by getting false or fraudulent claims allowed or paid by the State of Illinois.

195.     By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and is entitled to multiple damages under the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT VII** [5]
(Federal False Claims Act – Whistleblower Protection)
(31 U.S.C. § 3730(h))
(Aventis)

196.     Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

---

[5] Count VII was dismissed on February 11, 2008 pursuant to the Court's memorandum opinion and order.

197.     Defendant Aventis threatened, harassed, and discriminated against Ms. Kennedy in the terms and conditions of her employment, because of the lawful acts done by Ms. Kennedy in furtherance of an action under this section.

197.     By virtue of the unlawful acts committed by Aventis, Ms. Kennedy is entitled to reinstatement with the seniority status she would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## COUNT VIII [6]
(Illinois Whistleblower Reward and Protection Act – Whistleblower Protection)
(740 ILCS 175/4(g))
(Aventis)

199.     Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

200.     Defendant Aventis threatened, harassed, and discriminated against Ms. Kennedy in the terms and conditions of her employment, because of the lawful acts done by Ms. Kennedy in furtherance of an action under this section.

201.     By virtue of the unlawful acts committed by Aventis, Ms. Kennedy is entitled to reinstatement with the seniority status she would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

---

[6] Count VIII was dismissed on February 11, 2008 pursuant to the Court's memorandum opinion and order.

## COUNT IX
(Illinois Whistleblower Act – Whistleblower Protection)
(740 ILCS 174/20)
(Aventis)

202.    Relator Kennedy repeats and realleges each and every allegation contained above as if fully set forth herein.

203.    Defendant Aventis retaliated against Ms. Kennedy for refusing to participate in activities that would result in a violation of State or Federal laws, rules, or regulations.

204.    By virtue of the unlawful acts committed by Aventis, Ms. Kennedy is entitled to all relief necessary to make her whole, including but not limited to reinstatement with the same seniority status she would have had but for the violation, two times the amount of back pay, interest on the back pay, and compensation for damages sustained as a result of the violation, including litigation costs, expert witness fees, and reasonable attorney's fees.

WHEREFORE, Relators pray that the Court enter judgment against Defendants and in favor of the Governments and Relators as follows:

A.  Order Defendants to cease and desist from violating the False Claims Acts as stated herein;

B.  Award the Governments the maximum amount of damages they sustained as a result of Defendants' actions, as well as the maximum amount of civil penalties, as permitted, for each violation of the Governments' False Claims Acts.

C.  Award Relators, Matos and Kennedy, the maximum reward allowed pursuant to the *qui tam* provisions of the Governments' False Claims Act.

D.  Award Relators, Matos and Kennedy, all costs and expenses of this action, including Attorney's fees;

E.   Order Defendant Aventis to reinstate Katy Kennedy to the seniority status she would have had but for the discrimination;

F.   Award Katy Kennedy two times the amount of back pay, plus interest, against Defendant Aventis;

G.   Award Katy Kennedy all costs and expenses including litigation costs, expert witness fees, and attorney's Fees, against Defendant Aventis; and

H.   Awarding the Governments and Relators, Matos and Kennedy, all such relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relators hereby demands trial by jury.

By:     s/ Michael C. Rosenblat
        Attorney for Relators/Plaintiffs

Dated: December 31, 2008

Michael C. Rosenblat
**MICHAEL C. ROSENBLAT, P.C.**
33 North LaSalle Street, Suite 2900
Chicago, Illinois 60602
312-948-0006

Clinton A. Krislov
Kenneth T. Goldstein
**KRISLOV & ASSOCIATES, LTD.**
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
312-606-0500

## CERTIFICATE OF SERVICE

I, Michael C. Rosenblat, an attorney, certify that I caused copies of the foregoing **Plaintiffs' Fourth Amended Complaint**, to be served pursuant to ECF as to Filing Users and pursuant to LR 5.5 as to any as to any party who is not a Filing User or represented by a Filing User, to those individuals, by depositing the same in the US Mail by 5:00 pm on the 31st day of December 2008, with proper postage prepaid.

s/ Michael C. Rosenblat

## **SERVICE LIST**

*United States of America, ex rel Kennedy et al., v. Aventis Pharmaceuticals et al.*
03C-2750

Scott Lassar, Esq.
Jaime Jones, Esq.
SIDLEY AUSTIN, LLP
One South Dearborn
Chicago, IL 60603

Stephen C. Payne
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Via US Mail

Samuel S. Miller, Esq.
Assistant United States Attorney
US Department of Justice
219 S. Dearborn
Chicago, IL 60604

Brent D. Stratton, Esq.
Office of the Illinois
Attorney General
100 W. Randolph Street, 13th Floor
Chicago, IL 60614
Via US Mail

Benjamin N. Thompson
Jennifer M. Miller
WYRICK ROBBINS YATES & PONTON, LLP
4101 Lake Boone Trail, Suite 300
Raleigh, NC 27607-7506
Via US Mail

Michael I. Leonard
MECKLER BULGER & TILSON
123 North Wacker Drive, Suite 1800
Chicago, IL 6060